No. 14-3514

# In the United States Court of Appeals for the Third Circuit

FEDERAL TRADE COMMISSION

V.

WYNDHAM WORLDWIDE CORP., a Delaware corporation,
WYNDHAM HOTEL GROUP, LLC, a Delaware limited liability company,
WYNDHAM HOTELS & RESORTS, LLC, a Delaware limited liability company,
AND WYNDHAM HOTEL MANAGEMENT, INC., a Delaware corporation

WYNDHAM HOTELS & RESORTS, LLC,

*Appellant*

**On Appeal From the U.S. District Court
for the District of New Jersey (Salas, J.)
Civil Action No. 2:13-cv-01887-ES-JAD**

**JOINT APPENDIX VOL. 2, pp. JA56-288**

| | |
|---|---|
| Michael W. McConnell | Eugene F. Assaf, P.C. |
| STANFORD LAW SCHOOL | Christopher Landau, P.C. |
| 559 Nathan Abbott Way | Susan M. Davies |
| Stanford, CA  94305 | K. Winn Allen |
| (650) 736-1326 | KIRKLAND & ELLIS LLP |
| | 655 Fifteenth St. N.W. |
| | Washington, DC  20005 |
| | (202) 879-5000 |

*Counsel for Appellant Wyndham Hotels & Resorts, LLC*

Additional Counsel Listed on Inside Cover

October 6, 2014

*Additional Counsel for*
*Appellant Wyndham Hotels & Resorts, LLC*

Douglas H. Meal
David T. Cohen
ROPES & GRAY LLP
800 Boylston Street
Boston, MA   02199
(617) 951-7000

Jennifer A. Hradil
Justin T. Quinn
GIBBONS P.C.
One Gateway Center
Newark, NJ   07102
(973) 596-4500

# TABLE OF CONTENTS

Page

*Joint Appendix Volume I*

Order Denying Wyndham Hotels & Resorts, LLC's Motion to Dismiss
(Apr. 7, 2014) [Dkt. No. 182] .............................................................................. JA1

Opinion Denying Wyndham Hotels & Resorts, LLC's Motion to Dismiss
(Apr. 7, 2014) [Dkt. No. 181] ..........................................................................JA2-43

Memorandum Opinion and Order Certifying Decision for Interlocutory Appeal
(June 23, 2014) [Dkt. No. 203] .......................................................................JA44-53

Amended Order by the Court of Appeals Granting Petition for Leave to Appeal
(July 29, 2014) [3d Cir. Case No. 14-8091] ...................................................JA54-55

*Joint Appendix Volume II*

Plaintiff Federal Trade Commission's First Amended Complaint
(Aug. 9, 2012) [Dkt. No. 28] ..........................................................................JA56-78

Transcript of Nov. 7, 2013 Oral Argument on Motion to Dismiss
(Dec. 2, 2013) [Dkt. No. 139] ......................................................................JA79-264

Civil Docket for Case No. 2:13-cv-01887-ES-JAD (D.N.J.)
(Oct. 6, 2014) ............................................................................................JA265-288

Willard K. Tom
General Counsel
Lisa Weintraub Schifferle (DC Bar No. 463928)
Kristin Krause Cohen (DC Bar No. 485946)
Kevin H. Moriarty (DC Bar No. 975904)
Katherine E. McCarron (DC Bar No. 486335)
John A. Krebs (MA Bar No. 633535)
Andrea V. Arias (DC Bar No. 1004270)
Federal Trade Commission
600 Pennsylvania Ave, NW Mail Stop NJ-8100
Washington, D.C. 20580
Facsimile: (202) 326-3062
E-mail: lschifferle@ftc.gov
Telephone: (202) 326-3377

Attorneys for Plaintiff Federal Trade Commission

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Federal Trade Commission, | No. CV 12-1365-PHX-PGR |
| Plaintiff, | |
| v. | FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF |
| Wyndham Worldwide Corporation, a Delaware corporation; | |
| Wyndham Hotel Group, LLC, a Delaware limited liability company; | |
| Wyndham Hotels and Resorts, LLC, a Delaware limited liability company; and | |
| Wyndham Hotel Management, Inc., a Delaware Corporation, | |
| Defendants. | |

1  Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

2      1.    The FTC brings this action under Section 13(b) of the Federal Trade

3  Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain permanent injunctive

4  relief and other equitable relief for Defendants' acts or practices in violation of

5  Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), in connection with Defendants'

6  failure to maintain reasonable and appropriate data security for consumers'

7  sensitive personal information.

8      2.    Defendants' failure to maintain reasonable security allowed intruders

9  to obtain unauthorized access to the computer networks of Wyndham Hotels and

10  Resorts, LLC, and several hotels franchised and managed by Defendants on three

11  separate occasions in less than two years.  Defendants' security failures led to

12  fraudulent charges on consumers' accounts, more than $10.6 million in fraud loss,

13  and the export of hundreds of thousands of consumers' payment card account

14  information to a domain registered in Russia.  In all three security breaches,

15  hackers accessed sensitive consumer data by compromising Defendants' Phoenix,

16  Arizona data center.

17              **JURISDICTION AND VENUE**

18      3.    This Court has subject matter jurisdiction pursuant to 28 U.S.C.

19  §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a) and 53(b).

20      4.    Venue is proper in this district under 28 U.S.C. § 1391(b), (c), and

21  15 U.S.C. § 53(b).

22

- 2 -

JA57

**PLAINTIFF**

5.      The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

6.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case.  15 U.S.C. § 53(b).

**DEFENDANTS**

7.      Defendant Wyndham Worldwide Corporation ("Wyndham Worldwide") is a Delaware corporation with its principal office or place of business at 22 Sylvan Way, Parsippany, New Jersey 07054.  At all times material to this Complaint, Wyndham Worldwide has been in the hospitality business, franchising and managing hotels throughout the United States.  Wyndham Worldwide transacts or has transacted business in this district and throughout the United States.  At all relevant times, it has controlled the acts and practices of its subsidiaries described below and approved of or benefitted from such subsidiaries' acts and practices at issue in this Complaint.  See Exhibit A for an organizational chart depicting the entities named as Defendants in this Complaint.

8.      Defendant Wyndham Hotel Group, LLC ("Hotel Group") is a Delaware limited liability company with its principal office or place of business at 22 Sylvan Way, Parsippany, New Jersey 07054.  Hotel Group operates a data

1    center in Phoenix, Arizona (the "Phoenix data center") that it uses to store and

2    process payment card data, and the payment card data of some of its subsidiaries,

3    including Wyndham Hotels and Resorts, LLC. Hotel Group is a wholly-owned

4    subsidiary of Wyndham Worldwide, and through its subsidiaries it franchises and

5    manages approximately 7,000 hotels under twelve hotel brands, one of which is

6    the Wyndham brand. It transacts or has transacted business in this district and

7    throughout the United States. At all relevant times, Hotel Group has controlled

8    the acts and practices of its subsidiaries described below and approved of or

9    benefitted from such subsidiaries' acts and practices at issue in this Complaint.

10        9.    Defendant Wyndham Hotels and Resorts, LLC ("Hotels and

11   Resorts") is a Delaware limited liability company with its principal office or place

12   of business at 22 Sylvan Way, Parsippany, New Jersey 07054. Hotels and Resorts

13   is a wholly-owned subsidiary of Hotel Group. Throughout the relevant time

14   period, Hotels and Resorts has licensed the Wyndham name to independent hotels

15   through franchise agreements, and provided various services to those hotels,

16   including information technology services. At all times material to this

17   Complaint, Hotels and Resorts has licensed the Wyndham name to approximately

18   seventy-five independently-owned hotels under franchise agreements. Hotels and

19   Resorts transacts or has transacted business in this district and throughout the

20   United States, including franchising hotels located in Arizona. At all relevant

21   times, Hotel Group and Wyndham Worldwide have performed various business

22   functions on behalf of Hotels and Resorts, or overseen such business functions,

- 4 -

JA59

1   including legal assistance, human resources, finance, and information technology

2   and security.  Hotel Group and Wyndham Worldwide controlled the acts and

3   practices of Hotels and Resorts that are at issue in this Complaint.

4         10.     Defendant Wyndham Hotel Management, Inc. ("Hotel

5   Management") is a Delaware corporation with its principal office or place of

6   business at 22 Sylvan Way, Parsippany, New Jersey 07054.  Hotel Management is

7   also a wholly-owned subsidiary of Hotel Group.  Like Hotels and Resorts, Hotel

8   Management licenses the Wyndham name to independently-owned hotels, but

9   does so under management agreements in which it agrees to fully operate the hotel

10  on behalf of the owner.  At all times material to this Complaint, Hotel

11  Management has licensed the Wyndham name to approximately fifteen

12  independently-owned hotels under management agreements.  Hotel Management

13  transacts or has transacted business in this district and throughout the United

14  States, including managing at least one hotel in Arizona.  At all relevant times,

15  Hotel Group and Wyndham Worldwide have performed various business

16  functions on Hotel Management's behalf, or overseen such business functions,

17  including legal assistance and information technology and security.  Hotel Group

18  and Wyndham Worldwide controlled the acts and practices of Hotel Management

19  that are at issue in this Complaint.

20        11.     Defendants Wyndham Worldwide, Hotel Group, Hotels and Resorts,

21  and Hotel Management have operated as a common business enterprise while

22  engaging in the unfair and deceptive acts and practices alleged in this Complaint.

- 5 -

1   Defendants have conducted their business practices described below through an

2   interrelated network of companies that have common ownership, business

3   functions, employees, and office locations.  Because these Defendants have

4   operated as a common enterprise, they are jointly and severally liable for the

5   unfair and deceptive acts and practices alleged below.

6   **COMMERCE**

7        12.     At all times material to this Complaint, Defendants have maintained

8   a substantial course of trade in or affecting commerce, as "commerce" is defined

9   in Section 4 of the FTC Act, 15 U.S.C. § 44.

10   **DEFENDANTS' BUSINESS ACTIVITIES**

11   **Defendants' Business Structure**

12        13.     Wyndham Worldwide is a hospitality business that, through its

13   subsidiaries, franchises and manages hotels and sells timeshares.  It conducts its

14   business through three subsidiaries, including Hotel Group.  At all times relevant

15   to this Complaint, Hotel Group's wholly-owned subsidiaries, Hotels and Resorts

16   and Hotel Management, licensed the Wyndham brand name to approximately

17   ninety independently-owned hotels under franchise or management agreements

18   (collectively hereinafter "Wyndham-branded hotels").

19   **Defendants' Network Infrastructure**

20        14.     Throughout the relevant time period, Wyndham Worldwide has been

21   responsible for creating information security policies for itself and its subsidiaries,

22   including Hotel Group and Hotels and Resorts, as well as providing oversight of

- 6 -

1    their information security programs. From at least 2008 until approximately June

2    2009, Hotel Group had responsibility for managing Hotels and Resorts'

3    information security program. In June 2009, Wyndham Worldwide took over

4    management and responsibility for Hotels and Resorts' information security

5    program.

6          15.     Under their franchise and management agreements, Hotels and

7    Resorts and Hotel Management require each Wyndham-branded hotel to purchase,

8    and configure to their specifications, a designated computer system, known as a

9    property management system, that handles reservations, checks guests in and out,

10    assigns rooms, manages room inventory, and handles payment card transactions.

11    These property management systems store personal information about consumers,

12    including names, addresses, email addresses, telephone numbers, payment card

13    account numbers, expiration dates, and security codes (hereinafter "personal

14    information").

15          16.     The property management systems for all Wyndham-branded hotels,

16    including those managed by Hotel Management, are part of Hotels and Resorts'

17    computer network, and are linked to its corporate network, much of which is

18    located in the Phoenix data center. Hotels and Resorts' corporate network

19    includes its central reservation system, which coordinates reservations across the

20    Wyndham brand.

21          17.     Each Wyndham-branded hotel's property management system is

22    managed by Defendants. Only Defendants, and not the owners of the Wyndham-

- 7 -

1 branded hotels, have administrator access that allows Defendants to control the

2 property management systems at the hotels. Defendants set the rules, including all

3 password requirements, that allow the Wyndham-branded hotels' employees to

4 access their property management systems.

5     18. Defendants have even more direct control over the computer

6 networks of the Wyndham-branded hotels managed by Hotel Management. Hotel

7 Management controls the "operation" of those hotels pursuant to its management

8 agreements, including their information technology and security functions and the

9 hiring of employees to administer the hotels' computer networks.

10     19. The owners of the Wyndham-branded hotels pay Defendants fees to

11 support their property management systems and to connect them to Hotels and

12 Resorts' computer network. Defendants' technical support team is responsible for

13 addressing and resolving any technical issues that a Wyndham-branded hotel has

14 with its property management system. As explained further below, Defendants'

15 information security failures led to the compromise of many of the Wyndham-

16 branded-hotels' property management system servers, resulting in the exposure of

17 thousands of consumers' payment card accounts.

18     **DEFENDANTS' DECEPTIVE STATEMENTS**

19     20. Hotels and Resorts operates a website where consumers can make

20 reservations at any Wyndham-branded hotel. In addition, some Wyndham-

21 branded hotels operate their own individual websites, which describe the

22 individual hotel and its amenities. Customers making reservations from a

1   Wyndham-branded hotel's individual website are directed back to Hotels and

2   Resorts' website to make the reservation.

3       21.    Since at least 2008, Defendants have disseminated, or caused to be

4   disseminated, privacy policies or statements on their website to their customers

5   and potential customers.  These policies or statements include, but are not limited

6   to, the following statement regarding the privacy and confidentiality of personal

7   information, disseminated on the Hotels and Resorts' website:

8           . . . We recognize the importance of protecting the privacy of
            individual-specific (personally identifiable) information
9           collected about guests, callers to our central reservation
            centers, visitors to our Web sites, and members participating
10          in our Loyalty Programs (collectively 'Customers'). . . .

11          This policy applies to residents of the United States, hotels
            of our Brands located in the United States, and Loyalty
12          Program activities in the United States only. . . .

13          We safeguard our Customers' personally identifiable
            information by using industry standard practices.  Although
14          "guaranteed security" does not exist either on or off the
            Internet, we make commercially reasonable efforts to make
15          our collection of such Information consistent with all
            applicable laws and regulations.  Currently, our Web sites
16          utilize a variety of different security measures designed to
            protect personally identifiable information from
17          unauthorized access by users both inside and outside of our
            company, including the use of 128-bit encryption based on a
18          Class 3 Digital Certificate issued by Verisign Inc.  This
            allows for utilization of Secure Sockets Layer, which is a
19          method for encrypting data.  This protects confidential
            information – such as credit card numbers, online forms, and
20          financial data – from loss, misuse, interception and hacking.
            We take commercially reasonable efforts to create and
21          maintain "fire walls" and other appropriate safeguards to
            ensure that to the extent we control the Information, the
22          Information is used only as authorized by us and consistent

- 9 -

JA64

with this Policy, and that the Information is not improperly altered or destroyed.

22.     There is a link to this privacy policy on each page of the Hotels and Resorts' website, including its reservations page.

23.     Although this statement is disseminated on the Hotels and Resorts' website, it states that it is the privacy policy of Hotel Group.

**DEFENDANTS' INADEQUATE DATA SECURITY PRACTICES**

24.     Since at least April 2008, Defendants failed to provide reasonable and appropriate security for the personal information collected and maintained by Hotels and Resorts, Hotel Management, and the Wyndham-branded hotels, by engaging in a number of practices that, taken together, unreasonably and unnecessarily exposed consumers' personal data to unauthorized access and theft. Among other things, Defendants:

    a.      failed to use readily available security measures to limit access between and among the Wyndham-branded hotels' property management systems, the Hotels and Resorts' corporate network, and the Internet, such as by employing firewalls;

    b.      allowed software at the Wyndham-branded hotels to be configured inappropriately, resulting in the storage of payment card information in clear readable text;

    c.      failed to ensure the Wyndham-branded hotels implemented

- 10 -

1    adequate information security policies and procedures prior to

2    connecting their local computer networks to Hotels and

3    Resorts' computer network;

4    d.    failed to remedy known security vulnerabilities on Wyndham-

5          branded hotels' servers that were connected to Hotels and

6          Resorts' computer network, thereby putting personal

7          information held by Defendants and the other Wyndham-

8          branded hotels at risk.  For example, Defendants permitted

9          Wyndham-branded hotels to connect insecure servers to the

10         Hotels and Resorts' network, including servers using outdated

11         operating systems that could not receive security updates or

12         patches to address known security vulnerabilities;

13   e.    allowed servers to connect to Hotels and Resorts' network,

14         despite the fact that well-known default user IDs and

15         passwords were enabled on the servers, which were easily

16         available to hackers through simple Internet searches;

17   f.    failed to employ commonly-used methods to require user IDs

18         and passwords that are difficult for hackers to guess.

19         Defendants did not require the use of complex passwords for

20         access to the Wyndham-branded hotels' property

21         management systems and allowed the use of easily guessed

22         passwords.  For example, to allow remote access to a hotel's

- 11 -

1     property management system, which was developed by

2     software developer Micros Systems, Inc., Defendants used

3     the phrase "micros" as both the user ID and the password;

4  g. failed to adequately inventory computers connected to the

5     Hotels and Resorts' network so that Defendants could

6     appropriately manage the devices on its network;

7  h. failed to employ reasonable measures to detect and prevent

8     unauthorized access to Defendants' computer network or to

9     conduct security investigations;

10  i. failed to follow proper incident response procedures,

11     including failing to monitor Hotels and Resorts' computer

12     network for malware used in a previous intrusion; and

13  j. failed to adequately restrict third-party vendors' access to

14     Hotels and Resorts' network and the Wyndham-branded

15     hotels' property management systems, such as by restricting

16     connections to specified IP addresses or granting temporary,

17     limited access, as necessary.

18  **INTRUSIONS INTO DEFENDANTS' COMPUTER NETWORK**

19  25. As a result of the failures described above, between April 2008 and

20 January 2010, intruders were able to gain unauthorized access to Hotels and

21 Resorts' computer network, including the Wyndham-branded hotels' property

22 management systems, on three separate occasions. The intruders used similar

- 12 -

JA67

1    techniques on each occasion to access personal information stored on the

2    Wyndham-branded hotels' property management system servers, including

3    customers' payment card account numbers, expiration dates, and security codes.

4    After discovering each of the first two breaches, Defendants failed to take

5    appropriate steps in a reasonable time frame to prevent the further compromise of

6    the Hotels and Resorts' network.

7                      **First Breach**

8         26.     In April 2008, intruders first gained access to a Phoenix, Arizona

9    Wyndham-branded hotel's local computer network that was connected to the

10    Internet.  The hotel's local network was also connected to Hotels and Resorts'

11    network through the hotel's property management system.  Using this access, in

12    May 2008, the intruders attempted to compromise an administrator account on the

13    Hotels and Resorts' network by guessing multiple user IDs and passwords –

14    known as a brute force attack.

15         27.     This brute force attack caused multiple user account lockouts over

16    several days, including one instance in which 212 user accounts were locked out,

17    before the intruders were ultimately successful.  Account lockouts occur when a

18    user inputs an incorrect password multiple times, and are a well-known warning

19    sign that a computer network is being attacked.  Defendants did not have an

20    adequate inventory of the Wyndham-branded hotels' computers connected to its

21    network, and, therefore, although they were able to determine that the account

22    lockouts were coming from two computers on Hotels and Resorts' network, they

1  were unable to physically locate those computers. As a result, Defendants did not

2  determine that the Hotels and Resorts' network had been compromised until

3  almost four months later.

4       28.    The intruders' brute force attack led to the compromise of an

5  administrator account on the Hotels and Resorts' network. Because Defendants

6  did not appropriately limit access between and among the Wyndham-branded

7  hotels' property management systems, the Hotels and Resorts' own corporate

8  network, and the Internet – such as through the use of firewalls – once the

9  intruders had access to the administrator account, they were able to gain unfettered

10  access to the property management system servers of a number of hotels.

11       29.    Additionally, the Phoenix hotel's property management system

12  server was using an operating system that its vendor had stopped supporting,

13  including providing security updates and patch distribution, more than three years

14  prior to the intrusion. Defendants were aware the hotel was using this unsupported

15  and insecure server, yet continued to allow it to connect to Hotels and Resorts'

16  computer network.

17       30.    In this first breach, the intruders installed memory-scraping malware

18  on numerous Wyndham-branded hotels' property management system servers,

19  thereby accessing payment card data associated with the authorization of payment

20  card transactions that was present temporarily on the hotels' servers.

21       31.    In addition, the intruders located files on some of the Wyndham-

22  branded hotels' property management system servers that contained payment card

- 14 -

1    account information for large numbers of consumers, stored in clear readable text.

2    These files were created and stored in clear text because Defendants had allowed

3    the property management systems to be configured inappropriately to create these

4    files and store the payment card information that way.

5         32.    As a result of Defendants' unreasonable data security practices,

6    intruders were able to gain unauthorized access to the Hotels and Resorts'

7    corporate network, and the property management system servers of forty-one

8    Wyndham-branded hotels – twelve managed by Hotel Management and twenty-

9    nine franchisees of Hotels and Resorts.  This resulted in the compromise of more

10   than 500,000 payment card accounts, and the export of hundreds of thousands of

11   consumers' payment card account numbers to a domain registered in Russia.

12                              **Second Breach**

13        33.    In March 2009, approximately six months after Defendants

14   discovered the first breach, intruders were able again to gain unauthorized access

15   to the Hotels and Resorts' network, this time through a service provider's

16   administrator account in the Phoenix data center.

17        34.    In May 2009, Defendants learned that several Wyndham-branded

18   hotels had received complaints from consumers about fraudulent charges made to

19   their payment card accounts after using those cards to pay for stays at Wyndham-

20   branded hotels.  At that point, Defendants searched Hotels and Resorts' network

21   for the memory-scraping malware used in the previous attack, and found it on the

22   property management system servers of more than thirty Wyndham-branded

1    hotels.  As a result of Defendants' failure to monitor Hotels and Resorts' network

2    for the malware used in the previous attack, hackers had unauthorized access to

3    the Hotels and Resorts' network for approximately two months.

4         35.    In addition to again using memory-scraping malware to access

5    personal information, in this second breach the intruders reconfigured software at

6    the Wyndham-branded hotels to cause their property management systems to

7    create clear text files containing the payment card account numbers of guests using

8    their payment cards at the hotels.

9         36.    Ultimately, the intruders exploited Defendants' data security

10   vulnerabilities to gain access to the Hotels and Resorts' network and the property

11   management system servers of thirty-nine Wyndham-branded hotels – nine of

12   which were managed by Hotel Management and thirty franchisees of Hotels and

13   Resorts.  In this second incident, the intruders were able to access information for

14   more than 50,000 consumer payment card accounts and use that information to

15   make fraudulent charges on consumers' accounts.

16                              **Third Breach**

17        37.    In late 2009, intruders again compromised an administrator account

18   on Hotels and Resorts' network.  Because Defendants had still not adequately

19   limited access between and among the Wyndham-branded hotels' property

20   management systems, Hotels and Resorts' corporate network, and the Internet –

21   such as through the use of firewalls – once the intruders had access to this

22   administrator account they were able again to access multiple Wyndham-branded

- 16 -

JA71

1 hotels' property management system servers. As in the previous attacks, the

2 intruders installed memory-scraping malware to access payment card account

3 information held at the Wyndham-branded hotels.

4       38.     Again, Defendants did not detect this intrusion themselves, but

5 rather learned of the breach from a credit card issuer. The credit card issuer

6 contacted Defendants in January 2010, and indicated that the account numbers of

7 credit cards it had issued were used fraudulently shortly after its customers used

8 their credit cards to pay for stays at Wyndham-branded hotels.

9       39.     As a result of Defendants' security failures, in this instance,

10 intruders compromised Hotels and Resorts' corporate network and the property

11 management system servers of twenty-eight Wyndham-branded hotels – eight

12 managed by Hotel Management and twenty franchisees of Hotels and Resorts. As

13 a result of this third incident, the intruders were able to access information for

14 approximately 69,000 consumer payment card accounts and again make fraudulent

15 purchases on those accounts.

16                              **Total Impact of Breaches**

17       40.     Defendants' failure to implement reasonable and appropriate

18 security measures exposed consumers' personal information to unauthorized

19 access, collection, and use. Such exposure of consumers' personal information

20 has caused and is likely to cause substantial consumer injury, including financial

21 injury, to consumers and businesses. For example, Defendants' failure to

22 implement reasonable and appropriate security measures resulted in the three data

- 17 -

JA72

1   breaches described above, the compromise of more than 619,000 consumer

2   payment card account numbers, the exportation of many of those account numbers

3   to a domain registered in Russia, fraudulent charges on many consumers'

4   accounts, and more than $10.6 million in fraud loss.  Consumers and businesses

5   suffered financial injury, including, but not limited to, unreimbursed fraudulent

6   charges, increased costs, and lost access to funds or credit.  Consumers and

7   businesses also expended time and money resolving fraudulent charges and

8   mitigating subsequent harm.

9                    **VIOLATIONS OF THE FTC ACT**

10      41.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or

11   deceptive acts or practices in or affecting commerce."

12      42.     Misrepresentations or deceptive omissions of material fact constitute

13   deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

14      43.     Acts or practices are unfair under Section 5 of the FTC Act if they

15   cause or are likely to cause substantial injury to consumers that consumers cannot

16   reasonably avoid themselves and that is not outweighed by countervailing benefits

17   to consumers or competition.  15 U.S.C. § 45(n).

18                          **Count I**

19                          **Deception**

20      44.     In numerous instances through the means described in Paragraph 21,

21   in connection with the advertising, marketing, promotion, offering for sale, or sale

22   of hotel services, Defendants have represented, directly or indirectly, expressly or

- 18 -

JA73

1  by implication, that they had implemented reasonable and appropriate measures to

2  protect personal information against unauthorized access.

3       45.    In truth and in fact, in numerous instances in which Defendants have

4  made the representations set forth in Paragraph 44 of this Complaint, Defendants

5  did not implement reasonable and appropriate measures to protect personal

6  information against unauthorized access.

7       46.    Therefore, Defendants' representations as set forth in Paragraph 44

8  of this Complaint are false or misleading and constitute deceptive acts or practices

9  in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

10  **Count II**

11  **<u>Unfairness</u>**

12       47.    In numerous instances Defendants have failed to employ reasonable

13  and appropriate measures to protect personal information against unauthorized

14  access.

15       48.    Defendants' actions caused or are likely to cause substantial injury

16  to consumers that consumers cannot reasonably avoid themselves and that is not

17  outweighed by countervailing benefits to consumers or competition.

18       49.    Therefore, Defendants' acts and practices as described in Paragraph

19  47 above constitute unfair acts or practices in violation of Section 5 of the FTC

20  Act, 15 U.S.C. §§ 45(a) and 45(n).

21

22

## **CONSUMER INJURY**

50.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## **THIS COURT'S POWER TO GRANT RELIEF**

51.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

B.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies

1   paid, and the disgorgement of ill-gotten monies; and

2         C.    Award Plaintiff the costs of bringing this action, as well as such

3   other and additional relief as the Court may determine to be just and proper.

4

5                         Respectfully submitted,

6                         Willard K. Tom
                         General Counsel

7

**Dated: August 9, 2012**

8                         Lisa Weintraub Schifferle

9                         Kristin Krause Cohen
                        Kevin H. Moriarty

10                        Katherine E. McCarron
                       John A. Krebs

11                        Andrea V. Arias
                       Federal Trade Commission

12                        600 Pennsylvania Ave
                       N.W. Mail Stop NJ-8100

13                        Washington, D.C. 20580
                       Facsimile: (202) 326-3062
                       E-mail: lschifferle@ftc.gov

14                        Telephone: (202) 326-3377

15                        Attorneys for Plaintiff
                       Federal Trade Commission

16

17

18

19

20

21

22

- 21 -

1

2                           CERTIFICATE OF SERVICE

3   I hereby certify that on August 9, 2012, I electronically transmitted the attached
    document to the Clerk's Office using the CM/ECF System for filing and
4   transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

5   Eugene F. Assaf, Esq. eassaf@kirkland.com
    K. Wynn Allen, Esq. winn.allen@kirkland.com
6   Douglas H. Meal, Esq. douglas.meal@ropesgray.com
    Anne M. Chapman, Esq. achapman@omlaw.com
7   David B. Rosenbaum, Esq., drosenbaum@omlaw.com
    Attorneys for Defendants, Wyndham Worldwide Corporation, et al.

8
                                          s/   Lisa W. Schifferle
9

10

11

12

13

14

15

16

17

18

19

20

21

22

# EXHIBIT A
## Defendants' Corporate Structure

- Wyndham Worldwide Corporation (Wyndham Worldwide)
  - Wyndham Hotel Group (Hotel Group)
    - Wyndham Hotel Management (Hotel Management)
      - Wyndham-branded hotels under management agreements
    - Wyndham Hotels and Resorts (Hotels and Resorts)
      - Wyndham-branded hotels under franchise agreements

```
 1              UNITED STATES DISTRICT COURT.
                FOR THE DISTRICT  OF NEW JERSEY
 2              Civil 13-1887  ES

 3

 4     FEDERAL TRADE COMMISSION,

 5                    Plaintiff,      MOTIONS
                                      TO DISMISS
 6
                      V.
 7
       WYNDHAM WORLDWIDE
 8     CORPORATION, ET AL,

 9                    DEFENDANTS.
       - - - - - - - - - - - - - - - - - - - - - - - -
10

11                                NEWARK, NEW JERSEY
                                  NOVEMBER 7, 2013
12

13
       B E F O R E:   HONORABLE ESTHER SALAS,
14                     UNITED STATES DISTRICT JUDGE

15
                    A P P E A R A N C E S:
16
       KEVIN HYLAND MORIARTY, ESQ.
17     KRISTIN KRAUSE COHEN, ESQ.
       JONATHAN ELI ZIMMERMAN, ESQ.
18     FOR THE FEDERAL TRADE COMMISSION.

19     GIBBONS
       BY:  JUSTIN T. QUINN, ESQ.
20          AND
       KIRKLAND & ELLIS
21     BY:  EUGENE ASSAF, ESQ.
       AND:  K. WINN ALLEN, ESQ.
22     For the Defendants.

23

24

25
```

1

2           Pursuant to Section 753 Title 28 United
    States Code,  the following transcript is certified to
3   be an accurate record as taken stenographically in the
    above-entitled proceedings.
4                               S/LYNNE JOHNSON

5       - - - - - - - - - - - - - - - - - - - - -

6

7

8

9

10

11

12           LYNNE JOHNSON, CSR, CM, CRR
             OFFICIAL COURT REPORTER
             UNITED STATES DISTRICT COURT
13           P.O. BOX 6822
             LAWRENCEVILLE, NEW JERSEY  08648
14            CHJLAW@AOL.COM

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Good morning to everyone.  Please
 2     be seated.
 3              We are on the record in the matter of Federal
 4     Trade Commission versus Wyndham Worldwide Corporation
 5     et al, civil 13-1887.  Let me have appearances by
 6     counsel.
 7              MR. MORIARTY:  Kevin Moriarty on behalf of
 8     the Federal Trade Commission.
 9              MR. ZIMMERMAN:  Jonathan Zimmerman on behalf
10     of the Federal Trade Commission.
11              MS. COHEN:  Kristin Cohen for the FTC.
12              MR. QUINN:  Justin Quinn for the defendants.
13     Along with me at counsel table is Eugene Assaf, K.
14     Winn Allen and Douglas Meal.  Also with me are
15     representatives from Wyndham, Marcus Banks  and Korin
16     Neff.
17              Mr. Assaf will be arguing the authority
18     question.  Mr. Allen will be answering any questions
19     with respect to the common enterprise and if your
20     Honor has any questions on the motion to stay, I will
21     be addressing those.
22              THE COURT:  Perfect.  Be seated.
23              Let me tell you the order we are going to go
24     today.  We are going to start with whether Section 5,
25     unfair authority extends to data security and if so,
```

```
 1    does it govern the security of payments, payment card
 2    data.  So what we are going we are going to deal first
 3    as it was in the briefs.  Count 2, the unfairness
 4    claim.
 5             Let's deal with the first issue, whether
 6    again, as I said a moment ago, Section 5 unfairness
 7    authority extends to data security, and issue two then
 8    will be whether the FTC is required to provide fair
 9    notice of what Section 5 requires.
10             And then issue three will be whether
11    unfairness is adequately pled by the plaintiffs.
12             We then will move to the second argument,
13    count 1, which is the deception claim, and we will
14    have argument on that claim.  Then at some point we
15    will probably break.  We will come back and we will
16    deal with the other Wyndham entities' motions to
17    dismiss and finally we will deal with the motion to
18    stay discovery.  That is the order in which we will be
19    conducting argument today.
20             Let's start with, it is the first issue, I
21    would like to open with defendants.
22             Counsel, I know that you feel that Section 5,
23    the unfair authority, extends to data security.  You
24    do not believe it does.  I will hear from you now.
25             Let me apologize in advance to counsel.  I
```

```
 1   tend to ask a lot of questions.  I tend to interrupt
 2   counsel, when they are speaking and it is not meant to
 3   be rude.
 4          I just want to get to the issues that I am
 5   wrestling with, having prepared for this hearing
 6   today.
 7          So I will let you start, counsel, but your
 8   fairy provided fair warning that we are going to have
 9   a number of questions for you.
10          MR. ASSAF:  Gene Assaf on behalf of Wyndham.
11          Thank you, your Honor, for the time and quite
12   clearly the attention you are devoting.  I also thank
13   you for your warning, but I will say having done this
14   now for 25 years, it is a pleasure to be in front of a
15   litigator because I will be ready to hear your
16   questions.
17          I know when you have them you will fire them.
18   Hopefully I will have some answers for you.
19          Your Honor, as an initial matter, before we
20   start, in order to assist the Court and quite frankly
21   to assist the parties, what my practice is, and I
22   would ask permission to approach the Court and the
23   clerks.  I have a deck that will we will run through.
24   I think I have ordered it in the same order as your
25   Honor, so we would start at the beginning.
```

```
 1              I think I could address some of the issues as

 2    we go along.  Obviously, if your Honor has questions I

 3    could go to different parts.

 4              What I tried to do is graphically represent

 5    some of the issues in the brief, and condense those

 6    down into a slide or two for each issue.  If that is

 7    okay with your Honor, may I approach the courtroom

 8    deputy with copies of the deck.

 9              THE COURT:  Please.  Approach Mr. Selecky, if

10    you have a copy for my law clerks as well as, I don't

11    know as well as for Ms. Johnson.

12              MR. ASSAF:  Yes, your Honor.

13              May I approach?

14              THE COURT:  Great.

15              MR. ASSAF:  May it please the Court, this was

16    the overview I actually prepared in anticipation of

17    the Court's questions which I think actually tracks

18    some of the Court's questions.  So I will jump right

19    to the issues, and as the Court once framed it, does

20    the FTC have a statutory authority under Section 5 to

21    regulate data security.

22              Before I get there, your Honor, I would like

23    to take a few minutes to level the table and put it in

24    context, this is the parties and the issue and then I

25    will get into the statutory analysis issue.
```

```
1              So the factual background.  Obviously on one
2     side is the FTC, and I think it is very important to
3     start off here.  This is not, not some anti government
4     plot.  I have the greatest respect for the FTC, the
5     historical missions, the results for the consumers.
6     This is a fair minded discussion of whether, what they
7     do under their consumer protection actions for
8     consumers extends to data security.
9              So that is the FTC on one side.
10             On the other side is obviously Wyndham
11    hotels.  And one of the things that we are going to
12    hear today, both in terms of the pleadings issues, and
13    the statutory issues and the fair notice issue, is one
14    of the key things here that I will keep coming back to
15    is that the allegation is that that these Wyndham
16    branded hotels, you have Wyndham in Parsippany, but
17    then there are Wyndham-branded hotels, they own a
18    whole series of franchises, Ramada, Howard Johnson,
19    Wyndham.
20             And what the FTC, the crux of their
21    allegation, is that cyber criminals use certain
22    techniques to access personal information on the
23    Wyndham branded hotels property management server.  So
24    let's just step back how, I got into this, I said oh,
25    they are hacking into Wyndham.
```

```
1         Clearly, as you will see, they did hack into
2    Wyndham's computer servers, but the credit card
3    information we are talking about was actually stored
4    on the local hotels server, the franchisees, if you
5    will.  So that is why we are going go to get into the
6    issue of how far the authority goes for the FTC to
7    regulate not only the company here in Parsippany, but
8    then franchisees who are storing credit card
9    information at their individually owned hotels all
10   over the country.
11        The third set of parties here is Amici.   I
12   think there are a couple of points I would like to
13   emphasize at the outset here.
14        First of all, as the Court I am sure has
15   observed, it is unusual for the amicus to come in at
16   the District Court level.  This is the first Article
17   III Court to weigh in on this issue and it has
18   obviously much interest.  The two entities I would
19   like to call out here, your Honor, is the NFIB, small
20   business group.  350,000 members averaging $500,000 in
21   revenue a year in sales.  And their average number of
22   employees are ten.
23        And again, I would say it is significant that
24   they decided to weigh in at the District Court because
25   as we will see later in terms of fair notice issues,
```

```
 1   and the FTC's argument on consent degrees decrease, a
 2   large number of consent decrees in the data security
 3   area are from small businesses.
 4        As your Honor knows from your prior days on
 5   the bench as a magistrate, discovery costs are
 6   enormous, especially as you would imagine data
 7   security cases.  So these people I think, they don't
 8   have a chance to contest this, a realistic chance to
 9   object.  They have to enter a consent decree, because
10   otherwise they will go out of business if they fight
11   the FTC.
12        The second group is  the International
13   Franchising Association.  1300 franchisors, so if you
14   are driving down the highway, it is, everybody.  Tim
15   Horton, Subway, whenever you see a franchise, most
16   likely they are a member of this organization.  Why do
17   they have an interest, your Honor?  Because that
18   pleading that I showed you initially, can they be held
19   for the Subway Sandwich Shop's protection of data
20   security in Peoria, so that is why they are in.
21        Okay.  Factual background.  There is just the
22   first slide, then we are going, we have one more and
23   we will get into more of  the background.  These cyber
24   attacks occurred in 2008.  I think it is undisputed
25   that they were perpetrated by Russian cyber criminals.
```

```
 1            THE COURT:  Let me ask a question.  It
 2   happened in 2008.  My understanding, at least, from
 3   trying to track it in the complaint, in about April of
 4   2008, who was in charge of the data security at that
 5   time, 2008, April, 2008?
 6            MR. ASSAF:  Well, in terms of, a couple of
 7   answers to the question.  Wyndham obviously is
 8   responsible for the data security at their corporate
 9   center.  But as made clear on our website, including
10   the very policy that the FTC refers to, the
11   franchisees are responsible for their own maintenance
12   of credit card information, which makes sense.  You go
13   into a Ramada in South Bend, Indiana, they swipe your
14   card, they have your information.  And yes, they have
15   to communicate with Wyndham in Parsippany, but the
16   crux of the allegation is that the South Bend, Indiana
17   Ramada had the credit card information.  So your
18   Honor, clearly we are responsible for servers in
19   Parsippany.  Clearly.
20            THE COURT:  That is what I am -- all right.
21   You are admitting you are responsible for servers in
22   Parsippany, but with respect to maintaining and
23   keeping confidential this information you say it falls
24   on the independently owned franchisee.
25            MR. ASSAF:  Yes, your Honor.  And to your, I
```

```
1    think your next question is preempted, is that it did

2    start in 2008, and what happened is very sophisticated

3    malware was used to crack into our system.  I am going

4    to show you in a second from down the hall, there is a

5    criminal indictment, there are actually two of them

6    here, which allege very similar facts which I will get

7    to, Russian cyber criminals put malware on the system,

8    in the back door like they did for us, and they came

9    back later and used the back doors to gain entry to

10   the system.

11            THE COURT:  So in April, 2008, you would say

12   the information was being held and the responsibility

13   was being held by the independently owned franchisees,

14   right.

15            MR. ASSAF:  Yes, your Honor.

16            THE COURT:  Then at some point counsel,

17   though, I know, I told you I was going to interrupt

18   you.  At some point, doesn't Wyndham Worldwide

19   Corporation takeover in terms of management of the

20   information?

21            MR. ASSAF:  Yes.

22            THE COURT:  Counsel, I appreciate Power

23   Point, and I am not in any way trying to give any one

24   a hard time today, but the end result is, I can assure

25   you I have read every brief.  I have gone and looked
```

Case 18-1435, Document 34, 07/17/2018, 2341759, Page39 of 238    Case 2:13-cv-01887-ES-JAD Document 364-1 Filed 10/07/2014 Page 12 of 39 PageID: 11593

12

1   up every publicly available document even though you

2   did not provide me, which I ask in the future both

3   sides, if you cite to something, even if it is

4   publicly available, I would ask that each of you take

5   the time to at least provide me one courtesy copy of

6   the document, and in particular, I am speaking of the,

7   I believe, counsel, the  way you pronounce it is

8   CISPA.

9          You indicated in your brief, it is passed on

10  4/18/2013.  My understanding, my research, correct me

11  if I am wrong, I will get to that.  You think it is

12  sitting in committee and not currently law.  But we

13  will get to that.  That wasn't provided, but I found

14  it late last night late.  My point is I will have

15  questions for you.

16          I want to let you present what you are going

17  to present.  But I want to get to some of the heart

18  and the meat of the questions that I have.  So one of

19  the questions is, at some point, at least FTC is

20  saying that Worldwide Corporation took over some of

21  the management of this information.  And I wanted to

22  hear you on that because you seem to be indicating

23  that it really, all the information was in the hands

24  during all of the breaches of these independently

25  owned Wyndham hotels, or Wyndham-branded hotels.  I

```
 1    would like you to speak to that.

 2          MR. ASSAF:  Sure.  In terms of Wyndham's

 3    response, they did undertake remedial measures.  They

 4    hired forensic computer people to come in and try to

 5    figure out what was done, and in terms of

 6    responsibility issue that you are raising, your Honor,

 7    they notified the franchisees, they notified the card

 8    brands.  They tried to implement systems for Wyndham.

 9          But in terms of taking over responsibility

10    for data security, they still did not take over, and I

11    think that is a big legal issue, it goes back to why

12    the franchisee association is here, is that

13    franchisors at the end of the day cannot, in their

14    view, and I am going to cite the Radisson case later

15    on, should not be responsible for the computer systems

16    of the franchisees.  And how they maintain their data

17    security, especially, your Honor, when it is prominent

18    on our website that the franchisees maintain their own

19    data-security system.

20          THE COURT:  Okay.

21          MR. ASSAF:  We responded to the

22    investigation, notified the card brands, notify the

23    Secret Service, and bring on forensic accountants, or

24    forensic computer technicians.  Of the FTC later on

25    opened up an investigation, a million documents,
```

Case 18-1438, Document 34, 11/05/2018, 2417590, Page 41 of 238    Case 1:14-cv-03514-ES-JAD   Document 83-11   Filed 02/13   Page 4 of 13   Date Filed 10/07/2014 1595

14

```
 1   several witness interviews, at a cost of $5 million.

 2   They then file suit.

 3          Now, since filing suit there are two issues

 4   that talk about the cyber security framework.  There

 5   is cyber security litigation that is pending in 2012,

 6   you are right, never enacted and never signed.  In

 7   response to that, President Obama issues an executive

 8   order asking for preliminary cybersecurity framework,

 9   and then fast forward to October 28 of this year, the

10   federal government issues actually a preliminary

11   framework of cybersecurity measures that are

12   voluntary, to be sure, not the measure of law, an

13   executive order, but that we will get to later on that

14   we think provide important guideposts as to what

15   companies should and should not do going forward, and

16   so now at least those companies, arguably, will have

17   notice of what is required of them.

18          And I will just note here, your Honor, that

19   while those guidelines apply to banks, financial

20   institutions, nuclear power plants, we would still

21   comply with those guidelines as of today.  So that is

22   part of the anomaly I would suggest is part of this

23   case, is that the federal government has now issued

24   proposed, not regulations but guidelines, and we are

25   in compliance with them.
```

```
 1          THE COURT:  But getting, let's talk about

 2   whether the FTC, let's cut to the chase, whether the

 3   FTC has this authority.

 4          A lot of your arguments focus around Brown

 5   and Williamson, and the problem I am having and

 6   perhaps maybe you can tell me why this case you feel

 7   is so on point because when I read it, I really think

 8   it is distinguishable.  And the reason I think it is

 9   distinguishable is because we have a situation where,

10   as the Court said, since 1965 Congress has enacted six

11   separate statutes addressing the problem of tobacco

12   use and human health.  We don't have that situation

13   here.

14          What we have here is we do have something

15   that is rapidly evolving, and I give you that, in

16   terms of the concerns that the government has as well

17   as the sophistication of these criminals and these

18   hackers.

19          So yes, we have a situation where it is

20   rapidly evolving, but we don't have Congress speaking

21   to removing any, or extinguishing any power that the

22   FTC has.  And I read again CISPA, and there is no

23   mention of whether the FTC has the authority or not.

24   And quite frankly, where and how do you feel that this

25   case, this Brown and Williamson case is as instructive
```

 1    as you say it is?

 2              MR. ASSAF:  Okay.  Let me go to slide 23.

 3              Your Honor, the first argument is the

 4    argument about disclaiming authority.  Let me address

 5    your question as to the other statutory --

 6              THE COURT:  We will get to disclaiming.  I

 7    have questions.

 8              MR. ASSAF:  Let me address your issue on

 9    statutory -- on cases.  That is I start with what I

10    think you have been quoting, Brown and Williamson.

11    This is important, I will go through the statute.  It

12    is a two-part answer.

13              First the law.  At the time the statute is

14    enacted, it may have a range of plausible meanings.

15    Over time, however, subsequent acts can shape or focus

16    those meanings.  This is particularly where the scope,

17    as here, I would argue, is fairly broad.  And

18    subsequent statutes provide more specifically address

19    the topic.

20              So I would say to your question is there

21    actually have been subsequent, there are numerous

22    statutes since the age of data security.  They are

23    cited in our brief.  The Fair Credit Reporting Act,

24    Graham-Leach-Bliley Act, Children's On Line Protection

25    Act, to start off.  Why is that important?  That is

```
 1   important because it, because Congress, when they
 2   enacted that they said, for example, under Children's
 3   on Line Privacy Protection Act that the FTC were to
 4   issue certain regulations regarding data security.  If
 5   the FTC already had that power there would be no
 6   reason for Congress to give them additional powers
 7   there.
 8          So it ties in to what, to why I say the
 9   disclaimer issue is also important is that the FTC in
10   the early 2000s recognized they don't have authority
11   to regulate data security.
12          THE COURT:  You know what?  And I apologize.
13   Go back to that.  I do have some questions regarding
14   the disclaimer here.  Then we will go back to this
15   issue.
16          Quite frankly, I am looking for case law that
17   really supports your position that because the FTC has
18   sought additional data-security legislation.  It
19   necessarily then lacks the authority under Section 5.
20   And we will get to that question.  Let me let you go
21   back to this issue of whether they disclaim authority
22   in early 2000.  Tell me why you think they did.
23          MR. ASSAF:  Okay.  I start on with the Brown
24   and Williamson statement.  I point out obviously the
25   case is not only important because it is a Supreme
```

```
 1   Court case, I think it is more important because Judge
 2   O'Connor --
 3           THE COURT:  Let the record be clear.
 4   Whenever the Supreme Court says anything, it is
 5   incredibly important and I would of course defer to
 6   our Supreme Court.  However, when I believe the case
 7   is distinguishable, I have to ask you why then the
 8   Court needs to consider it when I think it is perhaps
 9   clearly distinguishable.  That being said, go ahead
10   and state what you, what are you saying.
11           MR. ASSAF:  Justice O'Connor I think lays out
12   three possible ways in which an agency action would be
13   seen as outside their authority.  The first is
14   disclaimer.  The second is other statutes address it,
15   and what I think it is shorthand for is is that when
16   Congress acts in specific ways,  it trumps a more
17   general way or gives meaning to it, and the third
18   issue would be especially an issue of rigorous public
19   debate, it is hard to believe that Congress would have
20   ceded this debate to an agency when the statute is
21   either silent or ambiguous.
22           Let me address the first on disclaimer.  In
23   1998 Chairman Pitofsky at the FTC was testifying on,
24   this shows you how quickly things have developed, the
25   worldwide web.  And so I think the FTC was struggling
```

1    as to what their authority was under the worldwide

2    web, both on the privacy side, and on the security

3    side.

4            And here, if you look at what Chairman

5    Pitofsky says, two things in his prepared remarks.  He

6    is trying to ask about whether businesses will self

7    regulate or whether the FTC should be given authority

8    to regulate businesses.  And his view is, as expressed

9    to Congress, that the FTC should get that authority

10   because it is unclear whether businesses will actually

11   self regulate, and he turns out obviously to be right.

12   Businesses aren't going to self regulate.

13           What he says is that the Commission believed

14   that unless the industry can demonstrate that it has

15   developed and implemented broad-based and effective

16   self regulatory promise by the end of the year,

17   additional governmental authority in this area would

18   be appropriate and necessary.

19           Footnote, important footnote:  Currently the

20   Commission has limited authority to prevent abusive

21   practices in this area.  The Act grants the Commission

22   authority to seek relief for violation of the  Act's

23   prohibitions on unfair and deceptive practices

24   affecting commerce, an authority limited in this

25   context to ensuring that websites follow their stated

1    information practices.

2         So your Honor, I would argue the first time

3    the FTC grapples with it, they say are authorities are

4    limited here to if a company says something on their

5    website, they have to abide by it.  They are not

6    talking here about the FTC determining what data-

7    security practices companies should adopt.  So this is

8    the first step.

9         That same testimony, your Honor, the FTC

10   says, gee, this is geared more towards privacy than

11   security.  And I would suggest that is actually not

12   correct.  It was not limited to on line privacy.  In

13   fact, if you look, this is for the record slide 19.

14        This is the conclusion in which he is asking

15   for legislative authority from Congress, and again,

16   the level said this, Justice O'Connor said you weren't

17   asked for authority, you already have it.  He says

18   consumers are deeply concerned about the privacy and

19   security of their own, and their children's personal

20   information in the on line environment and are looking

21   for greater protection.

22        And he then says, the four basic information

23   practices required by the statute would be.  So this

24   is proposed.  Would be.  And then four is security

25   integrity.  Websites would be required to take

```
 1   reasonable steps to protect the security integrity of
 2   that information.
 3           So at least the first step, your Honor, not
 4   dispositive.  So 1998, I would argue there is at least
 5   a step towards acknowledging.
 6           THE COURT:  But in 2000, and again, the
 7   Commission has argued, the SEC has argued that they
 8   began, and there are a number of these consent
 9   decrees, and they have said in their arguments that
10   they have brought more than 40 data-security cases, 19
11   of which allege unfair practices, and have routinely
12   reported a publicized data-security program.
13           The end result, counsel, that I would ask you
14   is this at some point in early 2000 they began
15   bringing these actions, quite frankly, you know, I
16   think Congress would presumably have notice of these
17   actions, since they have been occurring in over 40,
18   actually over 40 data-security cases, 19 of which,
19   again, alleged unfair practices.
20           Well, if there was a shift, I am not
21   necessarily saying there was a shift in position with
22   respect to whether they possessed the authority or
23   not, they began in 2000 certainly pursuing these
24   actions, and regulating and indeed enforcing when
25   necessary.  So you say what to that?
```

```
 1          MR. ASSAF:  Great question.  I totally agree
 2   they started this roughly 2003, 2004.  I have -- there
 3   are cases cited in our brief, consent decrees cannot
 4   form agency action interpretive guidance.  It is how I
 5   started off, your Honor.
 6          When you go again against, this is one of the
 7   names, Bonzai Auto Sales, that company is going to
 8   agree to a consent decree no matter what.  One, we
 9   have great law that consent decrees are not litigated
10   cases and don't form interpretive guidance.  There is
11   also the practical matter that there is no, in terms
12   of consent decrees, we never have the information of
13   investigations that don't end in consent decrees.
14   That would also arguably provide some guideposts as to
15   what is permitted and what is not permitted.
16          But more importantly, your Honor, this is
17   right on all fours with Brown and Williamson, when the
18   FDA starts to regulate tobacco, Congress obviously
19   knew that.  Congress didn't take action then to
20   circumscribe that authority.  There were lots of
21   complaints in Congress about it.  But the proper
22   process is that in order to an Article III Judge
23   decides whether the agency has authority.  So the fact
24   that the FTC, like the FDA, starts regulating
25   something, and Congress doesn't do anything in the
```

```
 1    first instance, doesn't surprise me because it is an
 2    exactly what happened in Brown and Williamson.
 3    Congress didn't do anything.  Instead, an Article III
 4    Judge said, you know what, we get to look at that and
 5    decide whether the agency is acting properly.
 6              THE COURT:  So your point about the consent
 7    decree, though, wasn't TJ Maxx one of the entities
 8    that entered into a consent decree with the FTC?
 9              MR. ASSAF:  Absolutely.
10              THE COURT:  That is a pretty big company you
11    would argue, right?
12              MR. ASSAF:  In term of that policy issue, let
13    me address that straight on.  You have company
14    companies.  TJ Maxx.  BJ's, who have entered into
15    consent decrease and it is not going to come as any
16    surprise to your Honor, is that there is of course a
17    path of least resistance, even though some of the
18    consent decrees require a monitor for 20 years, that
19    at some point, as we see from the record, companies
20    large and small say you know what?  It is just not
21    worth it to fight with the FTC.
22              THE COURT:  All right.  I was countering your
23    point about it being a mom-and-pop type of thing.  We
24    are dealing with some pretty sophisticated companies
25    and they did enter into consent decrease.  In
```

24

```
1   fairness, I think they would have also have resources
2   to litigate, if necessary.
3          But that being said, let's move on.
4          Continue, counsel.
5          MR. ASSAF:  Back to the 21.  Chairman
6   Pitofsky in  1998, and then in 2000 the Commission
7   publishes a position on the dissemination of certain
8   information.  And it is clearly in the context of the
9   FCC Act and in the context of COPPA, the Child on Line
10  Privacy Protection Act.  I quote from 21.  The
11  Commission's authority over the collection and
12  dissemination of personal data collected on line from
13  Section 5 of the act, and from COPPA, Which governs
14  the collection of information from children under the
15  age of 13.
16          Importantly at the end, as a general matter,
17  however, the Commission lacks authority to require a
18  firm to adopt information, practice, policies or to
19  abide by the fair information practice principles on
20  their websites or portions of their websites not
21  directed to children.
22          I marry that, your Honor, that that is not
23  just Wyndham saying, oh, that must help us.  I marry
24  that to the side panel to academic commentary on this
25  very proposition from Michael Scott and the
```

```
 1   Administrative Law Review.  In its 2000 report the
 2   Commission indicated that while it had power under
 3   Section 5 to pursue deceptive practices, such as the
 4   website's failure to abide by its stated privacy
 5   policy, it could not require companies to adopt
 6   privacy policies in the first place.
 7            And then 2001.  Lee Peeler, who is the
 8   associate director of advertising practices at the
 9   FTC, in response to some issues with Amazon, and it is
10   also important to understand, as I talk about this
11   slide, the FDA was an issue over 60 years because of
12   tobacco.  I think we could all recognize, though, that
13   obviously the digital age is moving much more quickly,
14   so the timeframe here is compressed, but I would say
15   in 2001, again, the FTC is going on record saying our
16   authority is about deceptive practices.  Deceptive
17   practices.  This is before any of the consent decrees
18   that you referenced earlier in your questions or that
19   are part of the record.
20            So I would say, this is the graphic on the
21   next page, that from 2000, from 1998 to 2001, there
22   are several statements, and then things clearly happen
23   rapidly, your Honor.  There are a number of consent
24   decrees after that.  But on the disclaimer point, I
25   submit that Wyndham has a very strong argument that
```

```
 1   the FTC, at minimum, was conceding that their only

 2   jurisdiction was over deception and whether your

 3   website was deceptive in terms of what you are doing

 4   for information policy.

 5           Nobody from the FTC, prior to these consent

 6   decrees, were talking about the fact, and this is

 7   important, an important point, I have shown you actual

 8   disclaimers, but I would actually turn it around as

 9   well.  Where is there any where from 1998 to 2001

10   where the FTC is telling Congress or even the

11   Executive Branch, that we have this authority, so

12   there is no need to do anything?

13           There is nowhere.  So I have at least three

14   instances.  I would submit the FTC actually doesn't

15   have anything where they go to Congress and in 2000

16   say we have this authority.  There is nothing you need

17   to do.

18           THE COURT:  Okay.  Counsel, I am going to

19   shift gears.  I want to hear from the FTC on this

20   issue.  Counsel does point to three separate instances

21   where it appears at least that there is a question of

22   whether you have authority.  And I would like to hear

23   your position only on that point.  Then we will move

24   back to counsel's additional points with respect to

25   this issue.
```

```
 1            MR. MORIARTY:  Your Honor, Kevin Moriarty on
 2   behalf the FTC.
 3            As I understand it, you only want me to talk
 4   about the disclaimer issue?
 5            THE COURT:  I want to hear what you say in
 6   response to the issue that in 1998 there was
 7   apparently at least statements on the record
 8   indicating that you did not have the authority to do
 9   what you are doing right now.  And you would say what,
10   sir?
11            MR. MORIARTY:  As a preliminary matter I
12   would say this case is very different than Brown and
13   Williamson.  I would say you understated how unique
14   Brown and Williamson was.  What the Supreme Court held
15   was that the FDA's assertion of authority would
16   require the FDA to actually illegalize tobacco
17   products.  And so the conflict between the FDA's
18   position there and this 35 years of regulation was
19   unique, and not anything like the conflict we are
20   talking about here.
21            But just to limit it to the disclaimer, you
22   know, I think all those reports and testimony to
23   Congress, they really speak for themselves, and so
24   there is not much use in trying to reframe them or
25   argue about what they mean.  They are all about, in
```

1    context, they are about this question that was coming

2    up in the late nineties and the early two thousands

3    which is that people were suddenly discovering that

4    companies on line were capable of collecting enormous

5    amounts of information about consumers, and people

6    were suddenly realizing this.  They are saying what

7    are we go to go do about this?

8           And The FTC's position was, well, to the

9    extent that we can't articulate an injury as a result

10   of this collection, the companies are just collecting

11   this information, and consumers aren't injured, then

12   all we can do is prevent companies from lying or

13   deceiving consumers about what their collection

14   practices are.  And so implicit in all of these is

15   look, if consumers are injured, then of course we have

16   jurisdiction because unfairness applies when consumers

17   suffer substantial injury.

18          So that is sort of, that is the ground work

19   of all these cases.

20          And you know, I can point out different spots

21   in each of these cases where, or each of these reports

22   or testimony where that is clear.  You know, where we

23   are limited in our authority to deceptive and unfair

24   practices.  But that is throughout these cases.  And

25   essentially the question that is being answered in

```
 1   these supposed disclaimers is okay, well, consumers
 2   aren't injured, is there anything you can do about it?
 3   And the answer is well, if they are not injured, no,
 4   we can only stop companies  from receiving it --
 5           THE COURT:  So you are saying it is a
 6   consistent position.
 7           MR. MORIARTY:  It is consistent.  The other
 8   issue which again sort of gets into the weeds of Brown
 9   and Williamson, which I think is hardly worthwhile.  I
10   think Brown and Williamson is such an unusual case.
11           The other issue here is in Brown and
12   Williamson, what happened was the FDA denied it had
13   authority.  Very clear disclaimer for 70 years.  As a
14   result of that denial this regulatory regime built up.
15   But the earliest alleged disclaimer that they can
16   identify from the FTC is 1998 or 2001.  These data-
17   security statutes that they are pointing to which
18   again don't conflict in any way with the FTC Act, in
19   the case of the FCRA, it was passed in the early
20   seventies, maybe 1970, so there is no way that
21   Congress was reacting to our disclaimer by passing
22   that law.  So really the disclaimers I think are a
23   red herring.
24           THE COURT:  Okay.  Thank you, counsel.
25           MR. MORIARTY:  Sure.  Thank you.
```

```
 1          MR. ASSAF:  So addressing point one of the
 2   disclaimer, again, I think the FTC is saying that
 3   there is nothing -- there is no affirmative evidence,
 4   I think their position is that it must have existed
 5   all along.  There is nothing in this record, your
 6   Honor, which they point to saying we have unfair
 7   jurisdiction and authority to regulate data security
 8   under the unfairness prong.
 9          I don't, again, if I am wrong I will be
10   corrected,  but I think there is nothing in this
11   record.  So that is step 1 of Brown and Williamson, or
12   at least one possible way that Brown and Williamson
13   would apply.
14          The second one is what you and I started to
15   talk about, the second prong.  You don't have to prove
16   any one of the prongs, but they are all instructive,
17   to be sure.
18          And the second prong is whether there is
19   other legislation that fills out the void and puts me
20   meat on the bones as to what Congress meant.  I
21   actually think these are three, not only pre statutes,
22   but three regulatory schemes that confirm that the FTC
23   did not have unfair authority to regulate data
24   security, and I am going to tell you why.
25          Let's take Bliley, 1999, right in the sweet
```

Case 18-1514, Document 63, 11/05/2018, 2411759, Page32 of 58    Case 1:14-cv-03514-ESH Document 34-1 Filed 10/07/2014 Page 3 of 61612

31

```
 1    spot of the chronology.    It mandates data-security
 2    requirements for financial institutions and instructs
 3    the FTC to establish standards for those financial
 4    institutions to protect against unauthorized access or
 5    use of customer records or information.
 6          And what is so important about this, your
 7    Honor, I hate to preview fair notice, but there is
 8    some spillover, obviously.   The FTC then issues
 9    regulations saying what data-security practices should
10    apply under the statute.
11          Secondly, the Children's on Line Privacy
12    Protection Act, 1998.  Same thing.  Directs the FTC to
13    promulgate regulations requiring website operators to,
14    quote, establish and maintain reasonable procedures to
15    protect the confidentiality, security, and integrity
16    of personal information collected from children.
17          And your Honor, let me address one issue.  If
18    the FTC is right on how broad Section 5 is of the FTC
19    Act, there is certainly not an exemption for children
20    under the FTC Act and whether it protects children's
21    data security.  So why would Congress, in 1999, seek
22    then to create a regime for the FTC to not only have
23    authority to regulate data security but it actually
24    then tells them, which gets to our fair notice point
25    later on, and they do this, issue regulations
```

```
 1    protecting that data security.

 2           And then finally, the Fair Credit Reporting

 3    Act, yes, although it was passed in the 1970's, to be

 4    sure, it was amended again in the sweet spot of this

 5    debate as we would describe it in 2003, that again,

 6    you impose requirements for the collection, disclosure

 7    and disposal of data collected by consumer reporting

 8    agencies and require the FTC and other agencies to

 9    develop rules for data handling in order to curb

10    identity theft.

11           And the FTC then issues regulations on this,

12    on data security.

13           So under the second prong or the second test

14    for Brown and Williamson of whether there is other

15    statutes out there that give guidance as to whether

16    Congress has already given them this authority, I

17    would argue there are at least three instances in

18    which Congress then, in the sweet spot of this

19    chronology, acts to give the FTC data security

20    authority, and does so, and also tells them to issue

21    regulations.

22           These cases are cited in our brief.  I think,

23    I respectfully disagree that -- Brown and Williamson

24    is not only obviously authority, but it is, it also

25    provides an analytical framework that other courts
```

 1   have used in terms of what an agency tries to do

 2   something other than it is authorized to do.  I don't

 3   think it is that unusual, it is not a one-off case.

 4   You have cases from the EPA, under the controlled

 5   substances Act, the FCC has been challenged.  All on

 6   whether other statutes have made it clear that a broad

 7   statute is actually more narrow than the agency has

 8   said.

 9          This is kind of a footnote to Brown and

10   Williamson, your Honor, then I will get to the third

11   point.  I don't know where this comes up.  I think it

12   is in the FTC's brief in this section so I will put it

13   here.  The FTC I think also drops a footnote saying,

14   well, no matter what, we get deference to determine

15   our own jurisdiction, and they cite to the U.S.

16   Supreme Court case, City of Arlington, Texas vs. FTC

17   from this summer.

18          Well, your Honor, in Arlington, importantly,

19   Arlington cites Mead, U.S. versus Mead, and it is an

20   eight to one decision by Justice Souter.  Here is what

21   Arlington says about Mead.  Mead denied Chevron

22   reference to action by agency, with that rule-making

23   authority, that was not rule making. I said there is

24   spillover from the rule making and the authority.  The

25   FTC by the way for the first time ever, we briefed

```
 1   this in Arizona and here, there is one line in their
 2   brief, we get deference to determine our own
 3   jurisdiction.
 4          That only applies, your Honor, if they in
 5   fact have issued rules and engaged in rule making as
 6   to their jurisdiction.  So I just wanted to pick this
 7   up, I didn't want to leave it there.
 8          Now, I will get to the third point of Brown
 9   and Williamson, and that is, I will try to tie it all
10   together, and address whether there is a limiting
11   principle here.
12          Okay.  The third point, Justice O'Connor
13   says, there is disclaimer, there are other statutes.
14   Then she says we must be guided to a degree by common
15   sense as to the manner in which Congress is likely to
16   delegate a policy decision of such economic and
17   political magnitude to an administrative agency.  We
18   are confident that Congress could not have intended to
19   delegate a decision of such economic and political
20   significance in so cryptic a fashion.
21          That may be, that is the explanation point
22   here.  Because what we know from the record, and I am
23   sorry your Honor had to go find the bills.  There is
24   charitably described a very healthy and rigorous
25   debate between Congress and its interest groups and
```

```
 1    the Executive Branch as to data security and how it
 2    should be done.  That is going on right now.  And so I
 3    would say Justice O'Connor's words only confirm under
 4    Brown and Williamson that there can be no argument
 5    that Congress, having now dealt with cybersecurity
 6    legislation and trying to figure out what it means,
 7    has delegated that to the FTC, and in fact, your
 8    Honor, I read the 2012 debates, and the 2013 debates,
 9    there is no serious notion the FTC is going to run
10    data security for U.S. businesses.
11         The whole question is Homeland Security, and
12    what Homeland Security is going to do in connection
13    with the National Institute For Standards and
14    Technology.  And you would expect that.  They have all
15    the standards, and, why would Homeland Security be --
16         THE COURT:  I also circled the section with
17    respect to common sense because the only problem I am
18    having is that if this is, if indeed Congress never
19    meant to give the authority to the FTC and they know
20    that, and it is clear, I have a hard time thinking
21    that based on the security breaches and based on what
22    we are talking about in this case, that Congress would
23    not have acted years ago, and I understand the Court
24    can't read into Congress's inaction or silence.  But
25    is the answer to not regulate?  Is the answer to not
```

```
 1    allow them -- they are again protecting consumers.
 2    And it just seems strange to me that if that was so
 3    clear, that Congress never intended to give them the
 4    authority, then we would not have seen some form of
 5    regulation, and instead what we are seeing is things
 6    are sitting right now and I understand this country is
 7    where it is right now, economically and the crisis
 8    that we all are faced with, various issues that face
 9    this nation at the moment.
10            But the end result is to say that Congress
11    didn't intend to give them the authority and yet there
12    has been nothing done, and in fact, we have, as you
13    noted, there is, they refuse to they refused to act in
14    2012.  So does that make, when we talk about common
15    sense, does that make any sense?
16            MR. ASSAF:  An excellent question right at
17    the key point of obviously the third point of Justice
18    O'Connor's analysis, that it actually I think cuts the
19    other way in that while cybersecurity is clearly a
20    problem, your Honor, the notion that the FTC is
21    regulated through this litigated case against Wyndham
22    when there are hundreds of data security breaches a
23    year, and that there are no guidelines as the safe
24    harbors, I appreciate that is a significant problem.
25            But there are also resources that address it.
```

```
 1   There is obviously the criminal aspects, to go after

 2   cyber criminals.  There are state Attorney Generals

 3   who are very active in this area in terms of consumer

 4   protection.  They all have consumer bureaus that are

 5   very active in this area.

 6          Unfortunately, there is a debate about this,

 7   too, but it is clearly out there.  We know it from

 8   Reilly in the Third Circuit and Hannifer, there is

 9   equivalent of private Attorney Generals or private

10   plaintiffs that if there is real injury that satisfies

11   Article III injury, they also bring claims for data

12   security.

13          So I would actually argue this is the worst

14   of all worlds, because you have agencies, Homeland

15   Security, criminals, state Attorney Generals, private

16   parties, going after it.  And here you have the FTC,

17   who has refused to issue any regulations or rules or

18   safe harbor provision as to what actually is required.

19          So your Honor, taking your premise that it is

20   a significant problem, if it is a significant problem,

21   I would argue then the FTC, or some agency of the

22   federal government, should articulate exactly what

23   companies should do for safe harbor provision, which

24   gets into fair notice, I know, but that is the, that

25   is to come -- that is, I think, the common sense
```

```
 1    issue.

 2              THE COURT:  But what would you say to the

 3    SEC's position, we issued guidelines, protecting

 4    personal information and guides for businesses.  We

 5    also have issued consent decrees, we are trickling

 6    into fair notice, but I think they really do overlap

 7    in many ways.  I mean, they haven't necessarily, they

 8    would say, sat silently, have they?

 9              MR. ASSAF:  On two points, on the guidelines

10    which I think, they cite for the first time these

11    guidelines, I went and looked on the website, and they

12    are just that.  I mean, we will go through them on the

13    Elmo, but they are the most vague and ambiguous

14    guidelines.  You should take reasonable measures to

15    protect.  They are a truism.  And something that in

16    law school we would say wait a second, you can't hold

17    somebody liable for telling them, here are the

18    guidelines, you have to act reasonably and we later

19    determine what is reasonable.

20              I actually think the guidelines undercut

21    their position.

22              In terms of consent degree, we will get into

23    this, but the law is very clear the consent degree is

24    not agency enforcement action that provides action to

25    aggrieved parties.  You saw this,  for example, in the
```

1   FCC.  The FCC consent decree, later on the parties

2   agree, they can't then be held liable because another

3   network entered into a consent decree that wasn't

4   litigated.

5           But your Honor I think is getting at a point

6   that I think bothers everybody, this is how I started

7   off, is that how -- the FTC has an important mission

8   here.  Consumers are out there, and the FTC is trying

9   to protect consumers, to be sure.  How do you

10  reconcile this?

11          I actually think, your Honor, that when you

12  look at it that way, as to the FTC's mission, what

13  they have done prior to this, and why I think it shows

14  that this case is outside that authority, is that they

15  -- under the unfairness and deceptive policy

16  provisions, they have gone after fraudsters, phishers,

17  schemers.  Unscrupulous people.  You just look at the

18  Bureau of Protection website.

19          I couldn't find a single situation in which a

20  third party who is the victim of a criminal attack,

21  and we know that, I think you could take judicial

22  notice of that given the indictment here.  We have

23  Russian cyber criminals.  They are not going to

24  dispute it.

25          You have a third party who then becomes the

```
 1   focus of the FTC's consumer protection bureau.  I

 2   think the way you reconcile all these cases is, it

 3   goes back to my limited experience with criminal law,

 4   kind of a malum in se issue.  Are you engaged, are you

 5   as an actor engaged in a malum in se issue.  I think

 6   it has basis in the case law.  All of the cases we

 7   talk about, with the exception of this one, the data

 8   security group of cases, they are limited to malum in

 9   se things, where the actor is doing something they

10   know is just wrong.

11          You go back to the primary purpose of Section

12   5 is to lessen the harsh effects of caveat emptor or

13   the DC Circuit.  They talk about what exactly the

14   primary categories are:  withholding material

15   information; making unsubstantiated advertising

16   claims; using high pressure techniques; depriving

17   consumers of various post purchase remedies.

18          I have no quarrel, your Honor, that data

19   security is a very important issue.  I suspect the

20   government, including the Homeland Security and

21   President Obama's White House are trying to do

22   something about it.  My quarrel is that the FTC

23   actually isn't the agency that is supposed to be doing

24   it.  They are supposed to be, and I would make the

25   argument as a policy matter that the resources of this
```

```
1    agency historically and brilliantly have been used to

2    protect consumers from scammers, thieves, and

3    deceivers.

4           And to actually now go into an area which

5    they have no real expertise, and I am going to get to

6    that, your Honor.  One of the issues in this case,

7    your Honor, is hardware configurations, security

8    networks.  I know we are putting the cart before the

9    horse, but we are accused of having unsecured hardware

10   configurations or security standards that are lax.

11          Well, your Honor, we can show on the Elmo, we

12   asked for discovery from the FTC as to what proper

13   hardware configurations are.  Forget that they haven't

14   issued regulations for it.  What they say is we object

15   to answering that because the term "hardware

16   configuration" is vague and ambiguous.

17          So your Honor, that is what I am saying.  I

18   can assure you, if I asked Homeland Security or the

19   National Institute of Standards and Technology what

20   hardware configurations are required for a proper

21   network, I know now from President Obama's Executive

22   Order, I know exactly what is required.

23          But the FTC, with all due respect,

24   notwithstanding all the good they do for consumers,

25   has no expertise in this area.  So that is why I say
```

```
 1    it comes back to the common sense point.  I agree with

 2    you in the abstract.  But let those agencies with the

 3    sophisticated technological expertise actually publish

 4    the guidelines.

 5           I will get to that fair notice.  So your

 6    Honor, I finish up on this point saying Brown and

 7    Williamson is not a one-off case, that Justice

 8    O'Connor writing for the Court laid out three ways in

 9    which an agency action can be challenged as beyond the

10    statute's authority to that agency.  We have shown you

11    disclaimers and we have three or four of them, and

12    they have none at the relevant timeframe saying this

13    is our authority.

14           We have shown you subsequent statutes in the

15    timeframe, under Brown and Williamson, that show that

16    Congress knew how to give the FTC authority when they

17    wanted to for data security.

18           Then we come to this point which I think is

19    an important point, and that is, I would say it is not

20    consistent with common sense to think that Congress in

21    this environment, both good and bad, your Honor.  I

22    will finish off with this.  Congress couldn't do it.

23    I personally was disappointed in 2012 when they didn't

24    get the cybersecurity act, because I thought it would

25    have helped us here in this case.  But they did not do
```

1    it.

2           But the political process worked.  President

3    Obama issued an executive order.  I am going to go

4    through chapter and verse as to what that executive

5    order requires certain groups to do.  It is going to

6    become a standard that people can look at in the

7    future.  That is how it should be done.

8           THE COURT:  But, and I am going to allow

9    counsel to respond to the points made.  But when we

10   look at the executive order again, and when we look at

11   CISPA, which again is pending legislation, there is

12   nothing in there, or is there, that says that the FTC

13   lacks authority?

14          MR. ASSAF:  And we had a debate about this in

15   the briefs.  I know your Honor is getting to that

16   point.  There have been ten bills.  Six of them had no

17   savings clauses as to cybersecurity, which support us.

18   They say but yeah, four of them had savings clauses.

19   And none of those ten get enacted.

20          But again, the fact that we are having a

21   debate that Congress six times doesn't put in a

22   savings clause.  Four times does.  How could it be

23   said that their statutory authority is clear at that

24   point?  I actually think  that point cuts in our

25   favor.

```
 1                THE COURT:  Okay.  Thank you, counsel.
 2           All right.
 3                MR. ASSAF:  Thank you, your Honor.
 4                THE COURT:  Now we will have counsel for the
 5      plaintiff address the Court.  We sort of addressed
 6      disclaimer already.  We have the issue of subsequent
 7      statutes and finally rounding off with the issue of
 8      common sense.
 9                Counsel, I will hear you now.
10                MR. MORIARTY:  Thank you, your Honor.  So
11      first I want to talk about the Brown case.  The FTC
12      Act is a consumer protection act.  This FTC alleges
13      that  Wyndham engaged in practices that put consumers
14      at risk, they deceived consumers as a result about
15      these practices,  and as a result consumers suffered
16      substantial harm.
17                The substantial harm question is key here.
18      The statutes that Wyndham is talking about, COPPA,
19      GLB, the FCRA, they are all enactments by Congress
20      that provide the FTC with additional tools to protect
21      data security in certain circumstances.  Specifically,
22      when it comes to children's on line privacy, financial
23      institutions treatment, and also information
24      collections, companies' collection of consumers credit
25      information in the context of the FCRA.  What each of
```

1   these statutes does is say, either in the context of

2   the FCRA they have specific rules are in the statute

3   and in the context of COPPA and GLB, Congress stayed,

4   requested the FTC issue regulation.  But in all those

5   cases what Congress did is say when someone violates

6   the rule, when someone violates the statute, you can

7   bring a case against them.

8           And so there is no injury requirement in

9   those cases, so they are dramatically different than

10  the FTC's authority under the FTC Act.  Under the FTC

11  Act we are limited to cases where we can prove

12  substantial jury.  We have alleged substantial injury

13  here.

14          In those cases if someone collecting

15  information about children on line, that is a

16  violation.  If a financial institution fails to have a

17  written information security program that they update

18  every year in response to likely threats to their

19  information, that is a violation.  Those are

20  violations of those acts.  In this case we have to

21  prove substantial injury.  So those cases are very

22  different.

23          Of course, it bears repeating that this is a

24  very different case than Brown and Williamson.  In no

25  way do those statutes in any way conflict with the FTC

Case 18-1435, Document 68, 07/17/2014, 1275907, Page72 of 73    Case 2:14-cv-03514-ES-JAD Document 34 Filed 06/03/14 Page 46 of 86 PageID: 1627

46

```
 1    Act.
 2            And the proof is in the pudding here.  The
 3    TFT isn't enforcing the FTC Act, the unfairness
 4    portion of the FTC Act, against companies for their
 5    data-security practices since 2005, and not a single
 6    conflict has arisen.  Wyndham has identified a lot of
 7    the security laws, they appeal to this idea of common
 8    sense.  I think we have addressed that, why those laws
 9    are different.
10            But you know, the key point of Brown and
11    Williamson is there is a conflict here.  The FDA's
12    change in its position would have mooted those laws.
13    It would have directly conflicted with those laws and
14    as a result it was a Supreme Court's job to make both
15    of those laws make sense since they both existed.
16    That is why that happened that way.  There is no
17    conflict.
18            Wyndham has not identified a conflict, for
19    the last almost decade we have enforced these cases,
20    there has been no conflict.
21            Brown and Williamson is a very special case.
22    I would point out the case law, Massachusetts versus
23    EPA, I don't think it appeared in the briefs,
24    essentially had exactly the same fact pattern here.
25    The EPA said it couldn't regulate I believe CO 2 as a
```

```
 1    pollutant under the Clean Air Act because at the time
 2    the Clean Air Act was passed Congress wasn't thinking
 3    about CO 2 as a pollutant.  Then in later years other
 4    laws were passed, for example, against, required the
 5    Department of Transportation to have capped off
 6    standards for cars.  The EPA was requested to start
 7    regulating standards for CO2 and they said no, we
 8    can't do it.  Congress was not expecting it.
 9            Second of all, there are other laws that
10    couldn't plate regulation of this issue.
11            Third, it is a dramatic change in sort of the
12    political and economic atmosphere for us to regulate
13    that.  And the Supreme Court said no.  Those laws
14    don't apply.  Those don't conflict.  Brown and
15    Williamson applies where there is a clear conflict
16    between the laws.  That sort of addresses that issue.
17            I am just going to run through the points so
18    this might be disjointed.  Please ask me questions.
19    As far as deference goes, the point of FTC versus
20    Arlington is there is a distinction between a
21    statutory interpretation and a jurisdictional
22    interpretation of a statute by an agency.  Our
23    reference is whatever deference we should receive it
24    doesn't matter that Wyndham is framing this as a
25    jurisdictional question about the extent of the
```

```
 1    authority or whether it was just a standard
 2    application of the FTC Act.  It was not fully briefed,
 3    this deference issue.
 4              I think is barely worth getting into it, and
 5    the reason is this idea of deference only comes up
 6    when the statute is not clear.  In this context, we
 7    have a statute that prohibits unfair acts or practices
 8    in or affecting commerce.
 9              THE COURT:  You say clearly the statute is
10    clear.
11              MR. MORIARTY:  It is clear.  The idea that
12    the collection of payment information in exchange for
13    services, the collection, the transfer, the
14    maintenance of that payment information isn't a
15    practice in or affecting commerce?  It defies belief.
16    It is squarely within the language of the statute.  We
17    don't have to get into the deference issue at all.
18              So I will move on to the idea that there are
19    other statutes here and the stating of causes and the
20    lack of stating of causes.  As they pointed out in the
21    reply brief, there is little point of trying to read
22    tea leaves of Congressional inaction.
23              In addition, I would say in all those
24    statutes, and in some of the statutes that they have
25    identified, in some of the instances they have
```

```
 1   identified the FTC going to Congress and asking for

 2   more authority, again this goes back to the COPPA and

 3   GLB issue, if there are regulations that said if, you

 4   have to take these steps or if there is a statutory

 5   law that says you have to take these steps regarding

 6   data security, we could enforce that law in the

 7   absence of consumer injury.  That is not what is

 8   happening here.

 9           THE COURT:  The key is, in the absence of

10   injury, you would not be able to enforce.  Right?  And

11   so that --

12           MR. MORIARTY:  Unfairness requires

13   substantial injury, correct.

14           THE COURT:  Right.  So the reason that we

15   have the FCRA and COPPA is because now Congress has

16   said if there is a violation, you now have the

17   authority to act.

18           MR. MORIARTY:  Right.

19           THE COURT:  That is why you believe those

20   statutes are distinguishable from this case, and in

21   this case, you clearly, you argue there is substantial

22   injury, and therefore, you always had the authority to

23   act.

24           MR. MORIARTY:  That's right, your Honor.  I

25   wouldn't, you know, I would also point out that the
```

```
 1    fact is that under Brown and Williamson there is just,
 2    there is core issues that are missing here.  There is
 3    no indication that those laws conflict with, there is
 4    no indication that those laws abrogated or applied to
 5    -- that there is some previous lack of authority in
 6    the cases.
 7            I guess the last point I will make is that, I
 8    think the idea that the FTC lacks any sort of
 9    expertise.
10            First of all, the factual questions are
11    completely inappropriate here.  This is a motion to
12    dismiss.  The response is to the interrogatories I
13    don't think should be relevant to the Court's
14    consideration.  The idea we lack expertise is
15    contradicted expressly by these statutes that Congress
16    has passed that provide the FTC with authority to
17    issue regulations on data-security practices, to issue
18    regulations on privacy, that is, that's FCRA, GLB and
19    COPPA.  I think this is a disconnect there.
20            I guess the one other point I would make is
21    they sort of belittled the guidelines that we passed,
22    and, the guidelines that we have issued, those, the
23    guidelines are for small businesses and they are
24    important guidelines for small businesses.  A
25    sophisticated company like Wyndham,  if acting
```

Case 18-1435, Document 44, 07/27/2018, 2359077, Page78 of 238    Case 3:14-cv-03514-ES  Document 181  Filed 10/07/2014  Page 51 of 78

51

```
 1   reasonably, would probably require more than just a
 2   little booklet in order to know how they should be
 3   setting up their network when they are connecting all
 4   of these individual franchise hotels.
 5            But even those guidelines, and I don't have
 6   the particular guideline in front of me, based on the
 7   allegations in our complaint, Wyndham wasn't even
 8   complying with those guidelines that they say are very
 9   rudimentary.
10            THE COURT:  We are going  to get into the
11   guidelines in terms of fair notice.  I have a question
12   for you.  In terms of the way it works with respect to
13   getting information and guidance from the FTC as to
14   whether, and I am a large company.  Are there
15   mechanisms for these companies to sort of seek
16   advisory opinions from the FTC about the security
17   system they have in place?
18            I am just wondering, and I recognize this is
19   a motion to dismiss, but I was curious in reading the
20   papers last night that, you know, I am not familiar
21   with what a company can do to sort of get an advisory
22   opinion from the FTC as to whether their firewalls are
23   adequate, as to whether indeed their data is
24   centralized and protected.  What is the process, just
25   for my own edification?
```

```
1              MR. MORIARTY:  We are pretty squarely within
2    the fair notices category there.  I think there are a
3    lot of answers to that question, the principal one
4    being that Wyndham in its privacy policy tells the
5    consumers that they are going to take commercially
6    reasonable steps to adequately protect their data.  So
7    you know, it is an objective standard, reasonableness,
8    and for them to claim that it is now kind of a
9    meaningless standard, it sort of rings hollow.
10             But as far as advisory opinions, there are
11   not advisory opinions.  But the way companies
12   determine what is reasonable and what is not
13   reasonable is the same way companies Act in any other
14   legal context.  The entire foundation of the common
15   law negligence is requiring companies to Act
16   reasonably under the circumstances.  For example, in
17   the context of data privacy they should evaluate the
18   size and complexity of their network, evaluate the
19   type of consumer data they are collecting and storing.
20   They should evaluate industry standards.  There are
21   industry standards out there that are not associated
22   with the FTC.  There are experts out there that
23   consult with companies routinely about the data
24   security.
25             THE COURT:  I am sorry to interrupt you,
```

```
 1   counsel.

 2              Does the FTC sort of endorse any particular

 3   industry standards that are out there?  Are they

 4   published?  How is that information disseminated in

 5   terms of what the industry standard should be?

 6              MR. MORIARTY:  Industry standards are well

 7   known.  There are industry standards that specifically

 8   apply to the collection and transmission of credit

 9   card data.  The FTC does not endorse any standards,

10   particular standards.  There is a Third Circuit case

11   called Vogel which talked about whether a

12   reasonableness standard should be pinned to industry

13   standards.  The Third Circuit said no, it should

14   evaluate other reasonable things that companies in

15   that position should look at.

16              The other thing I wanted to mention about FTC

17   guidance is we have these books that we issue,

18   guidance books.  Also the adjudications are very

19   valuable.

20              In this case in particular, I think it is

21   that at page 19 of our brief, we identify a good

22   number of the other, there is, at the time we wrote

23   the brief, there were 19 unfairness cases.  I think

24   there is two more that are public.  But we identified

25   the particular types of things that companies should
```

```
 1    be looking for in order to evaluate whether their data
 2    security is reasonable.
 3          Now, we don't say here is how you should set
 4    up your router.  We don't say you should have, you
 5    know, white lists and black lists for IP addresses.
 6    We are not tech support.  We do say to them,
 7    companies, these are the types of things the FCC is
 8    looking at, you should make sure your house is in
 9    order on these things.  The FTC provides guidance
10    through these opinions, through these consent decrees.
11          THE COURT:  Thank you.  I will let you
12    address any points you want to address after counsel
13    argues with respect to whether the FTC has provided
14    fair notice.
15          MR. MORIARTY:  Thank you, your Honor.
16          THE COURT:  Thank you.  Mr. Assaf.
17          MR. ASSAF:  May I have permission to make two
18    reply points?
19          THE COURT:  Sure.
20          MR. ASSAF:  First of all, with respect to the
21    FTC's point that Graham-Leach-Bliley, COPPA, that
22    these were all cases in which Congress enacted them in
23    order to avoid the FTC having to prove injury.  That
24    was kind of how they reconcile these cases.  First of
25    all, that is not in their brief.  In fact, on page 12
```

Case 18-1387, Document 64, 10/17/2018, 2411590, Page82 of 238    Case 1:15-cv-05754-ESS Document 341 Filed 10/07/2014 Page 55 of 76 PageID #: 1636

55

 1    they say something very different.  I will get to the

 2    injury point.  Page 12 they said they were enacted in

 3    order to give the agencies rule making, and/or civil

 4    penalty authority.

 5           Now, I suspect they are running from the rule

 6    making authority, we are now paying into that.  There

 7    is nothing in this record to suggest that those

 8    statutes were enacted simply to avoid the FTC or

 9    another agency having to prove injury.  And how do we

10    know that?

11           Because no statute can be enacted --

12           THE COURT:  I don't know if that was

13    counsel's argument, necessarily.  I think counsel was

14    saying that they, they cannot act unless there is

15    substantial injury, and that this was Congress's way

16    of saying if there are violations that necessarily are

17    without substantial injury, just a violation, then

18    they are -- they made it very clear to the FTC that

19    they are free to act from that point.

20           MR. ASSAF:  That point is not on page 12 of

21    their brief.  So I heard it differently.  I heard

22    injury.  Because obviously, as your Honor knows, that

23    Congress could enact a statute eliminating the injury

24    requirement for Article III purposes, that is Reilly,

25    they have to prove injury even if there is a

```
 1   Congressional statute.  A Congressional statute can't
 2   allow them in this Court without proving some sort of
 3   injury.
 4           Secondly, your Honor, secondly, your Honor,
 5   the issue, this gets into fair notice, we are going to
 6   talk about advisory opinions.  I think the answer to
 7   that question is not only are there no advisory
 8   opinions, but I want to put a point on this as we now
 9   get into fair notice, is that the FTC said well,
10   companies should have experts, they should look at
11   industry standards.  The FTC doesn't endorse any
12   industry standard, or tell you how to set up your
13   router.
14           It is a great lead-in to fair notice, because
15   now, if this litigation goes forward, you are going to
16   hear the FTC at this podium complaining about bringing
17   in an expert that says this router configuration is
18   what should have been done, and what should be done by
19   Wyndham going forward.
20           And so  not only is there no advisory
21   opinion, but there is actually, up until today, the
22   FTC, even in their pamphlet, has never provided any
23   discussion of what actually is required.  We are going
24   to get into that with fair notice.  So let's talk
25   about that.
```

1      THE COURT:  Again, counsel, the purpose of,

2  we are here on a motion to dismiss.  And a lot of the

3  arguments that we are going to get into, and I just, I

4  am wondering whether these arguments aren't left for

5  trial, in the sense that determining whether one

6  security system is adequate and/or reasonable.  Aren't

7  these issues that, quite frankly, are best left for

8  trial, and are they necessarily ones -- an issue that

9  the Court needs to resolve in a motion to dismiss?

10      MR. ASSAF:  Let me address that, your Honor.

11  If there is a trial as to whether a company's security

12  measures were adequate or reasonable, that is a

13  separate question as to whether, today, or at the time

14  of the filing of the complaint, a company had notice

15  of what the FTC standards were.  I actually just break

16  that --

17      THE COURT:  But isn't that more for a summary

18  judgment?  Isn't the argument that you are about to

19  make, and I am going to let you make them, but aren't

20  they best left for a dispositive motion?  Once

21  discovery has been had?  Because what if indeed there

22  is some evidence, and I am by no means saying there

23  will be, but let's say there is some evidence that

24  internally Wyndham knew that there were issues, that

25  they were aware of what some of the industry standards

```
 1    that they were concerned about some of the stuff that
 2    was coming out of the consent decrees, and that they
 3    were aware that their present security system was
 4    inadequate.  Isn't that, in essence, isn't that
 5    helpful to know, and doesn't that have to actually,
 6    don't we have to let discovery play out before one can
 7    stand at a dispositive stage and say we didn't have
 8    adequate notice?
 9              MR. ASSAF:  I think that would turn fair
10    notice cases on their heads.  There would never be a
11    fair notice case on the pleadings and they are all, as
12    I see them, all these fair notice cases are on the
13    pleadings, because otherwise you would have a company
14    have to go through discovery in order to raise the
15    fair notice question.  The whole purpose of the fair
16    notice doctrine is that prior to being hailed into
17    court, and be subjected to an enforcement action, that
18    you had fair notice of what the prohibited activity
19    was.
20              THE COURT:  But the cases you cite, weren't
21    all of them summary judgment motions?
22              MR. ASSAF:  I will check that when I sit
23    down, your Honor.
24              THE COURT:  They are.  If they are not,
25    correct me.  I could have sworn they were all
```

1   dispositive motions.  They weren't brought necessarily

2   on an MTD stage.

3          MR. ASSAF:  I will check that when I sit

4   down.  I suspect now.  Let me start off with the FCC

5   cases, these are not cases in which you need to

6   develop a factual record as to what exactly the

7   regulatory environment is, because you actually know

8   on the pleadings.

9          And so could there be some summary judgment

10  issues that the Court said I need more facts just for

11  a limited issue to complete the record?  I think so.

12  But I don't think we are going to go through years of

13  discovery and determine anything else in terms of the

14  notice issue.

15         Because your question goes to two different

16  issues:  What notice were we on versus what our

17  knowledge us.  I suspect issue one as to what the

18  notice is, that is done on the pleadings.  So let's go

19  through that.

20         FCC versus Fox.  This is where we start off,

21  Supreme Court 2012, fundamental principle in our legal

22  system is that laws which regulate persons or entities

23  must give fair notice of conduct that is forbidden.

24  GE versus EPA.  In the absence of notice, for example,

25  where the regulation is not sufficiently clear to warn

 1    a party about what is expected of it, an agency may

 2    not deprive a party of property by imposing civil or

 3    criminal liability.

 4              This, so this actually goes exactly to the

 5    point that not -- here I argue there is no dispute as

 6    to whether the regulation is sufficiently clear

 7    because I am going to get to the point that they

 8    haven't published any regulations.  So this is

 9    actually the most extreme case of fair notice.

10              Most of the fair notice cases say, are these

11    regulations sufficiently clear?  Here, there is no

12    dispute on this record.  They are not going to dispute

13    it, that there is no regulation.  So that is what I

14    think, your Honor, in terms of the cases, most cases

15    come up to a court where there is actually a

16    regulation in issue.

17              So we start with the Third Circuit, Dravos

18    with an OSHRC regulation.  The Third Circuit Said the

19    agency must be able to state with ascertainably

20    certainty what protections a company must employee in

21    order to comply with the regulation.  Here I would

22    argue there is no as certainly regulation because

23    there is no regulation.  The FTC has not published any

24    rule or regulation.

25              We already know, I previewed this in the last

1    section, your Honor,  that Graham-Leach-Bliley, the

2    Fair Credit Reporting Act, and COPPA, they have

3    authority to publish rules.  But under Section 57 (a)

4    they also have the authority to prescribe rules and

5    general statements of policy, and they have not done

6    that for data security.  There is no dispute about

7    that.

8          This is where again it is not just Wyndham.

9    I would suggest there is academic commentary saying

10   the nature, format and content of the agency's data

11   security related pronouncements raise equitable

12   considerations that create serious due process

13   concerns, what I call fair notice.

14         So what are the arguments?

15         Now, I understand, your Honor, I am going to

16   get to the agency's arguments, and I understand that

17   these are requests for admissions, but I think they

18   actually filed them in this Court.  And again, there

19   is not any dispute here.  The FTC has not published

20   public information about what security software should

21   be used by a company.  Admitted.

22         And the FTC has not published any substantive

23   rules or regulations pursuant to their statutory

24   authority explaining what data security protections an

25   individual or entity must employ to be in compliance.

```
1    So I want to marry that with the Dravos quote from the

2    Third Circuit which said is an agency must explain

3    with ascertainable certainty what must be employed.

4          Here, they can never meet Dravos because they

5    have not published.  What do they say?  They say

6    reasonable notices --

7          THE COURT:  All of this sounds of summary

8    judgment.  You are asking me now to consider requests

9    for admissions, things that are outside our pleadings

10   here, counsel.  We are here on MTD.  That was one of

11   the things I struggled for the last week is many of

12   the arguments you are making to me sound like they are

13   going to be appropriately made at a later juncture.

14   But at an MTD hearing, I am having trouble

15   understanding how the Court should be considering a

16   request for admission at this point.

17         MR. ASSAF:  So let me address that, your

18   Honor.  Put the request for admission off to the side.

19   There is not going to be any dispute.  The Court can

20   certainly take judicial notice, there are no rules,

21   regulations, or policy statements published by the

22   FTC.

23         You can open CFR, you can go to the agency

24   website.  You can obviously take judicial notice of

25   that.  And they are not going to dispute it, your
```

```
 1   Honor.  It has been dispositive in their briefing.

 2   They said we haven't published rules and regulations.

 3   I am sorry on to use the RFAs, but I don't really need

 4   them.  There is no dispute they haven't published

 5   them.  On the summary judgment point the record is

 6   clear that there are no rules or regulations.  What

 7   does the FTC argue?  Instead of rules and regulations

 8   it should be reasonableness, reasonableness is the

 9   touchstone.

10          THE COURT:  What about the best practices?

11   Are you going to get me there?  Because clearly the

12   best practices, and the Court read them yesterday and

13   counsel is saying when you look at the guide, that

14   they submit he failed to follow even the very basic

15   rules that were, or at least the very basic

16   information that was provided by the FTC to businesses

17   and small businesses in this particular informational

18   paragraph.

19          MR. ASSAF:  I am definitely going to get

20   there.  Let me preview it.  First of all, I think I

21   said, reasonable practices, because even their

22   pamphlet just says reasonable practices.  They don't

23   say best practices.

24          So, I am going to get you there.  There are

25   three arguments the FTC says, or makes out.  The first
```

```
1    is, rule making is not feasible here.  That is their

2    first argument.

3          The second is we have published these consent

4    decrees and they should give you guidance.  And the

5    third is you can look at private standards or read

6    what the industry or best practice -- reasonable

7    practice is.  And I have responses to all three that I

8    think on a motion to dismiss are properly in front of

9    the Court.

10          THE COURT:  Okay.

11          MR. ASSAF:  So first I start with the FTC

12   brief on slide 46, that it would not be practicable

13   for the FTC to establish through rule-making the

14   highly particularized guidelines that we suggested

15   should be published.

16          Now, I would suggest, your Honor, again, you

17   can do it on a motion to dismiss.  We know that

18   argument cannot be persuasive because the FTC has in

19   fact published particularized guidelines under

20   Graham-Leach-Bliley and under COPPA.  And even again,

21   this is a matter of public record in the CFR, they

22   published very detailed guidelines in the Bureau of

23   Consumer Protection of what it means if a company hit

24   green.  And so I would argue that if the FTC Bureau of

25   Consumer Protection  can publish regulations on data
```

```
 1    security for Graham-Leach-Bliley and COPPA, and they

 2    can publish detailed regulations on what it means to

 3    be green, they can at least publish some regulation

 4    here.  I don't think it is not feasible to publish

 5    regulations.

 6           In addition, as your Honor knows from doing

 7    your own research on the Cybersecurity Act and the

 8    Executive Order, and again the Court can take judicial

 9    notice of the Executive Order by the president, that

10    is done, that is part of the record here, is that the

11    cybersecurity framework lays out in detail certain

12    protocols that they encourage companies to follow.  So

13    this goes to the feasibility issue.  If you have one

14    executive agency publishing guidelines, and I am sorry

15    they are so small but they are on the slide 51, very

16    interesting, your Honor, if you look at the bold on

17    the right, COBIT, BA, ISP, CCS, TEC.

18           These are all references to certain hardware

19    and software protocols.  So when we talk about fair

20    notice, your Honor, if the FTC had done what the

21    Department of Commerce and the Department of Homeland

22    Security had done, and published certain guidelines,

23    then this would be a far different argument.

24           And so why am I putting this up here?

25    Because I think it completely cuts against the FTC's
```

```
 1    position that it is not feasible to public guidelines

 2    as to what you should be doing.  Two other executive

 3    agencies, the Department of Homeland Security and the

 4    Department of Commerce, have done it.

 5          Now, the consent decrees.  We talked about

 6    this in the first set of arguments, too, that the FTC

 7    responded that there are consent decrees.  I think

 8    these, as I pointed out earlier, are only FTC

 9    victories.  They are clearly not binding on the FTC.

10    If I came into court and said that this consent decree

11    was binding on the FTC as precedent, I do not think

12    that that would fly under the law.

13          And they are still vague.  And why do I say

14    that they are not legally binding?  If you turn to the

15    next page, slide 53, is that court after court has

16    said the entering of a consent decree is not a

17    decision on the merits and does not therefore

18    adjudicate the legality of any action by the party

19    thereto, nor is a consent decree a controlling

20    precedent for later Commission action.

21          Kenwit, on the Federal Trade Commission,

22    courts and FTC have construed consent orders as

23    contracts rather than as binding judicial precedent.

24    The Federal Circuit, consent order does not establish

25    illegal conduct.  And so forth.  I don't think there
```

```
1    is any Court of Appeals cases suggesting that consent
2    decrees are binding or even persuasive, or even
3    binding on the  agencies, yesterday alone other
4    parties.
5            And again, your Honor, this is just an idea
6    of consent decree.  This is a matter of public record,
7    so I am cited on a motion to dismiss.  These are the
8    types of consent decrees, they go through some of the
9    factual allegations, and they talk about, in large
10   part, of remedies, the 20-year monitoring is what the
11   company has to do going forward.
12           Then finally, your Honor, on the point we
13   started your question about private or industry
14   standards.  So the FTC says private standards provide
15   fair notice.  Or industry standards, or reasonable
16   standard.  I could be corrected, but nowhere has the
17   agency ever said that in terms of rules, regulations,
18   or policy guidance.
19           They said we encourage you to undertake
20   reasonable effort, but they never said your reasonable
21   efforts are the touchstone and provide you safe
22   harbor.  I still think that is ambiguous.  But I don't
23   think they have issued rules or regulations saying we
24   are going to look for industry standards in order to
25   provide you a safe harbor, which goes back again to
```

```
 1    Dravos, that a company has to have some notice of what
 2    we can do to stay out of trouble.
 3          The FTC, importantly, your Honor -- you asked
 4    the question, can you get an advisory opinion?  Have
 5    you, the FTC, ever adopted industry standard?
 6    Importantly, your Honor, they have the ability to do
 7    that, and in fact, the SEC, again, a matter of public
 8    record, they have adopted FASB, an accounting
 9    standards board.  Look to FASB.  That is what the FTC
10    can look to as the private standard.  The FTC can say
11    we will adopt the standards adopted by the Commerce
12    Department, by Homeland Security or by private
13    standard, but they have not done so.
14          So your Honor, that is where I think the cart
15    before the horse issue, that they have to tell me in
16    advance what my improper conduct is, and importantly,
17    consistent with Dravos in the Third Circuit, forget
18    about the ascertainable certainty.  I don't think
19    there is any real debate there is no ascertainable
20    certainty here.  But importantly, for the Third
21    Circuit purposes, what can I do as a company in order
22    to make sure I am in a safe harbor?
23          And even as of today, no company can get up
24    here, FTC can file against any of the hundreds of
25    companies who had a data breach by alleging you have
```

```
 1   unreasonable security practices.  We are in court, I
 2   will make this argument.  The FTC he will never ever
 3   worry about a motion to dismiss under their view.  All
 4   they have to say is we alleged unreasonable security
 5   practices.  Let's go forward with discovery.  That is
 6   all they have to allege, no matter what the violation
 7   is.
 8           So your Honor, I have no way, as a defendant,
 9   to know what I need to do to stay out of the FTC's
10   aim, or more importantly what I can do in front of an
11   Article III Judge to say, here re the regulations with
12   ascertainable certainty, and my client abided by those
13   regulations.  Right now, I can't do either.  And I
14   think that is inconsistent with the Third Circuit law.
15   Then we get to deception.
16           So I am happy to answer any questions, your
17   Honor, but that is the outline of my argument.  Again,
18   I don't think there is going to be any dispute that
19   there are rules or regulations, there are none out
20   there.
21           Thank you, your Honor.
22           THE COURT:  Okay.  I will hear from counsel
23   for the FTC.
24           Do you concede there are no rules and
25   regulations that are currently available?
```

1    MR. MORIARTY:  Regarding FTC Act liability,

2  no, there aren't for data security.  There are for

3  GLB, which counsel pointed out.  Graham-Leach-Bliley

4  regulations were issued by the SEC, which goes back to

5  the expertise.

6       I actually would like to touch on the

7  guidelines from GLB for just a second.  Those are the

8  guidelines that if a company violates those guidelines

9  they can be held liable under the FTC Act without

10  injury.

11       The guidelines, if you look at them, require

12  companies, I mean there are several, I think there are

13  four different steps, but sort of the linchpin of the

14  guidelines is that companies must take steps that are

15  reasonably designed to protect consumer data.  And

16  this idea that through the GLB guidelines the FTC has

17  created very elaborate technological regimes where

18  companies can know precisely how to protect their data

19  is inaccurate.

20       Just to step back for a second, I think the

21  basic premise of Wyndham's  fair notice argument is

22  that they don't know how to comply with the

23  reasonableness standard when it comes to protecting

24  consumer information.  The argument is problematic.

25  First Wyndham states in its privacy policy it is going

 1    to take reasonable measures to protect consumer data,
 2    so they invoke the same standard that they now say
 3    they can't comply with because they don't know what it
 4    means.
 5              My second point is that this is a standard
 6    that companies comply with all the time.  I made this
 7    point before in a variety of contexts, in common law
 8    negligence, in competition law.  And actually, in data
 9    security, in private data-security actions, negligence
10    actions against companies, the Court, the parties,
11    they evaluate whether the company acted reasonably
12    with consumer data.
13              And in those cases, your Honor, the
14    defendants are susceptible to a lot more liability
15    than they are in FTC Act ways.  We concede equitable
16    relief in those cases, plaintiff can get damages.  I
17    guess my basic argument is they are proving too much
18    to say that they don't know how to comply with the
19    reasonableness standard because that is how a lot of
20    the law works.
21              THE COURT:  Which is the standard?  Is it
22    reasonableness or is it ascertainable certainty?
23              MR. MORIARTY:  So I think their argument so
24    our standard is reasonableness.  And they argue that
25    reasonableness does not provide parties with

```
1    ascertainable certainty.

2            As a side note, there is a Third Circuit case

3    called Secretary of Labor versus Beverly HealthCare-

4    Hillview, 541 F.3d, (2008).

5            THE COURT:  2008 case?

6            MR. MORIARTY:  Yes, 2008 case, that states

7    that ascertainable certainty is not the standard.  I

8    believe the conditions are that if agency hasn't

9    reversed itself, and if the interpretation is publicly

10   available, an ascertainable certainty is not the

11   standard.  We certainly satisfy that.

12           THE COURT:  I was going to ask counsel, I

13   actually was going to provide counsel with a copy of

14   that case this morning.  And I wanted to hear from

15   both sides as to their opinion with respect to this

16   2008 case because in preparation for today's oral

17   argument I came across it, and neither side had noted

18   it in their briefs.

19           So you would say, though, that based on the

20   Third Circuit's case in 2008, the Court does not

21   necessarily have to apply the heightened standard.

22           MR. MORIARTY:  I agree.  But I dispute that

23   the reasonableness standard does not provide companies

24   with ascertainable certainty.  And I think that is

25   squarely within Third Circuit precedent.  I think the
```

```
 1    idea that reasonableness does not provide fair notice

 2    to companies has been foreclosed by the Vogel case.

 3    In that case, the Third Circuit held that an agency

 4    regulation predicated on enforcing a reasonableness

 5    standard did provide fair notice to regulated

 6    entities.

 7            This case appears in our brief at page 20-30.

 8    That is a 1980 case.

 9            So the last point is --

10            THE COURT:  Let me understand your position.

11    I am sorry, counsel, to make you go back.

12            Does this Court apply a reasonableness

13    standard, or is this Court bound to apply, based on

14    counsel's argument that the Dravos case, that the

15    Court then must implement a heightened standard for

16    enforcement?  Or are you saying -- what exactly is the

17    FTC's position?

18            MR. MORIARTY:  The FTC's interpretation,

19    well, as a preliminary matter the substantial injury,

20    unfairness complication of substantial injury requires

21    parties to balance benefits to consumers, it is

22    basically substantial injury to injuries versus

23    countervailing injuries.  It is essentially a

24    cost-benefit analysis.

25            In the context of data security, since 2005
```

```
1    in the BJ's complaint, the SEC has expressly said as

2    applied to data security that unfair application

3    requires companies to act reasonably with consumer

4    data.  Reasonable is just not word for the cost

5    benefit analysis that reasonable parties should

6    undertake.

7             So our argument is that ascertainable

8    certainty does not apply because we have been

9    consistent all this time.  We have consistently said,

10   essentially since the codification in 1994, and

11   certainly since we brought our first unfair data

12   security practices case in 2005, that reasonableness,

13   the cost benefit analysis is the standard for data

14   security practices, so as a result, the ascertainable

15   certainty standard under Beverly Healthcare doesn't

16   apply.

17            But I would further argue that reasonableness

18   is an objective standard recognized under the law and

19   does provide ascertainable certainty to companies.

20            So a separate issue which we have gotten into

21   a lot is whether the FTC should fill out the precise

22   contours of reasonableness by issuing rules and

23   regulations, or whether to proceed by ad hoc

24   adjudication.  And this is squarely within the

25   agency's informed discretion, this is the Chenery
```

```
 1    case, and the  NLRB  vs. Bell Aerospace case
 2    especially where, as here, it is doubtful whether any
 3    generalized standard could be framed which would have
 4    more than marginal utility.
 5           In the first FCC versus Fox, a Supreme Court
 6    case in 2009, the Supreme Court affirmed this approach
 7    of the FCC evaluating an obscenity, it said it could
 8    proceed on a case-by-case basis, and in fact this
 9    arose in the Vogel case in 1980 where the subsidiary
10    argument of the defendants, after saying
11    reasonableness didn't provide notice, they said at
12    least they should have provided us with regulations or
13    guidance to tell  us what reasonableness means, and
14    the Court said, this is just standard law at this
15    point, quote, is within the secretary's discretion
16    whether to proceed between ad hoc litigation and
17    regulation.
18           So I just thought I might address some of the
19    points that they raise.  And in fact I forgot
20    previously to address the point that they made in the
21    Brown and Williamson section.  I will make it short.
22           THE COURT:  Sure.  Counsel, I want to let
23    both sides know, make all the points you feel
24    necessary.  I am not cutting any one off today.
25           MR. MORIARTY:  The idea that FTC Act only
```

1    applies to parties that are engaged in fraud is just

2    inaccurate.  It is not based on the statute.

3    Unfairness, the injury requirements, plainly don't

4    have any limitations.

5         So getting to this case specifically, or

6    getting into the fair notice issue.  So BJ's is clear.

7    I can -- that is a 2005 case, applying the unfairness

8    case to data security.  Respondent's failure to employ

9    reasonable appropriate security measures to protect

10   personal information caused or likely to cause

11   substantial injury to consumers that is not offset by

12   countervailing --

13        THE COURT:  Slow down and start from the

14   beginning, counsel.

15        MR. MORIARTY:  I don't have to read it.  The

16   reasonableness standard satisfies the codification of

17   unfairness, which is at 15 USC 45 (a).  That is

18   essentially what I was reading, is the statute.

19        I don't think it is of great value to cite

20   academic articles in this case.  I know that some of

21   the authors of those articles are also practitioners.

22   I don't know if that affects the Court's valuation of

23   the value of their academic opinions.  I am not saying

24   that they are wrong or denigrating them in any way.

25   But to say that they are, you know, dispassionate

Case 14-3514, Document 113, 06/07/2016, 1658077, Page21 of 104    Case 1:13-cv-01887-ES-JAD   Document 31   Filed 07/16/14   Page 77 of 104 PageID: 1658

77

```
 1    observers is probably not accurate.

 2             So one of the issues on rules that they raise

 3    is why doesn't the FTC issue rules, and the answer is

 4    that the FTC Act, unlike Graham-Leach-Bliley which

 5    applies to only financial institutions, the FTC Act

 6    applies to all companies engaged in commerce.  In

 7    order to create a rule that apply to everyone equally,

 8    we might end up with a rule that is very onerous to

 9    small businesses.

10             In fact, your Honor, it is a position that

11    the Chamber of Commerce frequently takes when it

12    objects to statutes, that Congress is attempting to

13    pass, as they say, look, Congress can't possibly

14    substitute its judgment for the dynamic reasonableness

15    assessment that small businesses take, nor can it

16    create a rule which equally applies to everyone in a

17    fair way.

18             So to the extent that the FTC tried to issue

19    rules take are like frankly the cybersecurity

20    guidelines, which are designed to protect critical

21    infrastructure, that would be incredibly onerous to

22    small businesses that aren't protecting dams, or the

23    electric grid.  So a reasonableness standard is far

24    more fair to all companies that we regulate.  And

25    again, it is something that businesses do all the
```

```
1    time.

2         So the last point that I want to make is with

3    these consent decrees, there are consent decrees and

4    then there are also complaints.  And the idea that

5    they are not binding on this Court, we don't argue

6    that they are binding on this Court.  It  is a red

7    herring.

8         What we argued, the purpose of decrees is to

9    provide parties with notice about the application of

10   the FTC Act and about the types of things that the FTC

11   evaluates when determining whether a company is

12   engaged in reasonable practices with regards to

13   consumer data.

14        THE COURT:  So you say, counsel is arguing

15   that they are not binding, and you never submitted

16   that they are binding.  But what you are saying, the

17   real issue here is do these consent decrees provide

18   notice to businesses as to what you need to be doing,

19   and if you are not doing, there is danger.

20        And so you say that by -- counsel, I don't

21   know whether it was in, it is probably in the reply

22   brief, one of the things they say is all these consent

23   decrees are very -- they are a case that deals

24   directly with this particular company.  And it is very

25   difficult for us to say, well, based on those facts
```

1   are we in danger?  And that they don't provide, you

2   know, adequate warning or adequate notice as to what

3   they need to be doing.  And you would say what to

4   that?

5        MR. MORIARTY:  So the answer is that they do

6   provide a lot of information, but we are not

7   exclusively leaning on those adjudications, those

8   consent decrees and complaints as the only source of

9   fair notice.  Nor would industry, I believe, accept it

10  if the FTC stated we are the sole arbiter of what is

11  reasonableness.

12       Reasonableness is an objective standard.  It

13  is not the FTC's reasonableness and Wyndham's

14  reasonableness.  Reasonableness is objective.  There

15  are a lot of sources companies can look to.  There is

16  no single answer.  That is what happens all the time

17  in the law.

18       So if a company is trying to figure out, if

19  the grocery store is trying to avoid slip and fall

20  accidents, the common law that they might look at

21  won't be exactly their grocery store, you know,

22  circumstances won't be the same, the type of threats

23  to consumers might not be the same, but they can still

24  make reasonable judgments based on previous cases and

25  a variety of industry standards and just the general

 1   circumstances of their particular instances.  That is

 2   just, that is just how the common law works.

 3          THE COURT:  Can we talk a little bit about

 4   the best practices guidelines, and can you walk me

 5   through, perhaps, where you said earlier, even if you

 6   look at the very simplistic guidelines that counsel

 7   says are available, that there were violations you

 8   allege by Wyndham of the very basic rules?

 9          MR. MORIARTY:  So one of the key principles

10   of the guidelines is data inventory and data

11   management and data minimization.  And the allegations

12   in the complaint are that Wyndham permitted companies,

13   or on the Wyndham network there were hotels with

14   unencrypted information, and because of the lack of

15   password policies this information wasn't segregated

16   from anyone else who might also be able to get on the

17   network.  So that is kind of a basic flaw which we

18   have alleged in paragraph 24 of our complaint.

19          And again, there is the guidelines but there

20   is a lot of other stuff out there that would make a

21   lot of these vulnerabilities that we have identified,

22   they make them reasonably known to companies that are

23   trying to practice data security.

24          THE COURT:  Let's look at them, one of them

25   electronic security, make it your business to

```
 1    understand the vulnerabilities of the computer system

 2    and follow the advice of experts in the field, and

 3    identify the computers the servers were sent to the

 4    personal information is stored.  Identify all

 5    connections to the computers where you store sensitive

 6    information.  These may include, and you go on to say,

 7    internet, electronic cash registers, and so on.

 8    Encrypted, sensitive information that you send to the

 9    parties over public network.

10         So there seems to be at least some

11    information here, and you say that some of this

12    information wasn't publicized here.

13         MR. MORIARTY:  That's right, your Honor. You

14    articulated it much better than I was.

15         Yeah, I point to paragraph 24, we alleged

16    failure, not of that guidance, but of the complaint,

17    we alleged a failure to segment the network, we

18    alleged a failure to encrypt data, we alleged a

19    failure to change default passwords available on the

20    internet, a failure to have password policies that

21    require strong passwords.  These are all things that,

22    some of which might be mentioned expressly in the

23    guidance, but are all things known in the industry as

24    commonly known, and easily avoided vulnerabilities

25    that a company that is acting reasonably to protect
```

 1    consumer data could avoid.

 2            THE COURT:  Anything else, counsel?

 3            MR. MORIARTY:  No.  Thank you, your Honor.

 4            THE COURT:  Let me check with my reporter.

 5            We are going to take a break.  Ten minutes.

 6    And then we will let counsel respond.

 7            (Recess).

 8            THE  COURT:  We are back on the record in FTC

 9    versus Wyndham, civil action 13-1887.

10            We took a break, and we are now ready to hear

11    from counsel for Wyndham.  During the break I provided

12    counsel for Wyndham a copy of 2008 case that was cited

13    by the FTC's counsel, Beverly Healthcare-Hillview.

14            MR. ASSAF:  May it please the Court, I

15    appreciate the copy of the case.  It was not cited in

16    our brief.  I wish it had been.  Actually, I think it

17    supports beyond any doubt our position in the case.

18    2008 case Beverly Healthcare talked about Dravos and

19    said Dravos doesn't apply when -- may I leave the

20    podium, your Honor -- the agency had given conflicting

21    public interpretation of the regulation.  We are not

22    arguing conflict, or the regulation at issue.  The

23    regulation is so vague that the ambiguity can only be

24    resolved by deferring to the agency's own

25    interpretation of the regulation, and the agency has

1    failed to provide a sufficient, publicly accessible

2    statement of that interpretation before the conduct in

3    question.

4              So a couple of points, your Honor.  First of

5    all, in this case the Secretary of the agency, or in

6    the FTC case, the Commission, had actually published a

7    regulation.  So there is a regulation at issue that I

8    would argue, I understand under Dravos, you then at

9    least have a regulation for context.

10              After that,, your Honor, two things happen:

11    One, the agency, or in this case, the Commission,

12    issued two directives, publicly available, on the

13    meaning of the regulation.  Then what happened is that

14    the agency, or the Commission, had two litigated, not

15    consent decrees, two litigated cases explaining the

16    regulation and the interpretation of the regulation.

17              So on one side you have post Dravos a

18    situation where the agency issued a regulation.  They

19    issue a directive saying what the regulation means.

20    They litigate cases under the regulation and the Third

21    Circuit unsurprisingly says Dravos doesn't apply in

22    that case.

23              Here, no regulation.  And certainly no

24    interpretations of the regulation because there is no

25    regulation.

1    Counsel conceded when they stood up, your

2    Honor, the very first thing they conceded, there are

3    no rules or regulations here.  And I haven't completed

4    a full analysis, your Honor, of your question about,

5    well, aren't these cases resolved on summary judgment?

6    My initial analysis is that, for example, Dravos, Fox,

7    GE, they are only not summary judgment.

8        THE COURT:  They go right up to the Circuit.

9    Counsel, we are in a different position right now.  We

10   are in a different position.  They don't have a

11   regulation that you are obviously taking right up to

12   the Circuit.  But  in that instance, this is as you

13   all are saying, as you know, a unique situation for

14   this Court to be, and many of the arguments that you

15   are making, I believe, and I am going to consider

16   them, I haven't pre-judged this issue, but I think

17   many of these arguments, at least as to notice, maybe

18   not standing, what I  am calling standing, the issue

19   of whether the FTC has authority.  That obviously I

20   have to resolve at an MTD stage.  I understand that.

21       But the issue of fair notice I think is an

22   issue that, at least when it is dampening your

23   argument, seems to at least require that some

24   discovery be done as to what notice you were on as to

25   what reasonable standards were, because there was a

```
 1    policy statement which you said you were observing
 2    industry standards.
 3          We have to understand what you understood
 4    those industry standards to be and whether indeed
 5    there was an issue of notice.  You say not, and I
 6    understand you, that is what we are here for.  But I
 7    quite frankly think when you look at those cases, we
 8    are in a different posture today than many of those
 9    cases when they went directly to the Circuit for
10    guidance.
11          MR. ASSAF:  Your Honor, this is such an
12    important point.
13          I would like to try to convince you
14    otherwise.  I will start with the regulations which it
15    is exactly opposite.  You are saying, well, we are
16    here because there is no direct appeal of the
17    regulation.  There is no direct appeal of the
18    regulations because they have not published the
19    regulations.
20          THE COURT:  I understand the point.
21          MR. ASSAF:  So your question, by the way, and
22    I want to come back to the industry standard point,
23    but your question was, well, there is an argument here
24    that, well, we don't want to publish regulations
25    because it might be unfair for small businesses.  They
```

1     made that argument.

2          Under administrative law, your Honor, it is

3     exactly the opposite.  They don't get to stand up and

4     say, we get to determine how to enforce the law

5     without regulations based on our own decision-making

6     without regulations.  If they have a concern with how

7     they impact small businesses, that is what

8     administrative law is all about.  That they need to

9     publish the proposed regulation.  Get comments and

10    testimony on the proposed regulations.  I guarantee

11    you, like the cybersecurity act, that people will come

12    in saying the way you phrased this would impact

13    negatively on small business, and therefore, we

14    suggest that you do the opposite.

15         They would have lots of comments, lots of

16    testimony, and then we would have a regulation.  But

17    they don't get, with all due respect, they don't get

18    to come up and say we are not doing a regulation

19    because we think it would be hard for us to

20    administer.  That is the exact purpose of the

21    administrative law and the whole promulgation of

22    regulation process, is that they have to publish a

23    regulation, they have to give people notice as to what

24    the regulation means.  Give us a chance to comment on

25    the regulation, and then there due process is met,

```
 1    because they will have considered the small business

 2    impact, et cetera.

 3              THE COURT:  So you are saying that there must

 4    be the publication of a regulation.

 5              MR. ASSAF:  There must be.

 6              THE COURT:  And without the publication of a

 7    regulation, there is no fair notice.

 8              MR. ASSAF:  There is no fair notice.  I think

 9    under Dravos and the Supreme Court cases and it

10    answers your question about why are we here?  Because

11    could we only do this on summary judgment?  The reason

12    we are here is because if they had a regulation, we

13    could have either, A, challenged that directly to the

14    Third Circuit --

15              THE COURT:  Is there any case that says there

16    must be a regulation in order for there to be fair

17    notice?

18              MR. ASSAF:  Well, I think there are cases in

19    our brief.  I will get it on my reply once I get them

20    out.  I think it is black letter law that an agency

21    with rule-making authority, which they have, they have

22    rule-making authority, Congress has given it to them,

23    that when they are going to take action, enforcement

24    actions, that they have to publish regulations in

25    order to give companies fair notice of what is
```

```
 1    prohibited by their actions.

 2              And so, your Honor, your point, or your

 3    question as to, and I understand it, I was sitting

 4    there saying why are we here, why aren't we at the

 5    Third Circuit already?

 6              And the reason is that if they had published

 7    even a one-page regulation, and they don't want to do

 8    it, they know we would take them to the Third Circuit

 9    in a heartbeat saying this is arbitrary and

10    capricious, it doesn't give fair notice, et cetera,

11    and the Third Circuit under Dravos would say no

12    ascertainable certainty.  Try again.

13              That is why the telling part of the argument

14    is, it might impact small businesses differently, we

15    don't want to publish the regulation.  That is the

16    precise part of the law and why Article III courts are

17    so important, because you cannot allow an agency

18    simply to say we get to decide in our own halls when

19    they are going to enforce things and what we are going

20    to enforce.  Otherwise, by definition there is no

21    notice.

22              I am sorry, I am animated on this one.  Your

23    question on why we are here, it got me thinking at the

24    break, she is right.  Why are we here?  Why aren't we

25    in the Third Circuit.
```

```
 1          THE COURT:  You want to skip right to the
 2   Third Circuit on me?
 3          MR. ASSAF:  Yes, wait.  There is no
 4   regulation.  There is no rule.  And I read this case,
 5   and I said, exactly.  This is, Judge Fisher is working
 6   with an agency, with the statute, that had a
 7   regulation that then had interpreted decisions under
 8   the regulation that litigated it, and litigated cases,
 9   not consent decrease, he says, you know what?  The
10   regulation, you know, isn't subject to a Dravos
11   challenge.
12          If they had that regulation, we would be
13   having a wholly different argument in front of three
14   members of the U.S. Court of Appeals for the Third
15   Circuit.  But here, your Honor, it is not only the
16   regulation is vague.  There is no regulation, but
17   again, it is the unfairness, by definition you need
18   something.
19          THE COURT:  And counsel, let me just say that
20   quite frankly, a lot of the arguments that you
21   forwarded in your brief and today on the record, these
22   are arguments that I think are going to be available
23   to you, not now, we are not talking about the
24   authority issue, I am speaking directly to the issue
25   of fair notice.  These are arguments that, quite
```

```
1    frankly, the reason I said why are we doing this now
2    is because I think that once there is discovery, then
3    these arguments with respect to you not being on --
4    there not being fair notice, are going to come into
5    play, and the FTC is going to have a job to do with
6    saying that there is -- the notice is adequate, and
7    the notice is reasonable, and whose standard are we
8    utilizing.
9          All these seem to be arguments that are ripe
10   for dispositive motions and not necessarily at a
11   motion to dismiss.
12         But you disagree.  And I would like to hear
13   why you disagree.
14         MR. ASSAF:  Respectfully, I am happy to get
15   you additional law on this.
16         THE COURT:  No, we are not.  We have briefed
17   this, we are living with what we are arguing today.
18         MR. ASSAF:  But the issue is not a party's
19   subjective understanding of what the regulatory
20   environment is.
21         THE COURT:  It is an objective.  We agree.
22         MR. ASSAF:  I agree it is an objective.  So
23   whether Wyndham thought X, Y or Z is irrelevant for
24   the fair notice argument on this motion to dismiss,
25   because it is an objective standard as to whether a
```

1  party would be put on notice, because if Bonzai Auto

2  Sales said I had no notice, they may have an argument

3  on summary judgment because of the compelling

4  equities, but the Fox cases, the OSHA cases, all go to

5  a challenge.  In fact, they mentioned the CO 2 cases,

6  whether the greenhouse gas cases, whether EPA can

7  regulate greenhouse gas.  DC Circuit just decided

8  that.

9        A whole Army of parties came in and said,

10  this is an issue of fair notice, and it is now, cert

11  has been granted by the Supreme Court.

12        But the Court never said, oh, let's look at

13  Motorola and determine whether they believe the

14  regulations were sufficiently clear as to the

15  prohibited conduct.  It is what do the regulations, as

16  an objective matter, tell the community as to what is

17  prohibited?  That is the standard.  My client's

18  knowledge, other client's knowledge, amicus knowledge,

19  all are relevant as to whether fair notice is met.

20        That is why I keep coming back to the

21  principle, the bedrock principle of the administrative

22  law.

23        Your Honor, with all due respect, I hate to

24  predict things, but the Third Circuit would, if they

25  went up and said this is our regulatory scheme, we

```
 1   published a pamphlet and we think you have to do what

 2   is reasonable.  With all due respect, your Honor,

 3   under  Dravos and under this 2008 Beverly case, I

 4   think it sits up there for a nanosecond in front of a

 5   panel.

 6            They are saying go back and publish a

 7   regulation.  You are an agency with rule making

 8   authority and come back to us with that.  But as

 9   opposed to my challenge of it, anybody could challenge

10   the regulation, and so I get to, I know district

11   courts are struggling, you have a lot of things.  What

12   is the path here?

13            And I actually think the clearest path in

14   this case is, and it protects the policy issue that

15   you have been raising questions about, the clearest

16   path in this case, your Honor, is to have the FTC say

17   go back and issue regulations.  You say you have a

18   pamphlet.  You said you have consent decrees.  Put it

19   all together and publish it and let people testify or

20   give comments about it, and then, then, what do you

21   have to worry about?  You will never have another

22   argument like this on fair notice because you would

23   have published what is prohibited.

24            And so, your Honor, the clearest path is to

25   say, you know what?  I agree with Judge Fisher.
```

```
 1    Publish a regulation.  Make sure it is not vague, and
 2    then you could pursue data security, if you decide the
 3    first issue that they have standing.  Even if they
 4    have standing, your Honor, you should make them
 5    publish a regulation, and say, tell people what is
 6    prohibited by the conduct, because it is an objective
 7    standard.
 8            And then, your Honor, I like it here, I like
 9    appearing here, but I won't be bothering you.  I would
10    go right up to the Third Circuit on that issue, if
11    there is an argument about it.
12            But as to me, I will be candid with the
13    Court, it can't apply to me for 2008 conduct, and it
14    can't apply to other companies prior to the regulation
15    for 2009, 2010 conduct.  The whole purpose of fair
16    notice under the Supreme Court cases is that prior to
17    bringing enforcement action you have to give them a
18    piece of paper saying what is the prohibited activity,
19    or alternatively, how do you stay safe and stay out of
20    our aim?
21            So your Honor, on this issue, I would say, I
22    can, if I may continue to the guidelines.  I know you
23    raised these as well.
24            THE COURT:  Yes.
25            MR. ASSAF:  May I approach the podium?
```

```
 1              THE COURT:  Certainly, counsel.

 2              MR. ASSAF:  I picked out the section I

 3   thought the Court and the FTC would talk about.  A

 4   couple of points on passwords.  Number one, no rules

 5   or regulations.  There is certainly a pamphlet out

 6   there.

 7              Number two, I think, and I could be

 8   corrected, I think the first indication that there was

 9   a pamphlet out there was in their opposition brief

10   here in New Jersey as opposed to Arizona.

11              Three, it is very unclear when this was

12   published and whether it was published at all before

13   the conduct in question.  It could be.  The FTC could

14   fill me in on it, whether it is pre 2008 or not, but

15   whatever that is, this type of document that says here

16   are some guidelines.  It starts off actually saying,

17   here is a guide to this.

18              THE COURT:  Counsel, let me just say, for the

19   record, you can put that up.  Everything you said, it

20   is unclear when this was published.  We don't know,

21   all of those smacks of issues of fact.  All of that

22   says, at least not issues of fact, we have to explore

23   this in order for us to argue at a later stage

24   something that sounds dispositive in nature.

25              MR. ASSAF:  As first blush, your Honor, but
```

```
1    not when it is an agency of the United States taking

2    agency action.  They have the burden to show what they

3    are doing is permitted before a company has to engage

4    in discovery.  They have the burden.  In fact, when

5    they said, oh, I am thinking about it.  Page 3 of the

6    guidelines might be implicated by paragraph 24 of the

7    complaint.

8              Your Honor, that is not in the complaint at

9    all.  Okay.  And so if she just shows the problems

10   with not having ascertainable guidelines.  If they

11   want to adopt this, your Honor, they should do a

12   couple of things.  If I may be so forward.  Say our

13   guidelines, we are issuing a proposed regulation, we

14   are adopting our guidelines.  We are adopting certain

15   private guidelines, like the SEC has done, and we are

16   doing X, Y and Z.

17             Could we have your comments or could we have

18   your testimony on that on how it impacts?

19             Then, your Honor, we are in a much different

20   situation.

21             But I don't think, under fair notice, that it

22   is my burden to come in at this stage and try to

23   cobble together what the state of affairs is for the

24   FTC's regulatory scheme.  They are an agency of the

25   federal government.  They have to come forward under
```

1    the statute, again, they have rule making authority,

2    publish a rule and tell me what is prohibited and what

3    is allowed.

4           And again, your Honor, their argument is

5    well, we can't get into too much detail.  All right.

6    But let's not have that debate in front of an Article

7    III Judge.  Let's have that debate with the actual

8    rules and regulations.  In other words, we are all

9    shooting in the dark here because they don't want to

10   publish a regulation.  Let's publish the regulation

11   and see what it actually looks like.

12          So your Honor, I would say the guidelines,

13   the pamphlet does not get them there, and we have

14   looked.  I haven't found any case law supporting the

15   notion that an agency pamphlet constitutes rule making

16   under even Magnuson On Rule Making or other rule

17   making that Congress sets forth, I come back again to

18   rule making.  Congress gave them rule-making

19   authority.  So if they want to do something, they have

20   to publish the rules.

21          And this is not a summary judgment issue.

22   This is an issue for today.  And so if you decide,

23   there are two ways on this issue.

24          THE COURT:  Or reserve on fair notice.

25          MR. ASSAF:  If you decide fair notice against

 1  us, then the record is what it is.  And nothing else

 2  is going to be developed because they either haven't

 3  published the regs or rules, the only thing they could

 4  do, I submit, is come forward and say here is what we

 5  think the regulatory scheme is, your Honor.  But this

 6  case is so far, so much more extreme than Beverly, I

 7  think under Beverly, we win.  And I wish I had cited

 8  the case.  I am kicking myself for not doing it.

 9  Because there is a regulation there.

10          THE COURT:  Well, the argument is there,

11  counsel.  I appreciate it.

12          MR. ASSAF:  Finally I wanted to pick up a

13  point.  They mentioned the NLRB case.  It is the NLRB

14  case from the Third Circuit, that does have a special

15  meaning under law.  The NLRB general duty and good

16  faith negotiations are looked at as contract matters

17  as opposed to administrative law matters.  So under

18  Third Circuit precedent, that is a bucket of cases

19  that is different than the normal administrative law

20  cases.

21          It doesn't concern agency action under the

22  APA.

23          And I have one more point, your Honor.  Oh.

24  Industry standard.  I want to be clear, is that I

25  think I said, and I hope I said that the irony of

1   today's situation is that the only agency, Homeland
2   Security, Commerce, to published ascertainable
3   guidelines as of today, I am feeling pretty good that
4   we couldn't -- they couldn't use those guidelines
5   against us, okay, because it is when they published.
6           So as of today, for fair notice purposes, I
7   would look at them and say I think I have a safe
8   harbor in those because I think I comply with them
9   today.  So that is what I was trying to say.  That is
10  again the whole purpose of fair notice is that I now
11  know I have something I could come into court and say,
12  as of 2013, I have these regulations.  And I complied
13  with them.  So you can't take any adverse action
14  against me.
15          Thank you, your Honor.
16          THE COURT:  Any response?  We are going to
17  move along.  Any response from FTC with respect to any
18  of the issues?
19          MR. MORIARTY:  Your Honor, I will keep it
20  short.
21          So I will reiterate, it is  within a
22  agency's informed discretion to proceed by ad hoc
23  litigation for rule making.  Counsel believes the FTC
24  should proceed by rule making.  That point is clear,
25  they believe that we should, but that it is  within

```
 1   the agency's discretion to choose.
 2          And the one other point I would make is this
 3   idea, I think counsel was saying that for every
 4   unfairness case that the FTC brings, there must first
 5   be a rule.  And that is a very dramatic argument.  And
 6   I don't think the argument was just on data-security
 7   cases.  I think it was all unfairness cases.  I think
 8   in order to be consistent that has to be their
 9   argument.  That is, I would say, I don't have an
10   estimate, I think that is 90 percent of the FTC's
11   unfairness cases including all of our competition
12   cases which essentially require a court to evaluate
13   the totality of the circumstances to determine whether
14   a company was engaging in an unfair trade practice or
15   an unfair collusion between horizontal entities.  And
16   the same is true with consumer protection.  We bring
17   cases all the time for unfairness that do not have a
18   predicate of a rule.
19          Thank you, your Honor.
20          THE COURT:  Okay.  Now we move to issue
21   three, whether unfairness is adequately pled by the
22   FTC.  And Wyndham will open with argument with respect
23   to that.
24          I would state for the record, state a claim
25   for unfair practices under Section 5 of the FTC Act,
```

```
1    the FTC must plead, one, that an act or practice

2    caused or is likely to cause substantial injury to

3    consumers; two, the injury was not reasonably

4    avoidable by the consumers, 'and three, that the

5    injury was not outweighed by countervailing benefits

6    to consumers or competition.

7            And the issue now before the Court is whether

8    the FTC has adequately pled.

9            MR. ASSAF:  I am spending a lot of time up

10   here, your Honor.

11           All right.

12           THE COURT:  Understanding the Court at this

13   point is looking at the facts in the light most

14   favorable to the nonmoving parties, we are really

15   going to be looking at what the complaint is, in

16   particular I think paragraph 32 and paragraph 40 are

17   what the Court is at least considering, and I want to

18   hear comments, but the Court will allow counsel to

19   raise this issue of no substantial consumer injury.

20           MR. ASSAF:  Thank you, your Honor.  Starting

21   with the consumer -- the statute.  The standard of

22   proof is that the practice causes or is likely to

23   cause substantial injury to consumers which is not

24   reasonably avoidable by consumers themselves and not

25   outweighed by the benefits.
```

```
1            So there are two issues here.  One is the
2    pleading of whether the Wyndham alleged data-security
3    deficiencies caused the consumer harm.  And I would
4    first say, your Honor, that as you know, the complaint
5    is very careful, it says $10.6 million fraud loss.
6            Now, maybe I am just being overly sensitive.
7    But they don't say $10.6 million in consumer fraud
8    loss, and I would argue that there is a reason for
9    that.  The reason is that federal law protects credit
10   card users up to 50 -- in excess of $50.  So I
11   understand, though, well, you could have then $50, and
12   that could add up.
13           Now, this is where I do think there are two
14   different standards for private parties as opposed to
15   government.  I don't think the government can plead
16   around by careful omission that which they know to be
17   the truth.  And if they are forced to amend, to amend,
18   your Honor, they need to amend because it is, they
19   conducted an investigation, by the record here, they
20   have all these consent decrees, and they dealt with
21   hard brands all the time.  And they know in addition
22   to this that every major card brand exempts the
23   consumer from the $50.
24           That is why I said it is different than a
25   private party trying to get past a motion to dismiss.
```

1    I would argue, especially as a federal agency, that

2    they have an obligation to plead those facts even if

3    they are inconvenient for them.  And that is why I

4    think the $10 million fraud loss, my interpretation of

5    that is that they think that the banks, the card

6    brands, Visa and Mastercard, may have lost that money,

7    and they also leave aside, by the way, whether they

8    were reimbursed by Wyndham.

9         But they already know all of this from the

10   investigation, your Honor.

11        So I would ask that on issue one, the

12   consumer fraud loss, that they have to plead precisely

13   that which they know, and they are not going to be

14   able to get around discovery.  It is a different

15   obligation.  You know from your former days --

16        THE COURT:  The word "precisely" is

17   concerning me, counsel.

18        MR. ASSAF:  They know they can't just ignore,

19   when they say $10 million in fraud loss, there is a

20   reason I submit they don't say $10 million in consumer

21   fraud loss, because if -- unless it is consumer fraud

22   loss, they don't meet the elements of the statute that

23   say substantial consumer injury.  If it is J. P.

24   Morgan that has the $10 million in loss, they have no

25   jurisdiction to bring the unfairness claim.  So that

```
 1   is, at the end of the day, whatever they know they
 2   know, we will leave that aside.  But they have to
 3   plead consumer fraud loss, not just fraud loss in the
 4   abstract.
 5          THE COURT:  So what is your argument with
 6   respect to that?  Because, are you saying that the
 7   Court must require them to amend, based on what they
 8   know now?  That I have a requirement to make them
 9   amend their complaint?
10          MR. ASSAF:  No, I would hope they would amend
11   as to what they know now.  I think they have a
12   requirement to plead $10.6 million in consumer fraud
13   loss as opposed to the artful phrase, $10 million
14   fraud loss.  It is the whole point of, is it the
15   banks?  The credit card companies?  Or is it the
16   consumers?
17          And again, your Honor, this is a matter of
18   public record.  Unlike a lot of data breach cases
19   where consumers have brought actions against the
20   company alleged to be involved in the breach, no
21   actions here.  Notify the consumers, notify the state
22   attorney generals.  That is why this becomes all the
23   more informed.  Where are these consumers that
24   suffered the fraud losses?  We are not hearing about
25   them.
```

1          So that would be point one in terms of the

2     pleadings, that they have to talk about exactly what

3     the fraud loss is.

4          The second point of the pleading, your Honor,

5     goes to causation.  That is your paragraph 32, or what

6     you reference as paragraph 32.

7          Paragraph 32 states as a result of

8     defendant's unreasonable data-security practices,

9     intruders were able to gain unauthorized access to the

10    Hotels and Resorts corporate network, and the property

11    management system servers of 41 Wyndham-branded

12    hotels, twelve managed by hotel management and 29

13    franchisees of Hotels and Resorts.  This resulted in

14    the compromise of more than 500,000 payment card

15    accounts and the export of hundreds of thousands of

16    consumers payment and account numbers to a domain

17    registered in Russia.  I think there are two points on

18    causation here.

19         One is that they need to plead, and I do

20    suspect, I do argue a heightened standard, especially

21    after an investigation that they have undertaken, that

22    the alleged deficiencies caused the breach and caused

23    the harm.  Because, your Honor, I think what, as I

24    read the complaint, they say there are these alleged

25    deficiencies, and all the card brands, or all the

```
 1    consumers had their information taken  from the

 2    hotels.

 3            There is, my view of the  plaintiffs don't

 4    say these alleged deficiencies were a cause of the

 5    breach.  And the reason I say that is I am going to

 6    get back to the criminal complaints which again, in

 7    this Court, the Russian cyber criminals, is kind of

 8    the same playbook, they took sophisticated, they put

 9    sophisticated malware on, put it in a back door, and

10    why I think this is so important for pleading purposes

11    is that I think the FTC needs to plead that there were

12    alleged deficiencies and those alleged, those specific

13    alleged deficiencies caused the briefest and the harm

14    to consumers.

15            There are my two arguments.  Substantial

16    consumer harm needs to be explicitly pled; and two,

17    that they need to plead that these alleged

18    deficiencies caused the alleged harm.

19            THE COURT:  Don't they plead that in the

20    complaint already, in terms of, we look at paragraph

21    24, and then they cite to all these points.  Isn't

22    that pled?  Aren't they saying that indeed by failing

23    to use readily available security measures to limit

24    access between and among the branded hotels property

25    management system, the hotels corporate network and
```

1   the internet, such as employee's firewalls, B, C, D,

2   E, F, through J.  Maybe I am missing something.

3   Aren't they saying that it is because of these

4   failures that indeed, when we then turn to paragraph

5   32, they resulted in a compromise of more than 500,000

6   payment card accounts, and the export of hundreds of

7   thousands of consumers payments.  What do you say is

8   missing?

9        MR. ASSAF:  Your Honor, I apologize.  Maybe I

10   am missing it.  I haven't seen the causal link between

11   this precise -- and maybe it is, maybe it is, now that

12   we have read 24, maybe it is 24, the causal link, that

13   these caused the exact theft of the information.  But

14   I guess I have always come at this, if they are

15   repleading on consumer harm, they may as well try to

16   replead the exact alleged deficiencies.

17        THE COURT:  Okay.  I see your argument.

18        MR. ASSAF:  That is what I am trying to get

19   at.  They say there are all these deficiencies.  I

20   want them to tell me what deficiency it was that

21   caused the alleged --

22        THE COURT:  They haven't done discovery.

23   They are going to say to me in a minute, Judge, we

24   need to, of course we will get to the motion to stay

25   in a couple, at this rate in a couple of hours, but

1   you know, my point is, I think the other side is going

2   to say, Judge, in order for, they are asking us to

3   plead with such specificity, and we don't really have

4   access right now to this critical information.  We

5   need to get this critical information and to put that

6   on us is really unfair.  I anticipate that will be an

7   argument.

8          MR. ASSAF:  I think they will say that, too.

9   I think that would be reasonable, except that they had

10  an investigation, that was within their power, they

11  conducted it, they brought the complaint saying these

12  were the problems.

13         They can't have it both ways.  They can't say

14  we know what our inadequate data security practices

15  are and we are going to file a complaint against you

16  alleging them and then say but we don't actually know

17  the exact cause of the breach.  Because if it turns

18  out, your Honor, that they know that the same Russian

19  cyber criminals used a sophisticated malware to back

20  door, like they did in the indictment in their case, I

21  know I am using the word fairness a lot, but if they

22  know that, your Honor, they can't just go fishing for

23  discovery, and so I would say tell me what exactly you

24  have determined, since you brought a complaint, is the

25  problem and how that caused it.  Because with all due

```
1    respect, your Honor, I think they have to replead
2    consumer injury no matter what.
3             THE COURT:  Counsel, you say again that the
4    requirement that they plead with more specificity, you
5    say is because the Court should implement the higher
6    standard?
7             MR. ASSAF:  Yes, your Honor.
8             THE COURT:  Okay.  Before you sit down,
9    counsel.  There were some argument in your brief with
10   respect to this issue of whether the injury was not
11   reasonably avoidable by consumers.  That is not
12   really, are we taking an issue with respect to that,
13   that element of the standard?
14            MR. ASSAF:  I think that is going to get into
15   the deception issue so I will address that during
16   deception.
17            THE COURT:  Okay.
18            MR. ASSAF:  Thank you, your Honor.
19            THE COURT:  Counsel.  Mr. Moriarty.
20            MR. MORIARTY:  Thank you, your Honor.
21            THE COURT:  Do you need to go back and plead
22   with more specificity, sir?
23            MR. MORIARTY:  Your Honor, I think actually
24   the complaint does more than we give it credit for.  I
25   agree with your anticipated criticism which is that we
```

```
 1    haven't conducted discovery yet.  And I dispute, there
 2    has been a lot of characterizations about the nature
 3    of the investigation.  I just don't think those are
 4    particularly appropriate for consideration.  We have
 5    not conducted discovery on how they spent the money
 6    that they  claim to have spent during the
 7    investigation and it is just not something that we
 8    need to discuss, and it shouldn't affect where we are
 9    right now.
10            I would say that, as a factual matter, if we
11    are going to get into the investigation, the FTC sent
12    Wyndham an access letter which they responded to in
13    part but there was never any formal discovery in this
14    case.  When we issued formal discovery because we
15    needed more information, they moved to quash the
16    discovery, and then instead of pursuing that motion to
17    quash, they filed this case in Federal District Court.
18    We haven't had our opportunity for formal discovery
19    yet.
20            But I think that, I wasn't even on the case
21    during the entire time of the investigation, and the
22    parties can go back and forth a lot about who did what
23    during the investigation.  I think it is all kind of
24    irrelevant.
25            So as far as causation goes, paragraph 24,
```

```
1   which identifies ten vulnerabilities on the Wyndham
2   network that were caused by the unreasonable Wyndham
3   data security practices, in paragraphs 25 through 39
4   which describe the three breaches, in almost every
5   instance the paragraph aligns to a particular
6   vulnerability.
7           For example, in paragraph 26, it addresses
8   password complexity, because the password were
9   susceptible to brute force attack.  Paragraph 27, it
10  talks about 212 user lockouts which should have
11  alerted the IT people at Wyndham they were undergoing
12  an attack.  If they had good detection for intrusion,
13  for potential intrusion, which is another
14  vulnerability we identified in paragraph 24, they
15  would have been able to respond to that.
16          Same with paragraph 28, refer to firewalls
17  and segmentation.  Paragraph 29 refers to the fact
18  that there were vulnerable computers on their network
19  that weren't getting security patches.  So to go
20  through, I could go through all of them.  The main
21  point here is there is a direct link between the
22  vulnerabilities identified and the breaches.
23          The last point I would make so far as federal
24  law and credit card companies policies regarding zero
25  liability, it is a question of fact, not that these
```

```
 1   policies exist, not that the law exists, but in order

 2   for the law to work, someone has to detect that fraud,

 3   whether it is the credit card company, or the

 4   consumer, and the credit card company has to

 5   acknowledge and agree that in fact that fraudulent

 6   charge was a fraudulent charge.  And not all credit

 7   cards immediately accept a consumer's assertion that

 8   there was a fraudulent charge on that card.

 9           These are questions of fact.  We have alleged

10   separately from where we identified $10.6 million in

11   fraud charges, we separately allege in paragraph 24

12   unreimbursed fraud charges.  We are not saying $10.6

13   million in unreimbursed fraud charges, but we do

14   allege separately that there were unreimbursed fraud

15   charges, which is to say that consumers acting

16   reasonably under the circumstances were faced with

17   unreimbursed fraud charges.

18           In addition, your Honor --

19           THE COURT:  Where do you allege that,

20   counsel?

21           MR. MORIARTY:  That is paragraph 40.  It is

22   just, at the end of the same sentence where we --

23           THE COURT:  I thought you said paragraph 24.

24   Paragraph 40.

25           MR. MORIARTY:  40, line 5.  As far as, we
```

 1    identified 600,000, we said over 600,000 payment cards

 2    were stolen, and those include debits cards and the

 3    law, they didn't say anything about debit cards in

 4    their presentation.  In the law, and card brand

 5    policies are different on debit cards and it is not

 6    true that in all circumstances debit card companies

 7    will provide for zero liability for fraud charges.

 8          And then the last point I would make is that

 9    this case is not exclusively about the unreimbursed

10    fraud charges.  This case is about because there was

11    $10.6 million in fraud charges, consumers faced other

12    injuries, including loss of access to credit, loss of

13    access to funds, when their bank accounts were

14    temporarily frozen or depleted, reasonable mitigation

15    costs, including paying for credit monitoring and the

16    time, trouble and aggravation spent undoing the fraud

17    and paying for injuries.  These are what we allege in

18    the complaint.

19          THE COURT:  Forgive me, counsel.  In its

20    reply they said some of these lawsuits cannot be

21    viewed as injury necessarily.  You say what?

22          MR. MORIARTY:  As I understand it, I think

23    you are referring to the Reilly case?

24          THE COURT:  Yes.

25          MR. MORIARTY:  The Reilly case is a lot

```
1    different than this case.  We alleged more and
2    different kinds of injury than the plaintiffs did in
3    Reilly.
4            Most significantly in Reilly there was no
5    misuse, they did not allege misuse.  By contrast, the
6    FTC alleges misuse in this case, some of it being
7    reimbursed, but misuse nonetheless, which gives rise
8    to some of the unrelated injuries, including some
9    unreimbursed fraud charges, the time and trouble spent
10   undoing purchases and credit monitoring.
11           Second, the Reilly Court's holding that
12   mitigation expenses were not reasonable was based on
13   the fact that there was no misuse, potential misuse
14   was merely speculative.  In this case misuse isn't
15   just nonspeculative, it actually happened.  In Reilly
16   the Third Circuit says the present sense is actuality,
17   not hypothetical speculation.  In this case the FTC's
18   complaint passes that test because it identified
19   actual misuse.
20           THE COURT:  All right, counsel.
21           MR. MORIARTY:  That is all I have unless I
22   you have other questions.
23           THE COURT:  No, I will probably have
24   additional questions, depending on the response.
25           Counsel, again, we are looking at as pled.
```

```
 1    When I look at paragraph 40, the language there is

 2    right after the 10.6 million in fraud loss, it says,

 3    consumers and businesses suffered financial injury

 4    including, but not limited to, unreimbursed fraudulent

 5    charges, increased costs, and the loss access to funds

 6    or credit.

 7           Consumers and businesses also expended time

 8    and money resolving fraudulent charges and mitigating

 9    subsequent harm.  I know you argue that some of those,

10    lost time, lost access, may not necessarily constitute

11    an injury that they can rely on, and you think it is

12    one of monetary injury.  Let me hear you a little on

13    that and your position with respect to paragraph 40,

14    the way it is pled.

15           MR. ASSAF:  I am surprised because the first,

16    this is the first time they have walked back from the

17    $10.6 million number.  It has to be in the complaint,

18    10.6.

19           I stood up and said, your Honor, I am

20    skeptical of that.  I have nothing except my lawyerly

21    instincts to tell me that is being creatively pled.

22    They walked back from that, and said of course the

23    $10.6 million isn't all consumer losses.  Then they

24    point to paragraph 40 and say there is $10.6 million

25    in fraud loss and consumer and businesses suffered
```

```
 1    financial injury.  Consumers and businesses.  It is
 2    substantial consumer injury.  It is not business
 3    injury.  It is substantial consumer injury.
 4          So the $10.6 million number we know that is
 5    no longer the applicable number.  And then what they
 6    try to do is say, oh, it is consumers and businesses.
 7    Exactly what I said when I came up here before is that
 8    my suspicions tell me that that is the card brand and
 9    not the consumers.  So if they have --
10          THE COURT:  But even if there was some
11    consumers, again we are at the pleading stage.  Even
12    if there were some consumers that inevitably did not
13    get reimbursed, even, for say hundreds of dollars, all
14    right, I mean, you would say that is not substantial
15    injury?
16          MR. ASSAF:  Yes.  For the FTC to pursue an
17    enforcement action for substantial consumer injury, I
18    don't think it can be two people at $50.  I don't
19    think that that is the purpose of the Act.  I don't
20    think that is the purpose of unfairness statement.  I
21    don't think that is the exact -- remember, they are
22    bound by the statement on unfairness that says
23    substantial consumer injury.  If they had two people
24    out of this $10.6 million at $50, that doesn't meet
25    the standard, your Honor.
```

```
 1            THE COURT:  Well, you cite in your brief at

 2   page 9, in your reply, you talk about the FTC Chairman

 3   Miller, and I just want to look at that section of

 4   your brief for a second, because in just taking this

 5   directly, in a 1982 letter to Senators Packwood and

 6   Katzen, FTC Chairman Miller reiterated the

 7   Commission's view on what constitutes a substantial

 8   injury.  As a Federal body, the Commission believes

 9   the concerns should be with substantial injuries.  Its

10   resources should not be used for trivial or

11   speculative harm.  Substantial injury involves

12   economics or monetary harm and does not cover

13   subjective examples of harm, such as emotional

14   distress or offenses to taste or social belief.

15            And you cite to that.

16            Well, it does, I mean, I looked at that, and

17   I just, again, we are talking about monetary loss.  It

18   may just be 50 or a hundred, but what if it was, as

19   they said, there were breaches of hundreds of

20   thousands of card holders' information?  We don't know

21   because, again, discovery hasn't been had.  But I

22   mean, if you put them cumulatively together, is there

23   not monetary loss and would then this cite in your

24   brief not really help me in terms of what substantial

25   injury is?
```

```
 1              MR. ASSAF:  No, your Honor.  First of all I
 2    think the cite on emotional harm and noneconomic harm
 3    is consistent with Reilly.  That part of the pleading
 4    cannot be forward.  But in terms of this issue, in
 5    terms of if 600,000 numbers were accessed, and
 6    consumers didn't actually lose money, it actually, it
 7    is analogous to Reilly in some ways in that it says
 8    their credit card statement, that is my take away from
 9    Judge Aldisert's opinion in Reilly where he says your
10    credit card statements are the same now as they were
11    two months ago.
12              And so here, the fact that Russian cyber
13    criminals took 600,000 numbers, that can't be the
14    standard.  It has to be substantial consumer injury
15    under the statute, and the statement on unfairness.
16    And we know that, we know that because that is what
17    the statement says, but also, your Honor, all these
18    other hacking incidents that I talked about, including
19    the criminal indictment down the hall, hundreds of
20    thousands, if not millions of credit card numbers were
21    taken.  That can't be --
22              THE COURT:  But there was no misuse in
23    Reilly, was there?  There was no misuse in Reilly.
24              MR. ASSAF:  I agree.
25              THE COURT:  We have misuse here.  Let's
```

```
 1    assume arguably, I don't know what discovery is going

 2    to bare out.  But what if the credit -- doesn't the

 3    credit card holder have to advise the credit card

 4    company within 60 days of the unauthorized, I am just

 5    wondering, is there a time limit that they have to

 6    advise, I have fraudulent charges on my card?

 7            MR. ASSAF:  I think that is the case, your

 8    Honor, but I also know that the -- we notify the

 9    credit card holders and we notify the card brands, and

10    in some cases the card brands notified us saying we

11    think there is a problem here.

12            Your Honor, it is not -- the notion that a

13    couple of people who weren't reimbursed, who didn't

14    get reimbursement can form the basis of an action for

15    a substantial consumer injury, if there are a handful

16    of people who for some reason, whether it be

17    administrative or otherwise, can't get their $50 back,

18    we started the discussion about the FTC's mission to

19    protect consumer hard, substantial consumer injuries.

20    We are now talking about the FTC now trying to plead

21    around the notion of how much consumers, they know

22    this --

23            THE COURT:  But you are saying at a pleading

24    stage they have to plead with such specificity, I

25    don't think you can cite a case to me that says they
```

```
 1   have to plead with the amount of specificity you are

 2   currently advocating.  The reality is we don't know.

 3   Discovery has to play out.  They have to see, was it

 4   hundreds of people that weren't reimbursed, what is

 5   the difference?  Is it five people, is it a hundred?

 6   Is it if it is hundreds of people that weren't

 7   reimbursed and you cumulatively look at that number,

 8   does that amount of substantial injury.  Arguably,

 9   based on what I am reading in a footnote that you

10   provided, that goes beyond emotional distress.  That

11   goes beyond.  That is monetary damage.  And you can't

12   tell me that a hundred, or, you know, what is the

13   barometer, what is the gauge.  How much is substantial

14   injury?  Can you provide that to me in terms of a

15   monetary amount?

16         MR. ASSAF:  Well, I could tell you it is not

17   $100.  But their pleading requirement under the

18   statute, your Honor, and under the statement on

19   fairness, they have to, in order to bring an

20   enforcement action, say, determine, prior to bringing

21   the action that there was substantial consumer injury.

22         So it is not, I know I am the moving party,

23   but I am just moving saying they haven't met their

24   statutory burden to show their substantial consumer

25   injury.  In fact, I think it is worse because I think
```

```
 1   you just heard counsel for the FTC say the $10.6
 2   million, that is not all consumers.  That is business
 3   and consumers.  So your Honor, I have a statute that
 4   says substantial consumer injury, they have to plead
 5   it.
 6        So you are asking me what is substantial
 7   consumer injury?  I am in the same position as I am on
 8   the regulation.  If I had a pleading that said it is X
 9   hundreds of thousands of dollars we could then have a
10   debate.
11        But it is certainly not fair for a defendant
12   to say I don't have this information.  They do.  They
13   have a statutory requirement by Congress for
14   substantial consumer injury and they have now stood up
15   in front of a Judge and said the $10.6 million, that
16   is not it.  It is something less than that.
17             THE COURT:  Okay.
18             MR. ASSAF:  Now, the final issue, the
19   reasonably avoidable one that you raised with me, your
20   Honor, that actually is in this section.  And the
21   reason why, that is also an element of substantial
22   consumer injury, whether it is reasonably avoidable.
23   Your question about, if consumers were informed, and
24   the card brands were informed, and there are a handful
25   of consumers who didn't then follow up, it goes
```

```
 1    directly to reasonably avoidable injury.

 2              THE COURT:  Okay.  But here is the question I

 3    had on reasonably avoidable injury.  And I want to

 4    hear from both sides on this.  When I read it, as I

 5    looked at it, maybe I am wrong and counsel will tell

 6    me if I am wrong, please do so.

 7              When we look at that, the injury was not

 8    reasonably avoidable, the way that one reserves a room

 9    nowadays, you have to provide the hotel with a credit

10    card number, even if you want to pay cash.  A hotel

11    requires that you give them, in order to reserve that

12    room, your credit card information.  All right.  I

13    think that is the way, we all can agree on that.

14    Right?

15              So how am I as a consumer going to avoid the

16    injury, that being that all my private information was

17    hacked and taken by criminals in Russia, if I have no

18    choice but to give you, the hotel, my credit card

19    information, or guess what, I don't get to reserve a

20    room in Arizona?  So I am just wondering, we are

21    talking about the injury, that being the loss, and you

22    analyze it in saying, well, the credit card consumer

23    calls and notifies the company of fraudulent charges,

24    they are going to be exonerated from paying any of

25    those charges.  But when I look at injury, that being
```

```
 1    the injury as cited in 32, and in 40, that being the
 2    information that was taken, unfortunately, as I -- I
 3    can't reasonably avoid it because in order for me to
 4    reserve a room, I need to provide this information.
 5              So am I reading that wrong?  I am looking at
 6    the wrong injury?  And if so, tell me.
 7              MR. ASSAF:  Yes, your Honor. With all due
 8    respect, that approach, the question is not whether
 9    using a credit card is reasonably avoidable.  That is
10    not --
11              THE COURT:  No, hacking, taking my private
12    information, whether that injury, taking my
13    information, I can't give you anything other than that
14    information in order to reserve the room.
15              MR. ASSAF:  Then there are three separate
16    things.  Giving your credit card to the hotel.  Is
17    that reasonably avoidable?  I suspect it is not, but I
18    think it is also not an element of this case.
19              I think then you get to whether the hacking
20    itself caused a substantial consumer injury.
21              Or then the third issue of whether there is
22    actual substantial consumer injury as defined by
23    economic loss.
24              Issue two is not covered by the statute.
25    There has to be, I mean, it is not only, I would
```

Case: 14-3514   Document: 003411759077   Page: 150   Date Filed: 10/07/2014
Case 2:13-cv-01887-ES-JAD   Document 36-11   Filed 12/17/13   Page 2/150 Page 2 of 1704

123

```
 1    argue, this is the whole theme of actual injury.
 2    Okay.  It is more than just losing, you know, that
 3    have your credit card out there and you have the time
 4    and expense.  That I think is taken care of by Reilly
 5    and other cases.  But it is actual substantial
 6    consumer loss.
 7            That is the injury that the FTC has to plead
 8    in order to comply with the statute.  So they have to
 9    plead that there was actual substantial consumer
10    injury and that it was not reasonably avoidable.  And
11    so that is all, I am just asking that they comply with
12    the statute and the statement on unfairness, but that
13    is the key here.  It is not just to say there was
14    fraud loss and now we get to go forward.
15            Finally, your Honor, the debit point.  Can we
16    put up slide 102?
17            I just want to hopefully get rid of this
18    issue.  I know we briefed it.  That the debit issue is
19    covered like the credit card issue under federal
20    regulation.  And more importantly, your Honor, this
21    does go to a pleading issue.  There is no allegation
22    in the complaint that pin numbers were taken.  None at
23    all.  There is no -- you know, when you go into, you
24    sometimes swipe your credit card or you do the debit,
25    you do the pin number.  There no allegation in the
```

```
 1    complaint, so this is a total red herring, as is the
 2    time and effort, the emotional distress issue.  So
 3    when we talk about pleading issues, I don't think they
 4    meet substantial consumer injury as they conceded.
 5    That is not accurate in the complaint.  They can't
 6    lump together businesses and consumers and meet
 7    their --
 8              THE COURT:  When did they concede that?
 9              MR. ASSAF:  When they got up and said we
10    lumped together in paragraph 40 businesses and
11    consumers.  That is not what the statute, they are not
12    there to protect substantial business injury --
13    substantial business injury is not part of their
14    mission.
15              THE COURT:  Okay.  Mr. Moriarty.
16              MR. ASSAF:  Do you have any questions?  I
17    would be happy to answer.
18              THE COURT:  Not yet, no.  Thank you, counsel
19    Mr. Moriarty, have you conceded that the 10.6 million
20    is not part of the loss figure in this case?  Is that
21    what you did when you stood up?
22              MR. MORIARTY:  No, the 10.6 million dollars
23    are the unreimbursed fraud charges.  As a factual
24    matter, it is just one card brand.  But I understand
25    we can't address that it.  It is a predicate for the
```

1   loss which addresses the Reilly concern, which is that

2   there wasn't misuse in this case.  Any other injuries

3   including monetary injuries flow from misuse.

4           In addition,  there were unreimbursed fraud

5   charges to the extent it is consumer and business,

6   under the FTC Act, the FTC can protect small

7   businesses.  So the allegation refers to small

8   businesses that often book rooms for their employees

9   with their credit cards that also suffered the same

10  loss of their payment card information as a result of

11  the breaches.

12          On the reasonable avoidable part, the point

13  that you made, consumers certainly would not have

14  known that Wyndham had unreasonable data security

15  practices in this case, especially because, as we

16  allege, we alleged they had unreasonable data-

17  security practices.  We also allege that in their

18  privacy policy they deceive consumers by saying we do

19  have reasonable security data practices.  That is one

20  way consumers couldn't possibly  have avoided

21  providing a credit card to a company --

22          THE COURT:  Can you walk me through -- I am

23  sorry to interrupt you, counsel.   That is why I

24  apologized this morning.  Can you walk me through the

25  injury that you say the Court is looking at and

```
 1   whether that injury then is reasonably avoidable?

 2           MR. MORIARTY:  Sure, your Honor.  The injury

 3   we have alleged in paragraph 40 that is not reasonably

 4   avoidable, all the injuries is not reasonably

 5   avoidable, include unreimbursed fraud charges, the

 6   loss of access to funds as a result of frozen or

 7   depleted bank accounts, even if temporary, temporary

 8   loss of access to credit, and the cost of reasonable

 9   mitigation, and then we also allege injury in the form

10   of time, trouble and aggravation dealing with

11   unwinding this fraud, and with re-establishing

12   recurring payments after the credit cards have to be

13   changed for hundreds of thousands of consumers.

14           As far as that last point, the time trouble

15   and aggravation, I dispute the characterization as

16   emotional harm, or not covered by the FTC Act.  In FTC

17   versus Niovi, which is a Ninth Circuit case, there was

18   a very similar set of circumstances, and the Court

19   found that even if consumers were fully reimbursed or

20   raised on their debit accounts as a result of unfair

21   data security practices by the defendant in that case,

22   even though they were reimbursed, the time, trouble

23   and aggravation of being reimbursed constituted a harm

24   under the FTC Act.

25           THE COURT:  So your point as to whether it
```

```
 1   was reasonably avoidable by the consumer, you would
 2   say they couldn't because they were relying on a
 3   statement and assurances by Wyndham that they were
 4   taking reasonable -- what was your -- Let me not put
 5   words in your mouth.
 6           What is your point with respect to reasonably
 7   avoiding?
 8           MR. MORIARTY:  The point on reasonable
 9   avoidability we make in our brief is really just about
10   the injury, not about the choice to use Wyndham.  I
11   did make that point just now.  But the real point is
12   that consumers suffered substantial injury because
13   their payment card information was taken as a result
14   of Wyndham's unreasonable data-security practices.
15           And then because it was taken there were
16   $10.6 million in fraud charges, some of which are were
17   unreimbursed, there was the time and trouble spent
18   unlining the fraud, re-establishing credit, recurring
19   payments, loss of access to funds, as well as
20   reasonable mitigation expenses.  Perhaps we should
21   have briefed the debit card issue more.
22           My understanding is once you receive your
23   notice from your bank, you are considered on notice
24   of any fraudulent charges.  So the 60 days that was
25   referred to in the statute starts then, and so again,
```

1   this is a factual issue.  This is not an issue for a

2   motion to dismiss.  But I can conceive of a situation

3   where someone has a $4.00 charge that they don't

4   notice and 60 days passes from when they received that

5   charge, at that point the statute no longer provides

6   liability cap.  So after that 60 days, if there is an

7   additional charge beyond the $4.00, a thousand

8   dollars, $500, anything, that is not reimbursed by

9   statute.

10          Thank you, your Honor.  Do you have any other

11   questions?

12          THE COURT:  No.  Thank you, counsel.

13   Anything else?

14          MR. ASSAF:  Your Honor, I understand we have

15   argued this point.  But I think that the last

16   statement by the FTC illustrates why the pleading

17   requirements have to be met.  A federal enforcement

18   agency doesn't get to stand up and say I can imagine

19   there are situations out there.  You have to plead it.

20   You can't say, well, the law might be what it  is, but

21   I can imagine this.

22          They have a pleading obligation, your Honor.

23   And they haven't published regulations, they haven't

24   published rules.  I have argued that.  Now we are at a

25   stance where they are saying I don't have to plead it

```
 1    because I can imagine situations where it occurred.

 2            With all due respect, I don't think that is

 3    the standard for a federal enforcement action.  I

 4    think we have to have a standard where they have to

 5    plead what they know and it has to be true and

 6    accurate.

 7            THE COURT:  I don't think we need to get

 8    into the injury is not outweighed by countervailing

 9    benefits to consumers.  If either side feels they want

10    to weigh in on that.  Counsel.

11            MR. MORIARTY:  No, thank you, your Honor.

12            THE COURT:  Counsel.

13            MR. ASSAF:  No, your Honor.

14            THE COURT:  Okay.  So now it is 1:16.  We

15    have been arguing since ten o'clock this morning.  I

16    would like to take a break, take a break until 2:00

17    o'clock.

18            We will come back, and deal with count 1, the

19    deception claim, and then we will move on to the

20    motion filed by the other Wyndham entities, and

21    finally the motion to stay.

22            Thank you, counsel.  See everybody at two

23    o'clock.

24            (Luncheon recess.)

25
```

```
 1              A F T E R N O O N   S E S S I O N

 2         THE COURT:  All right.  Back on the record in

 3    the matter of FTC versus Wyndham Worldwide Corp.,

 4    civil 13- 1887.

 5         We are moving to count 1, deception claim, to

 6    establish liability under Section 5 of the FTC Act the

 7    FTC must establish there was a representation, the

 8    representation was likely to mislead customers acting

 9    reasonably under the circumstances, and the

10    representation was material.

11         Actually, I want to start with the FTC, and

12    ask that the FTC go through the complaint and tell me

13    where in the complaint you would argue you pled the

14    case for a deception claim.

15         MR. MORIARTY:  Yes, your Honor.  Your Honor,

16    as I understand it, defendant's main argument that we

17    hadn't pled deception was that the allegations in

18    paragraph 24 apply only to franchisees, and they argue

19    that the privacy policy applies only to the Wyndham

20    Hotel network.  Is that the issue would you like me to

21    discuss?

22         THE COURT:  Well, I sort of feel like in the

23    briefs we didn't really lay out the facts to support,

24    or disprove each of the prongs that I just went over.

25    And so what I am asking you to do is lay out your case
```

```
 1    in terms of looking at the case -- looking at your

 2    claims, rather, as it relates to count 1.  And then

 3    of course, the whole franchisor, franchisee, but I

 4    felt I didn't really have a good handle on what facts

 5    you were relying on to support your prongs of

 6    deception.

 7            MR. MORIARTY:  Okay.  So the first prong is

 8    that Wyndham made a representation, and that is in

 9    paragraph 21, it identifies the Wyndham Hotel Group

10    privacy policy.  And in that the privacy policy

11    specifically at paragraph, line 13 of the complaint,

12    paragraph 21, on page 9.  And then also it discusses

13    safeguarding, using industry standard practices, and

14    then paragraph 20 says we take commercially reasonable

15    efforts to create and maintain firewalls and other

16    appropriate safeguards.

17            Then it goes on to ensure that is the extent

18    we control the information, the information is used

19    only as authorized by us, and consistent with this

20    policy, and that the information is not improperly

21    altered or destroyed.  So that is the statement that

22    we are pointing to.

23            THE COURT:  Okay.

24            MR. MORIARTY:  The statement is likely to

25    mislead because as we have alleged the practices were
```

```
 1   not in fact commercially reasonable  to create

 2   appropriate safeguards to ensure that the information

 3   is used as only authorized by us and consistent with

 4   the policy.

 5          THE COURT:  Where is that in the complaint?

 6          MR. MORIARTY:  That is paragraph 24.  That

 7   just alleges the litany of vulnerabilities that appear

 8   on the network because of the lack of reasonable data

 9   security practices.

10          Lastly, your Honor, the materiality is, this

11   is not in the complaint because it is a case law

12   argument, but essentially materiality comes from the

13   fact that it is an expressed statement, and expressed

14   statements are presumed material under FTC law.  I can

15   give you a case for that.

16          THE COURT:  Please do.

17          MR. MORIARTY:  Okay.

18          THE COURT:  While you look for that case, let

19   me understand, you say that the representation --

20   strike that.  One, there was a representation.  You

21   say the representation can be found in paragraph 21,

22   specifically starting at line 13 of the complaint,

23   right?

24          MR. MORIARTY:  Yes.

25          THE COURT:  Then as to the second prong, the
```

1    representation was likely to mislead customers acting

2    reasonably under the circumstances.  So you would say

3    that 24 supports that second prong that it was likely

4    to mislead because they weren't doing these -- they

5    were failing to -- failed to use readily available

6    security measures, and then again those ten

7    vulnerabilities that you lay out in paragraph 24.

8            MR. MORIARTY:  Yes, your Honor.

9            THE COURT:  And then as to materiality you

10   say that case law, and you are going to give me now a

11   cite.

12           MR. MORIARTY:  There are a lot of cases that

13   support that.  There is a District of New Jersey cite

14   called In Re National Credit Management Corporation,

15   LLC, 21 F. Supp. 2nd 424 at pinpoint 441, (District of

16   New Jersey 1998.)

17           It is also in the deception statement which

18   is the FTC's interpretation of the deception

19   authority.   That is the policy statement on deception

20   that --

21           THE COURT:  Where in your opposition can I

22   find -- can I find these cases?

23           MR. MORIARTY:  No.  I would say that it is

24   not in there because I didn't see that issue raised in

25   their brief.  That we didn't state that it was

1 material.  The FTC statement on policy is, or FTC

2 policy statement on deception is 103 FTC 110, pin cite

3 174, that is a 1984 statement.

4        THE COURT:  All right.  So the reason you

5 didn't address it is it wasn't raised by Wyndham, so

6 you did not address it, but you again -- give me the

7 cite for the case.

8        MR. MORIARTY:  For the District of New Jersey

9 case is 21 F. Supp. 2d 424 at 441.

10        THE COURT:  Anything else?

11        MR. MORIARTY:  No, that covers the pleading.

12 I will address any additional issues they raise after

13 their argument.

14        THE COURT:  Certainly.  Let me hear from

15 Wyndham now.

16        MR. MORIARTY:  Thank you.

17        MR. ASSAF:  Good afternoon, your Honor.

18        So deception.  The FTC, after hours of

19 argument, seems that we are coming down to this big

20 analytical fight.  Their case is apparently all about

21 commercially reasonable efforts, and their view is

22 that in lieu of regulation and the new rules, rules

23 and policies, that all they have to do is show

24 commercially reasonable, both for unfairness and now

25 deception.

1          I, focusing on deception, your Honor, what we
2     say is that we safeguard our customers' personal
3     identical information by using industry standard
4     practice.  Although guaranteed security is not a
5     given, on or off the internet, we make commercially
6     reasonable efforts to make our collection of personal
7     information consistent with applicable laws. Two
8     points on this. It is ours.  Two, it is commercially
9     reasonable.
10          Here is what we have another analytical
11    divide between the FTC and Wyndham.  I keep going back
12    to fair notice.  We have the FTC, they haven't argued
13    it but your questions at least presuppose there is
14    some discussion about whether it is subjective or
15    objective.
16          Just for the record, your Honor, I don't
17    think they raised that in their brief.  But let's
18    assume I think from your questions you were asking
19    whether it is subjective.  We think it is objective.
20    Here, this is -- now, the FTC is saying, well, this is
21    objective.  Fair notice, not so much.  That could be
22    subjective.  I think they are buying in to your
23    question.
24          THE COURT:  I think they did say objective at
25    some point.

```
 1            MR. ASSAF:  That would be objective.  Could I
 2   take one minute, because you raised that issue, it
 3   bothered me.  We were looking at it at lunch.  And
 4   they didn't raise, the FTC didn't raise subjective or
 5   that it is a fact issue, fair notice, in their brief.
 6   And I didn't hear it, but I couldn't understand what
 7   their position is, and we have looked at the cases, at
 8   least over the last hour, we can't find any case, your
 9   Honor.  If you do, I appreciate you already giving me
10   Beverly, but if there is another Beverly instance I
11   would be happy to look at it.
12            We looked and can't find any case in which
13   fair notice is either a subjective issue as opposed to
14   an objective issue, or where courts say there is a
15   factual issue as to agency action and whether there is
16   fair notice.
17            So maybe I misunderstood the FTC and
18   misunderstood the tenor of the Court's question, but
19   it is clearly not raised in their brief, and it is
20   just bothering me because it seems to be a huge issue,
21   whether this is objective or subjective and we can't
22   find any case law saying that it is subjective and a
23   fact issue.
24            So in any event, to this issue, I think you
25   say commercially reasonable efforts, and as the FTC
```

said, when they are weighing agency action, their view

is, well, we want to consider small businesses and we

want to consider what businesses are looking at based

on their dynamic and how many employees they have.  I

would say if anything, your Honor, that analysis helps

us, because commercially reasonable effort as

determined by whom?

I would say, as determined by Wyndham, not by

the FTC.

And so I don't think that this is part and

parcel of their deception case, and I would suggest

that there is nothing in this statement that is the

hallmark of deception.  In fact, the FTC versus

Millennium Telecom here in the District of New Jersey,

the case cite from that case which I think is crucial,

the cardinal factor in determining whether an act or

practice is deceptive under Section 5 is the likely

effect that the promoter's handiwork will have on the

mind of the ordinary consumer.

So I go back to where I started this morning.

Again, the case law says promoter's handiwork.  There

is some sort of deceptive activity.  Here, your Honor,

there is no real allegation that there is some sort of

malevolent, deceptive activity by, or the handiwork of

Wyndham at play here.  What the FTC is saying is that

```
 1    we disagree with what security measures you put in.
 2    And I would say, your Honor, just as a matter of
 3    logic, it can't be that the failure to implement the
 4    data security measures that they say should be
 5    implemented is somehow this nefarious promoter's
 6    handiwork under the case law.
 7            But leave that aside, the explanation point
 8    to that is it is in the very same policy statement
 9    where we say, we do not control the use of this
10    information or access to the access to the information
11    by the franchisee or its associates.
12            And you remember, your Honor, even their
13    complaint says it is the Wyndham-branded hotels in
14    which the information was extracted from.  And we say
15    very plainly that it is, we don't control the
16    franchisee information.
17            So I don't think they can have it both ways,
18    saying, well, the policy is deceptive because a
19    consumer reads it and is deceived by the policy.  But
20    then the very next page of the policy tells the
21    consumer we don't control your information and the FTC
22    says, well, ignore that section.  The consumer isn't
23    reading that portion of the section.
24            So I would say that the policy itself is not
25    deceptive on its face, and I think the best source
```

```
 1   here is the international franchise association cases
 2   that talk about the relationship between franchisor
 3   and franchisee, including the Radisson case, from New
 4   Jersey, which is slide 63.  I call it the Radisson
 5   case.  The District of New Jersey, I think it is Judge
 6   Thompson.  Judge Thompson.  There is no genuine
 7   dispute that Radisson lacked both ownership interest
 8   and control over the day-to-day operations of the
 9   hotel.  The right to conduct and carry out periodic
10   inspections to ensure consistency and quality of the
11   Radisson brand does not give rise to the power to
12   control the daily maintenance of the premises.  Courts
13   that have addressed the issue of duty require
14   franchisors to exercise more than a right to control
15   uniformity of appearance, products and administration
16   in order to find a duty of care.
17        The International Franchising brief says it
18   much better than I could.  I think it is pretty clear
19   from cases across the country that franchisors should
20   be held liable for franchisee problems
21        And again, stepping back why we are here.
22        THE COURT:  You anticipated my next question
23   which is why --
24        MR. ASSAF:  This is such a huge issue,
25   because this is what I call the bridge too far.  This
```

```
 1    is why we are here.  That the FTC, you look at all

 2    those --

 3            THE COURT:  My question is why now?  The

 4    question that I was going to ask, the one I have been

 5    asking you all, throughout the course, I am not trying

 6    to give counsel a hard time, I just really honestly

 7    think a lot of the questions in terms of how the

 8    franchisor and the franchisee deal with one another,

 9    all of these sound like issues that are better left

10    for a later point in time, not at a motion to dismiss.

11            And I know that you fundamentally disagree

12    with me, and that is fair.  That is why we are having

13    oral argument for us to flush out your position.  But

14    I mean a lot of these arguments, you know, you even

15    say in your moving papers, counsel, page 27, and I

16    have questions which is that you say that the security

17    standard, defendants say the security standard is

18    adequate or reasonable is a question of law, page 27,

19    not of fact.  And all allegations as to the same are

20    the properly disregarded on a motion to dismiss.

21    Where do you support the statement?

22            MR. ASSAF:  This is a huge issue, your Honor,

23    it goes back to the fair notice and the pleadings

24    standards we have been talking about, and this is

25    Twombly.  This is, it is for a private party Twombly
```

```
1    and for the government Twombly.  The FTC can't just

2    make secure generalized allegations because that runs

3    afoul of Twombly.

4          So I know you and I have had a lively

5    exchange, it has been great, it has been a fun

6    argument, it is why you are a lawyer, this is a good

7    day, even though some of the questions haven't been

8    that good.

9          But again, this is really, really important

10   because Twombly, Twombly infects the government's

11   complaint for all the issues I talked about earlier,

12   that they can't just say, hey, we are making these

13   conclusory allegations that these are unreasonable

14   security efforts.  It is the double whammy for me.

15   Okay, they don't publish it, I know, talk about fair

16   notice.

17         Then they say I don't even have to meet

18   Twombly for the pleading.  All I have to say is it is

19   unreasonable, or commercially unreasonable.  That is

20   what it is.  So this is more of a Twombly, Iqbal

21   issue.  I think if this were a private party I would

22   suspect that the Court would have really hard

23   questions about well, there has to be more --

24         THE COURT:  Why is it Twombly?  Step me

25   through it, just as I asked counsel, Mr. Moriarty, the
```

```
 1    question, step me through, we are analyzing it from an
 2    MTD point of view.  Tell me why it is not adequate.
 3    Tell me why it is not pled with particularity.  What
 4    are they missing?
 5          If we look at what they are saying, counsel
 6    says, Judge, we say the representation can be found on
 7    page 21.  Strike that.  Paragraph 21, page 9 of my
 8    complaint, starts at line 13.  We say that obviously
 9    it was, it was a representation that was likely to
10    mislead customers acting reasonably under the
11    circumstances, because they weren't doing that.  What
12    they did, Judge, is they, and they say on paragraph
13    24, that I have ten separate vulnerabilities, that,
14    you  know, obviously are misrepresentation, and that
15    it was material, they argue, there is case law to
16    support that it was material misrepresentation.
17          Tell me why now this is a Twombly issue, and
18    not an issue that I think we disagree on, an issue
19    better left for summary judgment at a dispositive
20    stage when discovery has been exchanged and we can now
21    look to what they are alleging the actual deficiencies
22    are in terms of the record.  But I have at least ten
23    here saying there were deficiencies.  Why is that
24    there is not enough when  you look at it from an Iqbal
25    Twombly perspective?
```

1          MR. ASSAF:  21, they say these are the

2     policies.  These are the policies.  24, they say, 24,

3     we decided to, or we failed to provide reasonable

4     security measures.  And they identify a number of

5     allegations that were not reasonable.

6          Now, in term of Twombly, I didn't think they

7     were simply able to say these are things that they

8     didn't do.

9          It gets back to my whole causation point,

10    that they have to address with specificity that these

11    deceptive statements were in the mind of the

12    consumers, for example, on 24, that a reasonable

13    consumer would think that the available security

14    measure, that firewalls were being used.  Okay.  I

15    don't think they simply say, here is a litany of

16    problems and it is deceptive.

17         The deceptive element that they have to say a

18    reasonable consumer, having reviewed this policy,

19    would find deceptive.  And I don't think that is in

20    here.

21         So under Twombly, they can't just say these

22    are a bunch of problems.  These are deceptive, and we

23    have now cited our deception count.  I think they have

24    to do more in terms of analyzing, like a securities

25    fraud case, these statements were made to the

 1   investment public, that a reasonable investor relied

 2   on these on October 2, and that by relying on these,

 3   caused harm.  And I don't think they do it under

 4   Twombly.

 5          So that is why in terms of the cases, too, I

 6   come back to the notion that we would have to go

 7   through discovery to have all of these questions

 8   answered when the law is so clear that the franchisor-

 9   franchisee relationship is what it is, and so if they

10   are going to now exceed what I think the clear law is

11   on franchisor-franchisee relationship, that is even a

12   higher burden under Twombly because now they have to

13   come forward saying in the normal franchisee-

14   franchisee relationship, we understand this is the law

15   controlled as an equal liability in terms of

16   appearance, et cetera.

17          Now under Twombly they have to do more.  They

18   can't just say I am entitled to discovery because I am

19   making these allegations.  We know this law is out

20   there and the franchisor-franchisee relationship.

21   Otherwise, they will always simply plead these are

22   unreasonable standards and the franchisor is liable

23   and thus we get discovery.

24          I put it the other way around, your Honor.

25   How would I ever get, under the discussions we have

```
 1    had, how would I ever win on a motion for judgment on

 2    the pleadings or a motion to dismiss?  Because as I

 3    said --

 4              THE COURT:  But even that case that you are

 5    citing, wasn't that summary judgment?

 6              MR. ASSAF:  That was summary judgment, your

 7    Honor.  But if you look at all the cases in the IFA

 8    brief, these are cases on summary judgment and motions

 9    to dismiss, and I would say again here, they have to

10    come forward with some fact, some plus factor to show

11    that outside this.  Otherwise, your Honor, in two

12    months, if I am here, and they say, you know what?

13    All the indicia of franchisor-franchisee relationship

14    after millions of dollars in discovery, you are right.

15    That is where it was.

16              That doesn't really benefit me.  The whole

17    purpose of Twombly is to avoid excessive and costly

18    discovery by putting the pleading party's feet to the

19    fire before discovery begins.

20              THE COURT:  You seem to be holding the agency

21    to a higher standard.  A heightened pleading.  And I

22    would like you to speak to that a little bit, because

23    you said earlier, it was in a different context but I

24    do, you know, speaking of wanting to get back to

25    things, we were discussing issue three and whether
```

```
 1   unfairness was adequately pled by the FTC.  You

 2   started, you know, and I asked you whether this was

 3   almost a heightened standard that I was holding you

 4   to, and you somewhat said there is a difference

 5   between the private party versus a federal agency.

 6             Where can I find that in the law?

 7             MR. ASSAF:  Yes, there are two issues.  I

 8   think on this issue we are talking about, deception,

 9   that clearly sounds in fraud and I would suggest that

10   since it sounds in fraud as cited on page 24 in our

11   brief, it should meet 9 (b) requirements.  It is

12   deception or fraud, that is the whole purpose of Rule

13   9 (b).  When you see the deception elements, FCC

14   versus Millennium Telecard, July 12, 2011, we have a

15   couple cases that support that position.  Again we

16   cited in our brief.  FTC versus Lights of America, FTC

17   v.  Ivy Capital talking about when there is a

18   deception claims there is a heightened standard.  Your

19   Honor, to be sure there is a case that disagrees with

20   this.  Out of the Southern District of New York.

21             THE COURT:  They cite to it, right?

22             MR. ASSAF:  Right.  They cite to it.  But

23   here, one of my entire themes today has been I think

24   we are different because we are not schemers and we

25   are not deceivers.  They need that under their
```

```
 1   statute, especially deception.

 2            So this isn't like phishing or check kiting

 3   or ripping offer elderly people.  So once you are now

 4   in this new area, then I think it is especially

 5   incumbent upon the FTC if you are going to bring a

 6   deception claim to meet Twombly and to meet 9 (b).  So

 7   that is my argument there.  It does us no good under

 8   Twombly.  In fact, Twombly says the opposite:  At the

 9   end of the case for summary judgment the defendant

10   will have spent millions of dollars only to be

11   vindicated on the position that they thought was at

12   the summary judgment stage.

13            THE COURT:  Thank you, counsel.

14            MR. ASSAF:  Thank you.

15            THE COURT:  Any response?

16            MR. MORIARTY:  Yes, your Honor.

17            THE COURT:  You cite in your brief on page

18   26, you cite to a case the that held a claim of

19   deceptive practices, pursuant to Section 5, "is not a

20   claim of fraud as that term is commonly understood or

21   contemplated by rule 9 (b)."

22            MR. MORIARTY:  That's right.  Under the FTC

23   Act, in order to prove deception the case law states

24   the FTC does not have to prove intent.  That is where

25   we are getting away from the FTC Act when counsel
```

```
 1    suggests we have to somehow prove Wyndham is a bad guy

 2    or a bad actor, or anything like that which we are not

 3    alleging.

 4           And in addition, it is also what makes a

 5    difference in a securities fraud case where a company

 6    has to lie, someone has to rely on that intentional

 7    lie, and be injured by it.  In this case we have, the

 8    standard is simply that they made a statement that

 9    deceived consumers, whether or not they intended to,

10    and as a result the relief that we can get is less.

11    We don't get remedies at law.  We don't get punitive

12    damages.

13           Regardless, your Honor, if it did sound in

14    fraud, we would have to proceed with particularity,

15    which we have done here.  It simply requires to us say

16    precisely what the elements of our claim are, which we

17    have done in  paragraphs 21, 24 and the fact that we

18    allege a difference between express statement and

19    therefore materially consumers.

20           So the last point I want to talk about with

21    deception is this idea that franchise law is somehow

22    relevant.  We argue that that is a red herring, it is

23    not relevant at all.  We allege that Wyndham made

24    statements about how they treat their network and we

25    allege in paragraph 24 vulnerabilities by Wyndham on
```

1    the Wyndham network.  The idea that these are

2    franchisees, that they have disclaimed what happens at

3    Wyndham hotels has nothing to do with the core of our

4    allegations which is that Wyndham engaged in

5    unreasonable data-security practices on the Wyndham

6    network.

7           THE COURT:  Counsel, can you speak to the

8    issues raised with the subjective and objective

9    standard, as it relates to fair notice and that they

10    don't see any cases that say, you know, that speak to

11    whether it is a subjective or objective standard, and

12    I am interested -- I know we are going backwards, back

13    to fair notice, where I believe we focused a lot of

14    our argument here today.  Can you speak to your

15    position, and if it is not in your briefs, and if so,

16    why not?

17           MR. MORIARTY:  It is in our briefs and it

18    does relate to the deception issue because it is this

19    idea that if they say we are going to take

20    commercially reasonable practices, is it okay for them

21    to say we are going to take what we believe are our

22    commercially reasonable practices, they might not be

23    your commercially reasonable practices.  The idea that

24    reasonable under the law is something that everyone

25    can have a different idea of.  It doesn't mean

1   anything.  Subjective standard is simply wrong.

2   Reasonableness is an objective standard.

3          When the FTC states for the purpose of

4   unfairness that reasonableness is what unfairness

5   means as it applies to data security, that is an

6   objective standard.  So in a way, in a very real way,

7   the proof is the same on both sides.  Unfairness

8   requires them to take reasonable steps to protect

9   consumer data, and as it happens in their statement,

10  in their privacy policy, they say they will take

11  commercially reasonable steps to protect consumer

12  data.  It is the same evidence in the case.

13         THE COURT:  And you say again reasonableness

14  is an objective standard.

15         MR. MORIARTY:  That's correct, your Honor.

16  And  I think, that appears in the Vogel case, they

17  talk about reasonableness as an objective standard.  I

18  can pull it up.

19         THE COURT:  Can you take a moment and pull it

20  up if you will?

21         MR. MORIARTY:  Yes.  I am not into the tech.

22  I can just read it.  I am not going to use the Elmo.

23         So talking about an unconstitutionally based

24  challenge, this is at pin cite 1078.  In order to

25  uphold the regulations in the face of such a

```
 1    constitutional attack, the first test of the

 2    regulation has been held to imply an objective

 3    standard, the reasonably prudent person test.

 4          Then it goes on to say whether a reasonable

 5    person familiar with the conditions in the industry

 6    would have instituted more elaborate precautions.

 7          THE COURT:  Okay.  You answered my question.

 8    Counsel.  Thank you.

 9          MR. MORIARTY:  Any other questions?

10          THE COURT:  Not yet.  I might.

11          MR. ASSAF:  It is such an important issue,

12    your Honor, I don't think that actually responds, at

13    least to the question that you and I were discussing,

14    is whether it is an objective standard as to what

15    Wyndham needs to meet to comply with their version of

16    an enforcement action.  I think the question you and I

17    were discussing, which is critical to this, is whether

18    for fair notice challenge, there is a question of

19    whether there is an objective standard that

20    accompanied the challenge of the fair notice standard

21    or a subjective.

22          And we have been saying, and I think the case

23    law bears it out, I want to correct something, I

24    didn't mean to suggest that we can't find it one way

25    or the other.  I think if we read the cases, every
```

```
 1    case we read is an objective standard, that you look
 2    at fair notice objectively as to what the agency does.
 3            THE COURT:  I may have posed the question
 4    incorrectly.  I apologize.
 5            MR. ASSAF:  I think the FTC, they don't argue
 6    that it is a subjective standard.  They don't argue
 7    it is an issue of fact.  That is what I thought you
 8    were asking them.  I don't think they kind of
 9    confirmed that, it is a crucial issue obviously in
10    terms of the motion to dismiss, whether it can be
11    decided as a threshold matter, based on record
12    evidence of Code of Federal Regulation and publicly
13    available materials, or whether there is a subjective
14    standard, and I don't know, I think it is important
15    that the FTC at least, because there is a lot in the
16    record right now as to how it goes, but I think we are
17    all now on the same page, this it is an objective
18    standard, unless the FTC disagrees.
19            THE COURT:  No, I believe.  Let me let
20    counsel for the FTC clarify.  I believe that you had
21    argued earlier that it was an objective standard.  But
22    counsel, clarify for the record, now we are dealing
23    specifically with the fair notice issue that we
24    addressed in our earlier argument, that you do submit
25    it is an objective standard?
```

```
 1            MR. MORIARTY:  You know, I might not be fully

 2    on the same page, but our argument is that

 3    reasonableness is an objective standard, and we have

 4    provided fair notice to entities engaged in data

 5    security practices by stating they need to have

 6    reasonable data-security practices.

 7            THE COURT:  Okay.  And then the issue as to

 8    whether there was an issue of fact was something that

 9    I actually raised with counsel, and said, well, why

10    are we raising this now?  Shouldn't we at least

11    exchange discovery to see what Wyndham may have known,

12    and counsel corrected me that it is not important what

13    Wyndham knows because it is not subjective, but it is

14    whether they had fair notice, and the only issue that

15    I would say back, having thought about it during lunch

16    as well, is that, well, there may be documents that

17    indicate that Wyndham was on notice of certain things,

18    either via consent decrees, or best practices.  And if

19    there are memos, internal memos or concerns within

20    Wyndham, that is an issue that has to obviously play

21    out in discovery, but it would be relevant, I believe,

22    to the issue of notice, and whether they had notice as

23    to particular standards that they needed to have in

24    place.

25            That is I think what we were all, we were
```

1    sort of talking around each other.

2         But I believe counsel said that they never

3    heard you claim it was a subjective issue.  You

4    didn't.  And that they never at least saw in your

5    papers that you were saying these were issues of fact.

6    And I quite frankly raised that during the course of

7    oral argument today in fairness as to whether this was

8    something that obviously the parties needed to delve

9    into in discovery.

10        So the record I think is now clear as to how

11   this sort of all involved.

12        But counsel, you are looking at me kind of

13   puzzled.  I want to make sure --

14        MR. MORIARTY:  No, that is just my face.

15        THE COURT:  Is there anything you can shed

16   light on in terms of any of these issues that relates

17   to fair notice and/or your deceptive claim?

18        MR. MORIARTY:  No, your Honor.  I do agree we

19   have alleged they have engaged in unreasonable data

20   security practices and discovery will tell us whether

21   they have.  They spent a lot of time talking about

22   very sophisticated malware, there is nothing they

23   could have done to stop it.  These are questions of

24   fact.

25        Some of the things we might find out, we have

alleged they didn't take steps to prevent intrusions
or that when they knew of intrusions they didn't take
steps to remedy where those intrusions were coming
from.

And these are questions of fact that we will
find out through further discovery, who knew what, how
did they find the information, what did they do in
response to the information, how long did it take,
these are factual questions.

THE COURT:  Okay.

MR. MORIARTY:  Thank you.

THE COURT:  Counsel, go ahead.  I have a
feeling you may want to respond.

MR. ASSAF:  I don't want to date myself, your
Honor, but Cool Hand Luke and Paul Newman, stay down,
stay down.  I sometimes feel like that, today.  In
terms of staying down.  I will try one more time.

This analytically, we are not, the discussion
you and I are having is different than what the
discussion you and the FTC is having.  I am not
discussing what needs to be alleged in their complaint
for unreasonable data security and what has to be
proven.  That is not what this discussion is about.

My discussion is a constitutional one, of due
process and fair notice, that a party who makes an

 1   allegation that the agency is acting inconsistent with

 2   due process and fair notice, that is not a factual

 3   issue that requires discovery.  And in fact, I haven't

 4   seen any cases showing that it is.  The subjective

 5   intent of the party challenging the agency action as

 6   inconsistent with due process is one of an objective

 7   standard.

 8        That is the discussion that is critical for

 9   what I thought was issue two today, and what I have

10   been trying to get at, is no discovery is relevant or

11   necessary for that.

12        If General Electric had a file full of memos

13   stating that the EPA's position would be what it is,

14   and had a bunch of actual discussions about consent

15   decrees under the EPA's power and what they meant, it

16   wouldn't matter a hill of beans to GE's challenge

17   under due process.  The only thing that matters is the

18   objective standard.  So that is why the party

19   challenging it, what my subjective intent was and

20   whether I thought consent decrees were out there and

21   what they meant, irrelevant to a due process

22   constitutional challenge.

23        That is the thing I am trying to get at is, I

24   think, again, my view is that it would be erroneous

25   to, that is why I asked, I am trying to get to the

 1   FTC's position, it is not in their brief.  I think it

 2   would be erroneous to assert that a party making a

 3   constitutional challenge is their subjective intent as

 4   to the challenge.  That is the point I am  trying to

 5   get at.

 6           I am sorry,  your Honor, for belaboring it,

 7   but it is such an important point.

 8           Finally, on Vogel, I thought we put a pin in

 9   it before, Vogel is a case they cite for

10   reasonableness.  This is on the other side, this is if

11   discovery goes forward or the agency action.  It is a

12   NLRB case under contract principle.  The Third Circuit

13   as well as every other Court of Appeals is very clear,

14   the NLRB jurisprudence is factual based, and there

15   were things in the record besides the administrative

16   action.

17           You have a whole body of case law from NLRB

18   and what good cause means and what workers' rights

19   means, it is contract-based based on the collective

20   bargaining agreement, and other issues under the NLRB.

21   That Third Circuit case doesn't help them out.

22           Thank you for your indulgence,  your Honor.

23           THE COURT:  Thank you.  Anything further from

24   the FTC?

25           MR. MORIARTY:  I would point out, when you or

```
1    your clerk pulls it up, Vogel is an Occupational

2    Safety and Health case, it is under the general duty

3    clause.

4            THE COURT:  Let's move to the second round of

5    the motions here.  I believe we have addressed

6    everything.  This pertains to WHR.  We now look at the

7    other Wyndham entities' motion to dismiss.  I will

8    hear counsel now for Wyndham.

9            MR. ALLEN:  Thank you, your Honor.  For the

10   record, Winn Allen on behalf of defendants.

11           I know you are probably glad to see a change

12   of scenery up here.

13           Your Honor, thank you again for oral argument

14   on this hearing.  It is undisputed that the only

15   defendant in this case who whose computer systems were

16   breached, whose computer systems were alleged to have

17   inadequate data security protection is Wyndham Hotels

18   and Resorts, LLC, which is one of the many subsidiary

19   companies of the Wyndham corporate family.

20           Nonetheless, as you know, the FTC, Wyndham

21   Hotels and Resorts direct parent company, Wyndham

22   Hotel Group, and the ultimate parent company, the

23   entire Wyndham corporate family, Wyndham Worldwide

24   Corporation.

25           As your Honor well knows, in the normal case,
```

```
 1    we don't accept such imputed liability, in a typical

 2    thirties there is a strong presumption against it.

 3            What the FTC says here is that there is a

 4    long line of cases invoking what they call common law

 5    liability under Section 5 of the FTC Act.  I submit to

 6    your Honor there is a fundamental legal problem with

 7    the FTC common enterprise allegations in this case,

 8    that make it appropriate for resolution at the motion

 9    to dismiss stage, I can anticipate one of the

10    questions your Honor might have is why now, why not at

11    summary judgment?

12            The main problem is if you look at all the

13    common enterprise cases we cite and the FTC cites,

14    there is a common thread that runs through them.  I

15    will quote here just a few cites.  Common enterprise

16    liability applies when, quote, a judgment absolving

17    one of them, that is the defendants, a judgment object

18    absolving one of the defendants of liability would

19    provide the other defendants with a clear mechanism

20    for awarding the terms of avoiding the terms of the

21    order.  That is NHS Systems, cited in the brief, point

22    13, WL 1285424, National Urological Group also cited

23    in the brief, Delaware Watch case, also cited in the

24    briefs.

25            Your Honor, the FTC has not and cannot as a
```

1    matter of law allege that here.  There are no

2    allegations in the complaint that Hotels and Resorts

3    has ever in the past resorted to the corporate forum

4    to try to avoid a final court order, or that it is

5    particularly plausible to think Hotels and Resorts

6    would do that in the future.

7            As a legal matter, your Honor, again, we are

8    operating at a little bit of an unknown area here

9    given this is the first data securities case, we are

10   unclear as to what the legal obligations of Section 5

11   are, if it does indeed apply to the data security.

12   What the FTC has said is the data-security obligations

13   they believe are in Section 5 attach to entities that

14   collect data.

15           One place we cited that was a document called

16   protecting consumer privacy in the area of rapid

17   change.  We cited that in the brief.  There is another

18   document that is cited in the brief, we didn't

19   directly cite it for this proposition that I would

20   call the Court's attention to, and that is the

21   document called Privacy on Line, Fair Information

22   Practices in the Electronic Marketplace, May, 2000

23   document, that is cited in Hotels and Resorts' motion

24   to dismiss.  It is not cited in our motion to dismiss.

25           If you look at pages 33 and 34 of that

Case: 14-3514   Document: 003411759077   Page: 188   Date Filed: 10/07/2014
Case 2:13-cv-01887-ES-JAD   Document 34-1   Filed 02/188   Page 161 of 188   PageID: 1742

161

```
 1   document, the FTC makes the same point, the legal

 2   obligations imposed by Section 5 attach to entities

 3   that collect data.

 4          Here it is undisputed that as it pertains to

 5   this case, the only entities that were collecting

 6   consumer data were Hotels and Resorts, the main

 7   defendant, Mr. Assaf was just up here on behalf of,

 8   and the independently owned Wyndham hotels that aren't

 9   parties here.  Those legal obligations that the FTC

10   believes Section 5 to impose are going to stay

11   attached to Hotels and Resorts for as long as it is

12   collecting consumer date.  You don't need Wyndham

13   Worldwide Corporation.

14          THE COURT:  But I am confused.  Maybe you can

15   address this.

16          One of the things that the FTC says is that

17   at some point, Wyndham Hotel Group was managing the

18   security, the info security program for hotels and

19   Resorts, that was anywhere between June, 2008 to June,

20   2009.  There is an agency, again, as you know, looking

21   at the facts in the light most favorable to the

22   nonmoving party, there is that allegation that that

23   was being managed by WHG.  At some point I think there

24   was a concession that WWC, and the FTC argued on page

25   10 of the complaint, basically pleads that Wyndham
```

```
1   Worldwide controlled the acts and practices of its
2   subsidiaries including Hotels and Resorts, WWC was
3   responsible for the data security of Hotels and
4   Resorts network during the third breach.  So there are
5   allegations, and we are at, again, a motion to dismiss
6   phase in this case and not summary judgment.  So with
7   those allegations, why would it be proper to let WWC
8   and WHG out?
9           MR. ALLEN:  Absolutely.  Paragraph 14 of the
10  complaint they do allege and I accept as true for my
11  argument when Wyndham Hotel Group had responsible for
12  data security at Hotels and Resorts for a period of
13  time and Wyndham Worldwide  did, as a matter of law, I
14  submit, that that is not enough to bring them in the
15  case on a common enterprise theory.  It goes back to
16  my distinction between entities that collect data and
17  entities that provide data security services.
18          Here it is undisputed in the complaint that
19  Hotels and Resorts, and the independently owned
20  Wyndham Hotels, were the entities that were collecting
21  the consumer data that is at issue here, and therefore
22  they are the entities that are subject to the ultimate
23  legal responsibilities that the FTC believes Section 5
24  to impose.
25          So frankly, whether Wyndham Worldwide
```

```
 1   Corporation, whether Wyndham Hotel Group, whether a
 2   third party entity that we contracted with was
 3   providing data-security services to Hotels and Resorts
 4   is irrelevant for purposes of Section 5 liability.
 5   The Section 5 theory that the FTC has in this case
 6   attaches to the entity that collects the data, and
 7   here that is Hotels and Resorts.
 8            I make one other point, your Honor, is that
 9   the FTC couldn't make out a stand-alone case against
10   Wyndham Worldwide Corporation, the ultimate parent
11   company or Wyndham Hotel Group, the company that sits
12   between Wyndham Worldwide and Hotels and Resorts, that
13   is because the Section 5 of the FTC Act, your Honor,
14   is a consumer protection statute.  It is directed at
15   consumers.  It prevents deceptive and unfair acts
16   directed at consumers.
17            And here, your Honor, as pled in the
18   complaint, the entities interfacing with consumers
19   that are alleged to have made statements to the
20   consumers and acted unfairly to consumers were the
21   independently owned hotels that aren't parties here
22   and Wyndham Hotels Resorts.  Your Honor, I have two
23   other quick points.
24            THE COURT:  Before you move to your other
25   quick points, the Court has a case, Judge Linares, it
```

1    was issued on July 12 of 2011, and that is FTC

2    Millennium Telecards, and I am quoting from it.

3            "When determining whether a common enterprise

4    exists, courts look to a variety of factors, including

5    common controls, the sharing of office space and

6    officers, whether business is transacted through a

7    place of interrelated companies, unified advertising,

8    and evidence which reveals that no real distinction

9    existed between the corporate defendants."

10           And so I am guided by this case in terms of

11   when we talk about common enterprise, why it would be

12   appropriate at this stage, since there have been

13   allegations, and the FTC has basically gone through in

14   their complaint, where there is a sharing of office

15   space and so forth.  Again I ask you, understanding

16   what Judge Linares held in 2011 and understanding that

17   common enterprise, and those are some factors that the

18   Court should look at, why again you think it is

19   appropriate to dismiss now?

20           MR. ALLEN:  Three points, your Honor.

21           First, the factors that you point to are only

22   one element of the common enterprise analysis.  The

23   other one is the one I just spent time talking about

24   to prove common enterprise liability you have to prove

25   that there is some reason to think that the entity

1    will be more subject to liability.

2          The second is if you look the at facts

3    alleged, one, Wyndham conducted business through a

4    maze of interrelated companies; two, common control;

5    three, shared office space; and four, pooled resources

6    and staff.

7          I submit to your Honor that those aren't

8    evidence of a common enterprise or ignoring the

9    corporate forum.  They are routine facts of life for

10   modern corporate America.  Pretty much any company in

11   the Fortune 500, they will keep themselves distinct

12   for liability purposes to have different entities

13   within their corporate family, but they will also

14   synergize  by sharing functions and common employees.

15   That is why a number of cases we cited in a brief,

16   Spagnola, from the SDNY, Universal Health Services

17   from West Virginia, routinely say that those facts

18   that the FTC alleged aren't enough to disregard

19   corporate separateness, particularly when you have a

20   reason to think that at the end of the day the

21   defendant is going to be able to use the corporate

22   forum sham to avoid liability.

23          I mentioned Universal Health Services.  I

24   encourage you to read that case.  It is a case under

25   the False Claims Act.  But the facts are very similar

1    and the Court there was applying federal common law,

2    the same kind of federal common law this court would

3    apply in trying to decide whether to set aside

4    corporate distinctions.  There the government sued a

5    subsidiary and tried to amend its complaint to add a

6    parent company.  The government made the same

7    arguments the FTC is making here:  Common control,

8    shared office space, shared employees, parent provided

9    services to their subs.  The Court rejected the

10   government's attempts to bring liability against the

11   subs for the two reasons I have explained to you.  One

12   is the Court didn't see there is any reasonable

13   likelihood that the sub would try to avoid liability

14   at the end of the day; and two, the facts the

15   government relied on were simply routine facts of

16   doing business.

17          One last point before I sit down, your Honor,

18   is that if you look at the common enterprise cases and

19   there are a number of them cited in both briefs.  I

20   submit to you they are materially different from this

21   case.  I am generalizing here, of course, but most of

22   them involved closely held corporations; they were run

23   by a single individual or group of individuals.  The

24   actual individuals who ran the companies were often

25   included as defendants in the very case.  They often

1    used corporate forums to shift assets and revenues

2    back and forth and critically, in most of the cases

3    cited by us and the FTC, there was evidence of a

4    deliberate intent to use the corporate forum to do one

5    of two things:  One, to avoid consumer complaints, you

6    know, some individual set up a company, it got a lot

7    of consumer complaints, let's just set up another

8    company and do the same thing; or two, to explicitly

9    avoid state and federal regulatory investigations.

10           In a lot of cases you would have the FTC or

11   state Attorney General file a complaint, they set up

12   another company and move the assets.

13           With that, unless you have questions, I will

14   sit down and save the rest for my rebuttal.

15           MR. MORIARTY:  Your Honor, regarding common

16   enterprise, I am not sure if that case involving, I

17   guess  it was a False Claims Act, I don't think it was

18   a common enterprise case.  I don't know, though.  I

19   could be wrong.  I think common enterprise shows up, I

20   think it is a unique creatures of the FTC Act

21   jurisprudence.

22           As far as the common enterprise is concerned,

23   and whether this company is likely to shift

24   responsibility, whether we would be able to get the

25   same relief by just going after WHR because they have

```
 1   a collection responsibility, I think those are sort of
 2   besides the point.  What we have alleged here are the
 3   factors that are necessary to establish common
 4   enterprise.
 5          And then as far as the question of whether
 6   they are likely to transfer authority, we have alleged
 7   that in fact, responsibility for data security, which
 8   we allege was unreasonable in the complaint, paragraph
 9   24, was transferred during the time of the complaint,
10   from,  I believe Wyndham Hotel Group had it initially
11   during the first --
12          THE COURT:  That was my question for you.  In
13   your brief you say June of 2008 to June, 2009, Wyndham
14   Hotel Group was in charge of managing it.  But we
15   know, at least according to the complaint, that the
16   allegations are that our first breach happened in
17   April, 2008, right?
18          MR. MORIARTY:  Yes.
19          THE COURT:  I think the second breach, let me
20   refresh my recollection, I am sure you can tell me
21   right off the bat, the second breach then occurred on
22   March, 2009.
23          MR. MORIARTY:  Correct.
24          THE COURT:  So this all predates when Wyndham
25   Hotel Group, WHG, was managing the security programs.
```

```
 1              MR. MORIARTY:  I am sorry.  I think those
 2     were during Wyndham Group managing and then in June,
 3     2009, Wyndham Worldwide took over.  Throughout the
 4     entire Wyndham Hotel network -- Hotels and Resorts
 5     owns the Wyndham hotel network.  They always own it.
 6     That is our allegation.  That is what we understand.
 7              Wyndham Hotel Group is in charge from the
 8     beginning of the relevant time in the complaint, they
 9     are in charge of data security.  They are in charge
10     from the beginning until June, 2009, during which the
11     first two breaches happen.  Then it is transferred to
12     Wyndham Worldwide Corporation, June, 2009.   I think
13     the  last breach starts to happen some time in the
14     fall of 2009, and is discovered in 2010.
15              So We have alleged that  responsibility for
16     these various things does transfer.  So to the extent
17     that we are not going to look at the common enterprise
18     prongs, we are only going to look at the likelihood of
19     the FTC being able to get its injunctive relief
20     against just WHR, there are factors in the complaint
21     that suggest that this type of authority, or perhaps
22     even the ownership of the Wyndham Hotel network can
23     change.
24              More importantly, we alleged direct liability
25     against each of the Wyndham entities.  So even setting
```

```
 1    aside common enterprise, all the named defendants

 2    belong in this case.

 3           For Wyndham Hotel Group, the policy at issue

 4    in this case says it is he policy of Wyndham Hotel

 5    Group.  The complaint also  alleges, as I just

 6    mentioned,  paragraph 14 that Wyndham Hotel Group was

 7    responsible for the data-security program.  Wyndham

 8    Worldwide is the parent corporation of, controls the

 9    acts and practices of the subsidiaries, including the

10    named defendants in the case.  Paragraph 14, the

11    complaint alleges that Wyndham Worldwide is

12    responsible for the data-security policies of its

13    subsidiaries which are what are at issue in this case.

14           Lastly, paragraph 14, we talk about transfer

15    of the authority, transfer responsibility for data-

16    security program in the Wyndham Hotel network to

17    Wyndham Worldwide, 2009.

18           Lastly, Wyndham Hotel management was

19    responsible for all operations that manage Wyndham

20    Hotels, including data security, including

21    responsibility for data security at several management

22    hotels that ere breached.

23           The complaint alleges that Hotel Management

24    operated the websites of Wyndham Hotels, some of which

25    referred consumers to the main website where the
```

1   privacy policy was hosted.

2        So what we have in our complaint is

3   allegations of direct liability for unfair and

4   deceptive practices against each of the four Wyndham

5   entities in addition to a common enterprise liability

6   theory.

7        That is everything I had on that.  Do you

8   have any questions?

9        THE COURT:  No.  Anything further, counsel.

10       MR. ALLEN:  Briefly, your Honor.

11       With respect to the Universal Healthcare

12   decision, again, that Court was applying federal

13   common law, and courts applying common income

14   liability under Section 5.

15       On the direct liability issue I think it is

16   important to take them claim by claim.  If you look at

17   deception claim, which is count 1, the FTC spent a lot

18   of time talking about with the deception claim

19   centered around the policy.  The privacy policy

20   doesn't mention Wyndham Worldwide Corporation at all,

21   except to distinguish Wyndham Worldwide Corporation

22   from the entities that are actually making

23   representations in the privacy policy.

24       So I don't understand how Wyndham Worldwide

25   Corporation could be alleged to have made any

```
 1   deceptive representations in this case at all.

 2          Wyndham Hotel Management is not mentioned at

 3   all.  I really don't understand it with respect to

 4   that.

 5          On the unfairness claim again, briefly, all

 6   of the key unfairness allegations, I would say one

 7   more time, pertain to conduct at Wyndham-branded

 8   hotels, or at Hotels and Resorts where breaches were,

 9   where the computer networks were, and again, the

10   ultimate legal liability in Section 5 is imposed on

11   entities that collect data, not on entities that

12   provide management services.

13          THE COURT:  Thank you, Mr. Allen.  All right.

14   We are at the last motion.  This is a motion to stay.

15   It is filed by Wyndham.

16          MR. QUINN:  Good afternoon, your Honor.

17   Justin Quinn on behalf of the defendants.

18          I want to thank your Honor for having

19   argument on the motion to stay.

20          THE COURT:  Because you know, Mr. Quinn, that

21   generally this would be something that I would ask my

22   Magistrate Judge to handle, and I quite frankly am

23   going to entertain it right now, but there is the

24   common practice of this Court, both as a Magistrate

25   Judge for four and a half years, as well as a District
```

```
 1   Judge now, I rarely grant such a stay, and my position
 2   has always been, in very rare instances will I grant a
 3   stay, and I would like to hear from you now why you
 4   believe the Court should grant the stay in light of
 5   the journey that this case has taken, and quite
 6   frankly, we have, you know, the original complaint was
 7   filed on June 26 of 2012.  There was an August 2nd
 8   motion to change venue.  There was an amended
 9   complaint that was ultimately filed on August 9.  And
10   a pending motion to dismiss that was filed on August
11   27.
12           And of course, I have done my best to bring
13   you all to court as soon as I could feasibly do that,
14   based on the Court's calendar.  But a lot of time has
15   gone by.
16           I am just afraid to let more time go by
17   without moving the parties towards discovery here in
18   the actual exchange.  So  why should I stay the
19   discovery at this point pending my ruling in these
20   matters?
21           MR. QUINN:  Well, I think there are three
22   fundamental and practical reasons that would justify a
23   stay.
24           Your Honor has the discretion to stay the
25   discovery in this case pending the motion to dismiss,
```

```
 1   and the party making the application must demonstrate

 2   good cause.

 3          So in this case, good cause exists for three

 4   reasons, the first of which the duration of the stay

 5   is that we are requesting here is minimal.  In this

 6   case the parties briefed the issues, as your Honor

 7   noted, the Court scheduled it,  today we are here for

 8   oral argument.  So Wyndham anticipated that a decision

 9   on the motions to dismiss will be rendered forthwith.

10          And I just want to state that the FTC can't

11   say that they are going to be prejudiced.  Let me just

12   be clear.  Wyndham has expended over $5 million, and

13   turned over well over a million pages of documents.

14   By contrast, Wyndham has received 1,000 pages of what

15   is effectively publicly available documents that are

16   on the website.

17          Second, and fundamentally, your Honor, this

18   case presents several, or I should say a few threshold

19   issues which, if rendered in Wyndham's favor may

20   foreclose portions of this litigation, if not the

21   litigation in its entirety which would in turn absolve

22   the need for discovery, which under settled law in

23   this Circuit is the purpose of a motion to stay.

24          In other words, motions to stay pending

25   motions to dismiss are granted when the motions to
```

```
 1    dismiss would either narrow discovery or absolve the

 2    need for discovery.  That is exactly the case here.

 3              Finally, your Honor, I will be brief.

 4              THE COURT:  You don't have to be.

 5              MR. QUINN:  I understand.

 6              Finally, your Honor, conducting the discovery

 7    at this juncture would be an inefficient use of the

 8    parties' resources.  I am sure you are aware discovery

 9    disputes would be spawned which would in turn burden

10    the Court.  So it is for those three reasons, Judge,

11    that good cause exists and discovery should be held in

12    abeyance until the Court has determined its motion to

13    dismiss.

14              Thank you, Judge.

15              THE COURT:  Thank you.  I take it from

16    reading the opposition that the FTC is saying we

17    hadn't had discovery, that we in fact have not, the

18    defendant has not been cooperative with our request,

19    yet we have been turning over discovery to them, and

20    you cite to several interrogatories, I think a total

21    of 47 requests for admissions, and 33 doc requests,

22    that in total have been asked of you and that you have

23    been complying with, and that all you asked for is

24    reciprocity.  Right?

25              And I do have a couple of questions for Mr.
```

Case 14-3514, Document 34, 11/17/2014, 1390777, Page 203 of 238    Case 2:13-cv-01887-ES-JAD Document 116-7 Filed 10/07/2014 Page 76 of 84 PageID: 1757

176

```
 1   Quinn with respect to some of the points raised in the

 2   brief.  But let me hear you now.

 3            MR. ZIMMERMAN:  I would agree with your

 4   Honor, for the record.  Jonathan Zimmerman on behalf

 5   of the FTC.

 6            I will address Mr. Quinn's response quickly.

 7   Before I do, this case came to your Honor in a

 8   somewhat unusual posture.  As soon as we filed the

 9   case in Arizona, we were ordered to begin discovery,

10   and the plaintiffs and defendants and plaintiffs

11   aggressively pursued discovery for nearly nine months

12   before the case was transferred here.

13            During that period, we responded at length to

14   numerous discovery requests which your Honor has

15   outlined.  In return, we received minimal responses

16   from Wyndham.  In fact --

17            THE COURT:  What of this point that Mr. Quinn

18   makes, that you received thousands of pages --

19            MR. ZIMMERMAN:  They continually point to the

20   $5 million and thousands of pages.  That came up in

21   their motion to quash the administrative subpoena

22   which was attached to our opposition brief, the

23   decision.

24            The Commission, and what I would say to that

25   is, number 1, we don't believe that those are in any
```

 1  way full and adequate responses to our discovery

 2  requests.  And even if they were, Wyndham has not

 3  made the simple effort of identifying how those

 4  documents respond to our discovery requests.  They

 5  simply say we produced a bunch of stuff.  That should

 6  be enough.

 7       THE COURT:  So it is a document dump.  You

 8  say it is not particularly responsive.

 9       MR. ZIMMERMAN:  Essentially, as the

10  Commission found on the motion to quash, much of it

11  was irrelevant, a lot of it did not address things

12  that came up in the administrative subpoena.  And in

13  no way now that we are in federal court do we believe

14  it is fully responsive to the pending discovery

15  requests.

16       THE COURT:  What is the prejudice to you?  I

17  am hearing there is no prejudice, that you have been

18  waiting this long, regrettably you have been waiting

19  longer than I personally would have wanted you to

20  wait, although the motions, as I see it, weren't

21  really technically ripe until June of this year, I am

22  being a little hard on myself.  But you have been

23  waiting based on the change of venue motion and so

24  forth.  What is the harm in waiting a few more weeks

25  until the Court has had an opportunity to rule on the

1    pending motion?

2         MR. ZIMMERMAN:  Your Honor, as we outlined in

3    our pleadings, we believe there are three prejudices.

4    The first is what I outlined, it is simply inequitable

5    to allow defendants to take substantial discovery and

6    get away with just not responding in kind, and then

7    stay discovery.

8         Moreover, as your Honor stated earlier on,

9    delay itself can be highly prejudicial.  Witnesses'

10   memories can fade, documents can be lost.  At the time

11   we opposed this we were heavily involved in third-

12   party discovery.  Stopping that process only to start

13   it over again is prejudicial.

14        THE COURT:  Thank you, counsel.

15        MR. ZIMMERMAN:  Thank you.

16        THE COURT:  Anything?

17        MR. QUINN:  May I respond?

18        THE COURT:  Yes, please, of course.

19        Mr. Quinn, from what I read in the

20   plaintiff's opposition, they say discovery has only

21   been one way here.  It has been their responding to

22   your requests on August 3rd for 17 logs, 20 doc

23   requests, then on 8/17, the defendants serve 15

24   requests for admission, and they go on to say that on

25   February 11, 2013, the defendants served an additional

```
 1    request for documents and admissions, bringing the
 2    total to 47 requests for admissions and 33 document
 3    requests on a parallel track.  The defendants also
 4    commenced discovery on third parties.  That is page 2
 5    of the opposition.
 6            It does somewhat seem, it concerns me, that
 7    we have a situation where the FTC is responding to
 8    your request, yet the plaintiff has served one set of
 9    requests on you, on the defendants.  It took
10    defendants five months to produce any responsive
11    documents, and to date have only produced documents
12    related to contracts with their franchised and managed
13    hotels, page 6 of their opposition.
14            There does seem to be an issue of equity here
15    and fairness, and I am not sure, quite frankly, that
16    we should, that the Court should condone that type of
17    one-way discovery, if that is what is going on.
18            MR. QUINN:  That actually is more just
19    muddying of the water.  So what the FTC has turned
20    over and what they failed to disclose is the majority
21    of the documents as you stated in our brief has been
22    discovery from the third parties.
23            Also, the majority of our requests for
24    admission for interrogatories have not been responded
25    to, which we I think attached to the back of our reply
```

 1   brief, in that we asked for certain things and they

 2   decided to claim a privilege, which they can, or claim

 3   that it is completely irrelevant to the case at issue.

 4        For example, I think we asked in one what

 5   they consider to be reasonable data security

 6   practices.  And they claim that is irrelevant.  So to

 7   suggest that this has been one-sided, I think is not

 8   entirely true.  But I just want to point out, to say

 9   something about the delay, I think your Honor had

10   questioned, well, you know what.

11        I am, for example, going to focus my argument

12   back.  The idea in filing the motion to stay along

13   with the motion to dismiss would be to focus

14   discovery.  And that is the purpose of the motion to

15   stay.  That is why we are requesting that your Honor

16   hold discovery in abeyance, figure out what is in the

17   case after the motion to dismiss, if there is anything

18   and then the parties, to the extent you would, it

19   would be -- we would take it from there.

20        THE COURT:  Mr. Quinn, I remember my

21   question.  I asked on page 10 of the opposition, the

22   defendant's knowledge, plaintiff says, defendants

23   acknowledge that they have not challenged the FTC

24   authority to bring this claim.  Motion to dismiss, ECF

25   number 32.

 1          And it says, in parens, WHR does not dispute
 2   that FTC can bring enforcement action against
 3   companies that make deceptive statements to consumers.
 4   And so I am curious that if there is not a challenge
 5   with respect to count 1, why shouldn't we get moving
 6   on count 1?  At least the discovery as it relates to
 7   the deception claim?
 8          MR. QUINN:  Because then it would just be
 9   inefficient for the purposes of the Court and the
10   parties.
11          THE COURT:  Chances are, right, that the
12   Court is going to issue, by the time Judge Dickson, I
13   am now paired with Judge Dickson, by the time Judge
14   Dickson sets this down for a Rule 16 conference, gets
15   the party to exchange some discovery, this Court will
16   have ruled.  Or close thereafter.
17          So I am just wondering whether we are
18   delaying the inevitable as it relates to count 1.
19          MR. QUINN:  I don't think we are, your Honor.
20   And again, this is the motions to dismiss present
21   threshold issues which the FTC concedes on page 10 of
22   its brief.  We are asking simply that the Court hold
23   discovery in abeyance and let the motions play out as
24   they will, and then we will take it from there.  I
25   mean, that is appropriate, and good cause is for that

```
 1   reason, this will narrow discovery.

 2           And one more point.

 3           Your Honor, there is a challenge to count 1

 4   that would also dismiss that count in its entirety.

 5   So it won't be in the parties' best interest, or the

 6   Court's best interest to bifurcate that.

 7           THE COURT:  Okay.  Any response from the FTC?

 8           MR. ZIMMERMAN:  I don't want to delay in any

 9   longer.  I will respond quickly.  Many of the

10   documents we produced thus far to Wyndham have been

11   public documents because their discovery sought public

12   statements of commissioners.  Based on that, we

13   produced it.

14           Moreover, their argument that they would like

15   to focus discovery is a little late.  They initially

16   filed these motions in Arizona back in August, and

17   they could have filed to stay discovery at that time.

18   They chose not to.  They chose to aggressively pursue

19   discovery.

20           Finally, as to the discussion you had at the

21   end, I think there is some confusion.  Wyndham has

22   claimed that good cause exists to stay the discovery

23   because they have challenged the FTC's allegedly novel

24   use of the unfairness here, and that should weigh in

25   the balance in their favor of staying it.  Our point
```

```
 1   is to count 1 is that yes, they have moved to dismiss
 2   count 1, but they have not brought a challenge to the
 3   alleged novel authority.
 4            THE COURT:  They haven't challenged the
 5   authority to bring an action under count 1.
 6            MR. ZIMMERMAN:  Exactly.  Thank you, your
 7   Honor.
 8            THE COURT:  Thank you.
 9            All right.  Well, as the parties know, the
10   Court retains broad discretion in determining whether
11   or not it makes sense to proceed with discovery while
12   the motion to dismiss is pending.  The question is not
13   whether Wyndham has demonstrated good cause, but
14   rather what is permitted in light of the Court's heavy
15   docket.
16            When I look at the arguments being forwarded
17   by the defendants today, I recognize that they say
18   there is good cause to stay at this point in time, it
19   is a novel issue, it is a matter of first impression
20   for the Court.  But the end result is I do think that
21   is a need to move this case forward.  There is a need
22   for the Court to exercise its discretion in moving
23   these matters forward.
24            Neither I nor my colleagues are in the
25   practice of staying discovery as a matter of course,
```

```
 1   whenever a dispositive motion is pending, quite
 2   frankly.  In very rare circumstances the district
 3   judges in this district, at least, stay discovery.
 4   Having been a magistrate judge for over four and a
 5   half years, and being paired with a number of our
 6   district judges, I know that I can speak from
 7   experience to say that it is rarely done in terms of a
 8   stay of discovery pending dispositive motions.  In
 9   fact, the converse is true.
10          A stay pending a district judge's decision on
11   a dispositive motion is an exception and not the rule
12   in the District of New Jersey.
13          In light of the Court's heavy docket,
14   dispositive motions often remain pending for months,
15   and sometimes over a year.  That is not going to
16   happen in this case at this point in time because the
17   parties have come in for oral argument at this point.
18          I am going to do my best to get an opinion
19   issued rather quickly as to the issues raised during
20   oral argument and in the briefs, and I will endeavor
21   to keep my promise and get an opinion out
22   expeditiously.
23          That being said, the Court is disinclined to
24   let the parties stand by idly while memories continue
25   to fade, and evidence becomes stale.
```

1          Moreover, experience has taught us, and me in

2     particular, that going forward with discovery

3     encourages amicable resolution of disputes which in

4     turn prevents the Court from being crushed by the

5     heavy weight of our docket.

6          In this particular matter, I don't

7     necessarily think that we are going to have a

8     resolution of this case any time soon.  And in fact,

9     it will require the Court to resolve some rather

10    hefty, and I think intellectually challenging issues

11    that the Court will wrestle with, and do my best to

12    issue a thoughtful opinion in the near future.

13         But under the circumstances, considering, as

14    I said when I started questioning Mr. Quinn, this case

15    has been out there since as far back as June of last

16    year.  We have had motion practice, which I can

17    respect, but the time has come.  We are going to move

18    forward.

19         So I will ask Judge Dickson to bring the

20    parties in in the next few weeks for a Rule 16

21    conference, to set a schedule that the parties can

22    follow, and I anticipate there are going to be

23    discovery issues, and I recognize that the parties are

24    advocates, and they are doing their jobs, but I will

25    caution the parties to really only raise those issues

```
 1   that are real issues in dispute with respect to

 2   discovery.

 3            And I am going to keep a watchful eye on

 4   discovery in this case, and I hope to not have to

 5   intervene with discovery.  But I am not going to have

 6   this case delayed based on any issues, and so if need

 7   be, I will step in on discovery issues and make calls

 8   if I have to make to make the calls.  I prefer not to,

 9   but I will leave to it Judge Dickson, and his able

10   hands to resolve any of those pending discovery

11   disputes that I am sure you all will start thinking

12   about from this moment forward.

13            Any other issues that we need to resolve at

14   this time?

15            The time is now 3:18.  I will gladly deal

16   with any issues that may be pending.  If not, I thank

17   you all for your advocacy, for the arguments that have

18   been forwarded here today, and I wish you all safe

19   travels.

20            (Adjourned at 3:20 p.m.)

21

22

23

24

25
```

# U.S. District Court
## District of New Jersey [LIVE] (Newark)
## CIVIL DOCKET FOR CASE #: 2:13-cv-01887-ES-JAD

Federal Trade Commission v. Wyndham Worldwide Corporation et al
Assigned to: Judge Esther Salas
Referred to: Magistrate Judge Joseph A. Dickson
Case in other court: Third Circuit, 14-03514
          Arizona, 2:12-cv-01365
Cause: 15:0045 Federal Trade Commission Act

Date Filed: 03/26/2013
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: U.S. Government Plaintiff

| Date Filed | # | Docket Text |
|---|---|---|
| 06/26/2012 | 1 | COMPLAINT, filed by Federal Trade Commission (submitted by Lisa Schifferle). (Attachments: # 1 Exhibit, # 2 Civil Cover Sheet)(REK) (Entered: 06/26/2012) |
| 06/26/2012 | 2 | SUMMONS Submitted by Federal Trade Commission (submitted by Lisa Schifferle). (Attachments: # 1 Summons, # 2 Summons, # 3 Summons)(REK) (Entered: 06/26/2012) |
| 06/26/2012 | 3 | This case has been assigned to the Honorable Steven P. Logan. All future pleadings or documents should bear the correct case number: CV 12-01365-PHX-SPL. Magistrate Election form attached. (Attachments: # 1 Magistrate Consent Form)(REK) (Entered: 06/26/2012) |
| 06/26/2012 | 4 | Summons Issued as to Wyndham Hotel Group LLC, Wyndham Hotel Management Incorporated, Wyndham Hotels and Resorts LLC, Wyndham Worldwide Corporation. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons)(REK). *** IMPORTANT: When printing the summons, select "Document and stamps" or "Document and comments" for the seal to appear on the document. (Entered: 06/26/2012) |
| 07/09/2012 | 5 | WAIVER OF SERVICE Returned Executed by Federal Trade Commission. Wyndham Worldwide Corporation waiver sent on 6/26/2012. (Schifferle, Lisa) (Entered: 07/09/2012) |
| 07/09/2012 | 6 | *WAIVER OF SERVICE Returned Executed by Federal Trade Commission. Wyndham Hotel Group LLC waiver sent on 6/26/2012. (Schifferle, Lisa) *Modified to correct filer on 7/10/2012 (TLJ). (Entered: 07/09/2012) |
| 07/09/2012 | 7 | *WAIVER OF SERVICE Returned Executed by Federal Trade Commission. Wyndham Hotel Management Incorporated waiver sent on 6/26/2012. (Schifferle, Lisa) *Modified to correct filer on 7/10/2012 (TLJ). (Entered: 07/09/2012) |
| 07/09/2012 | 8 | *WAIVER OF SERVICE Returned Executed by Federal Trade Commission. Wyndham Hotels and Resorts LLC waiver sent on 6/26/2012. (Schifferle, Lisa) *Modified to correct filer on 7/10/2012 (TLJ). (Entered: 07/09/2012) |

| 07/10/2012 | 9 | Agreement to Magistrate Judge Jurisdiction. Party agrees to Magistrate Judge Jurisdiction. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAP) (Entered: 07/11/2012) |
| 07/13/2012 | 10 | NOTICE of Appearance by Anne Michelle Chapman on behalf of Wyndham Hotel Group LLC, Wyndham Hotel Management Incorporated, Wyndham Hotels and Resorts LLC, Wyndham Worldwide Corporation. (Chapman, Anne) (Entered: 07/13/2012) |
| 07/13/2012 | 11 | Corporate Disclosure Statement by Wyndham Hotel Group LLC identifying Other Affiliate Wyndham Worldwide Corporation for Wyndham Hotel Group LLC.. (Chapman, Anne) (Entered: 07/13/2012) |
| 07/13/2012 | 12 | Corporate Disclosure Statement by Wyndham Hotel Management Incorporated identifying Corporate Parent Wyndham Hotel Group, LLC, Other Affiliate Wyndham Worldwide Corporation for Wyndham Hotel Management Incorporated.. (Chapman, Anne) (Entered: 07/13/2012) |
| 07/13/2012 | 13 | Corporate Disclosure Statement by Wyndham Hotels and Resorts LLC identifying Corporate Parent Wyndham Hotel Group LLC, Other Affiliate Wyndham Worldwide Corporation for Wyndham Hotels and Resorts LLC.. (Chapman, Anne) (Entered: 07/13/2012) |
| 07/13/2012 | 14 | Corporate Disclosure Statement by Wyndham Worldwide Corporation. (Chapman, Anne) (Entered: 07/13/2012) |
| 07/13/2012 | 15 | Party Elects Assignment of Case to District Judge Jurisdiction. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAP) (Entered: 07/16/2012) |
| 07/16/2012 | 16 | Minute Order: Pursuant to Local Rule 3.8(a), a request has been received for a random reassignment of this case to a District Judge FURTHER ORDERED Case reassigned by random draw to Judge Paul G. Rosenblatt. All further pleadings/papers should now list the following COMPLETE case number: CV 12-1365-PHX-PGR. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAP) (Entered: 07/16/2012) |
| 07/18/2012 | 17 | ORDER SETTING SCHEDULING CONFERENCE for 11/19/2012 at 11:00 AM before Senior Judge Paul G Rosenblatt. Signed by Senior Judge Paul G Rosenblatt on 7/18/12. (TLJ) (Entered: 07/18/2012) |
| 07/20/2012 | 18 | MOTION for Admission Pro Hac Vice as to attorney Eugene F Assaf on behalf of defendants Wyndham Hotel Group LLC, Wyndham Hotel Management Incorporated, Wyndham Hotels and Resorts LLC, and Wyndham Worldwide Corporation. (BAS) (Entered: 07/23/2012) |
| 07/20/2012 | 19 | MOTION for Admission Pro Hac Vice as to attorney K Winn Allen on behalf of defendants Wyndham Hotel Group LLC, Wyndham Hotel Management Incorporated, Wyndham Hotels and Resorts LLC, and Wyndham Worldwide Corporation. (BAS) (Entered: 07/23/2012) |
| 07/20/2012 | 21 | MOTION for Admission Pro Hac Vice as to attorney Douglas H Meal on behalf of defendants Wyndham Hotel Group LLC, Wyndham Hotel Management Incorporated, Wyndham Hotels and Resorts LLC, and Wyndham Worldwide |

| | | Corporation. (BAS) (Entered: 07/23/2012) |
|---|---|---|
| 07/23/2012 | | PRO HAC VICE FEE PAID. $ 50, receipt number PHX124297 as to Eugene F Assaf. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 07/23/2012) |
| 07/23/2012 | | PRO HAC VICE FEE PAID. $ 50, receipt number PHX124296 as to K Winn Allen. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 07/23/2012) |
| 07/23/2012 | 20 | ORDER pursuant to General Order 09-08 granting 18 Motion for Admission Pro Hac Vice; granting 19 Motion for Admission Pro Hac Vice. Per the Court's Administrative Policies and Procedures Manual, applicant has five (5) days in which to register as a user of the Electronic Filing System. Registration to be accomplished via the court's website at www.azd.uscourts.gov. (BAS)(This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (Entered: 07/23/2012) |
| 07/23/2012 | | PRO HAC VICE FEE PAID. $ 50, receipt number PHX124302 as to Douglas H Meal. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 07/23/2012) |
| 07/23/2012 | 22 | ORDER pursuant to General Order 09-08 granting 21 Motion for Admission Pro Hac Vice. Per the Court's Administrative Policies and Procedures Manual, applicant has five (5) days in which to register as a user of the Electronic Filing System. Registration to be accomplished via the court's website at www.azd.uscourts.gov. (BAS)(This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (Entered: 07/23/2012) |
| 08/02/2012 | 23 | MOTION to Change Venue/Transfer Case to the United States District Court for the District of New Jersey or, alternatively, the United States District Court for the District of Columbia by Wyndham Hotel Group LLC, Wyndham Hotel Management Incorporated, Wyndham Hotels and Resorts LLC, Wyndham Worldwide Corporation. (Attachments: # 1 Affidavit of Kirsten Hotchkiss in Support of Defendants' Motion to Transfer Venue, # 2 Text of Proposed Order) (Assaf, Eugene) (Entered: 08/02/2012) |
| 08/03/2012 | 24 | NOTICE re Defendants' Notice of Service Re Discovery Requests by Wyndham Hotel Group LLC, Wyndham Hotel Management Incorporated, Wyndham Hotels and Resorts LLC, Wyndham Worldwide Corporation . (Rosenbaum, David) (Entered: 08/03/2012) |
| 08/06/2012 | 25 | NOTICE re Service Re: Third Party Discovery by Federal Trade Commission . (McCarron, Katherine) (Entered: 08/06/2012) |
| 08/06/2012 | 26 | NOTICE of Appearance by David B Rosenbaum on behalf of Wyndham Hotel Group LLC, Wyndham Hotel Management Incorporated, Wyndham Hotels and Resorts LLC, Wyndham Worldwide Corporation. (Rosenbaum, David) (Entered: 08/06/2012) |
| 08/09/2012 | 27 | NOTICE re of Service re: Third Party Discovery Requests by Federal Trade Commission . (Schifferle, Lisa) (Entered: 08/09/2012) |
| 08/09/2012 | 28 | *AMENDED COMPLAINT against All Defendants, filed by Federal Trade Commission. (Attachments: # 1 Exhibit)(Schifferle, Lisa) *Modified to reflect |

| | | document is not in compliance with LR Civ 7.1(c); attorney noticed on 8/14/2012 (TLJ). (Entered: 08/09/2012) |
|---|---|---|
| 08/17/2012 | 29 | NOTICE re Service of Defendants' First Set of Requests for Admission to The Federal Trade Commission by Wyndham Hotel Group LLC, Wyndham Hotel Management Incorporated, Wyndham Hotels and Resorts LLC, Wyndham Worldwide Corporation . (Rosenbaum, David) (Entered: 08/17/2012) |
| 08/20/2012 | 30 | RESPONSE in Opposition re 23 MOTION to Change Venue/Transfer Case to the United States District Court for the District of New Jersey or, alternatively, the United States District Court for the District of Columbia filed by Federal Trade Commission. (Attachments: # 1 Exhibit Declaration of Kevin Wilmer)(Cohen, Kristin) (Entered: 08/20/2012) |
| 08/20/2012 | 31 | *NOTICE of Appearance by Kristin Krause Cohen for Jonathan Eli Zimmerman and Andrea Vanina Arias on behalf of Federal Trade Commission. (Cohen, Kristin) *Modified to add counsel to docket text on 8/21/2012 (TLJ). (Entered: 08/20/2012) |
| 08/27/2012 | 32 | MOTION to Dismiss Case by Wyndham Hotels and Resorts LLC. (Attachments: # 1 Exhibit Exhibit 1)(Rosenbaum, David) (Entered: 08/27/2012) |
| 08/27/2012 | 33 | MOTION to Dismiss Case by Wyndham Hotel Group LLC, Wyndham Hotel Management Incorporated, Wyndham Worldwide Corporation. (Rosenbaum, David) (Entered: 08/27/2012) |
| 08/30/2012 | 34 | REPLY to Response to Motion re 23 MOTION to Change Venue/Transfer Case to the United States District Court for the District of New Jersey or, alternatively, the United States District Court for the District of Columbia *Defendants Reply in Support of Motion to Transfer* filed by Wyndham Hotel Group LLC, Wyndham Hotel Management Incorporated, Wyndham Hotels and Resorts LLC, Wyndham Worldwide Corporation. (Rosenbaum, David) (Entered: 08/30/2012) |
| 09/05/2012 | 35 | NOTICE by Federal Trade Commission *Service of Responses and Objections to Discovery Requests*. (McCarron, Katherine) (Entered: 09/05/2012) |
| 09/12/2012 | 36 | *JOINT STIPULATION for Extension of Time to File Response/Reply as to 32 MOTION to Dismiss Case , 33 MOTION to Dismiss Case by Federal Trade Commission. (Attachments: # 1 Text of Proposed Order)(Moriarty, Kevin) *Modified to correct event type on 9/13/2012 (TLJ). (Entered: 09/12/2012) |
| 09/13/2012 | 37 | ORDER that the parties' Joint Stipulation for Extension of Time to File Responses and Replies to Defendants' Motions to Dismiss 36 is accepted and that the plaintiff shall file its responses to the motions to dismiss no later than 10/1/12, and the defendants shall file their replies to the motions to dismiss no later than 10/23/12. Signed by Senior Judge Paul G Rosenblatt on 9/13/12. (TLJ) (Entered: 09/13/2012) |
| 09/13/2012 | 38 | NOTICE re Service of Third Party Discovery by Federal Trade Commission . (McCarron, Katherine) (Entered: 09/13/2012) |
| 09/19/2012 | 39 | NOTICE re Service of Plaintiff's Responses and Objections to Defendants' First Set of Requests for Admission by Federal Trade Commission . (Schifferle, Lisa) (Entered: 09/19/2012) |

JA268

| 09/19/2012 | 40 | NOTICE re Notice of Service of Defendants Second Set of Requests for Admission to The Federal Trade Commission by Wyndham Hotel Group LLC, Wyndham Hotel Management Incorporated, Wyndham Hotels and Resorts LLC, Wyndham Worldwide Corporation . (Rosenbaum, David) (Entered: 09/19/2012) |
| 09/20/2012 | 41 | NOTICE re Service of Third Party Discovery Requests by Federal Trade Commission . (Schifferle, Lisa) (Entered: 09/20/2012) |
| 09/20/2012 | 42 | ORDER vacating Scheduling Conference set for 11/19/2012. Signed by Senior Judge Paul G Rosenblatt on 9/20/2012. (LMR) (Entered: 09/20/2012) |
| 09/24/2012 | 43 | NOTICE re Notice of Service of Defendants' Second Set of Requests for Production to The Federal Trade Commission by Wyndham Hotel Group LLC, Wyndham Hotel Management Incorporated, Wyndham Hotels and Resorts LLC, Wyndham Worldwide Corporation . (Rosenbaum, David) (Entered: 09/24/2012) |
| 09/24/2012 | 44 | STIPULATION *for Entry of Protective Order* by Wyndham Hotel Group LLC, Wyndham Hotel Management Incorporated, Wyndham Hotels and Resorts LLC, Wyndham Worldwide Corporation. (Attachments: # 1 Text of Proposed Order Joint Stipulated Protective Order Concerning Confidentiality)(Rosenbaum, David) (Entered: 09/24/2012) |
| 10/01/2012 | 45 | RESPONSE in Opposition re 32 MOTION to Dismiss Case filed by Federal Trade Commission. (Moriarty, Kevin) (Entered: 10/01/2012) |
| 10/01/2012 | 46 | RESPONSE in Opposition re 33 MOTION to Dismiss Case filed by Federal Trade Commission. (Moriarty, Kevin) (Entered: 10/01/2012) |
| 10/02/2012 | 47 | JOINT STIPULATED PROTECTIVE ORDER CONCERNING CONFIDENTIALITY re Stipulation 44 (please see attached order for complete information). Signed by Senior Judge Paul G Rosenblatt on 10/2/12. (TLJ) (Entered: 10/02/2012) |
| 10/05/2012 | 48 | MOTION for Admission Pro Hac Vice as to attorney Shivaprasad Nagaraj by International Franchise Association. (Attachments: # 1 Exhibit Certificate of Good Standing)(Nagaraj, Shiva) (Entered: 10/05/2012) |
| 10/05/2012 | 49 | MOTION for Leave to File Brief Amicus Curiae of the International Franchise Association in Support of Defendant Wyndham Hotels & Resorts LLC's Motion to Dismiss by International Franchise Association. (Nagaraj, Shiva) (Entered: 10/05/2012) |
| 10/05/2012 | 50 | LODGED Proposed Brief Amicus Curiae of the International Franchise Association in Support of Defendant Wyndham Hotels & Resorts LLC's Motion to Dismiss re: 49 MOTION for Leave to File Brief Amicus Curiae of the International Franchise Association in Support of Defendant Wyndham Hotels & Resorts LLC's Motion to Dismiss . Document to be filed by Clerk if Motion to Leave to File or Amend is granted. Filed by International Franchise Association. (Nagaraj, Shiva) (Entered: 10/05/2012) |
| 10/05/2012 | 51 | Corporate Disclosure Statement by International Franchise Association. (Nagaraj, Shiva) (Entered: 10/05/2012) |
| 10/05/2012 | 52 | MOTION for Admission Pro Hac Vice as to attorney Jonathan Cedarbaum on |

| | | |
|---|---|---|
| | | behalf of International Franchise Association. (BAS) (Entered: 10/05/2012) |
| 10/05/2012 | | PRO HAC VICE FEE PAID. $ 50, receipt number PHX126799 as to Jonathan Cedarbaum. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 10/05/2012) |
| 10/05/2012 | 53 | MOTION for Admission Pro Hac Vice as to attorney Heather Zachary on behalf of International Franchise Association. (BAS) (Entered: 10/05/2012) |
| 10/05/2012 | | PRO HAC VICE FEE PAID. $ 50, receipt number PHX126798 as to Heather Zachary. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 10/05/2012) |
| 10/05/2012 | 54 | MOTION for Admission Pro Hac Vice as to attorney Steven P Lehotsky on behalf of International Franchise Association. (BAS) (Entered: 10/05/2012) |
| 10/05/2012 | | PRO HAC VICE FEE PAID. $ 50, receipt number PHX126796 as to Steven P Lehotsky. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 10/05/2012) |
| 10/05/2012 | 55 | ORDER pursuant to General Order 09-08 granting 52 Motion for Admission Pro Hac Vice; granting 53 Motion for Admission Pro Hac Vice; granting 54 Motion for Admission Pro Hac Vice. Per the Court's Administrative Policies and Procedures Manual, applicant has five (5) days in which to register as a user of the Electronic Filing System. Registration to be accomplished via the court's website at www.azd.uscourts.gov. (BAS)(This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (Entered: 10/05/2012) |
| 10/05/2012 | 56 | NOTICE of Appearance by David A Selden on behalf of Chamber of Commerce of the United States. (Selden, David) (Entered: 10/05/2012) |
| 10/05/2012 | 57 | MOTION for Leave to File BRIEF AMICI CURIAE by Chamber of Commerce of the United States. (Attachments: # 1 Text of Proposed Order)(Selden, David) (Entered: 10/05/2012) |
| 10/05/2012 | 58 | *LODGED Proposed BRIEF AMICI CURIAE re: 57 . Document to be filed by Clerk if Motion to Leave to File or Amend is granted. Filed by Chamber of Commerce of the United States. (Selden, David) *Modified correct document number on 10/9/2012 (TLJ). (Entered: 10/05/2012) |
| 10/10/2012 | | PRO HAC VICE FEE PAID. $ 50, receipt number PHX126877 as to Shiva Nagaraj. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 10/10/2012) |
| 10/10/2012 | 59 | ORDER pursuant to General Order 09-08 granting 48 Motion for Admission Pro Hac Vice. Per the Court's Administrative Policies and Procedures Manual, applicant has five (5) days in which to register as a user of the Electronic Filing System. Registration to be accomplished via the court's website at www.azd.uscourts.gov. (BAS)(This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (Entered: 10/10/2012) |
| 10/16/2012 | 60 | RESPONSE to Motion re 57 MOTION for Leave to File BRIEF AMICI CURIAE , 49 MOTION for Leave to File Brief Amicus Curiae of the International Franchise Association in Support of Defendant Wyndham Hotels & Resorts LLC's Motion to Dismiss filed by Federal Trade Commission. (Zimmerman, Jonathan) |

| | | (Entered: 10/16/2012) |
|---|---|---|
| 10/17/2012 | 61 | NOTICE re Service of Responses and Objections to Discovery Requests by Federal Trade Commission . (Zimmerman, Jonathan) (Entered: 10/17/2012) |
| 10/22/2012 | 62 | RESPONSE to Motion re 57 MOTION for Leave to File BRIEF AMICI CURIAE , 49 MOTION for Leave to File Brief Amicus Curiae of the International Franchise Association in Support of Defendant Wyndham Hotels & Resorts LLC's Motion to Dismiss *Defendants' Response to the Motions for Leave to File Amicus Curiae Briefs in Support of Defendants' Motions to Dismiss* filed by Wyndham Hotel Group LLC, Wyndham Hotel Management Incorporated, Wyndham Hotels and Resorts LLC, Wyndham Worldwide Corporation. (Rosenbaum, David) (Entered: 10/22/2012) |
| 10/23/2012 | 63 | REPLY to Response to Motion re 32 MOTION to Dismiss Case *Reply in Support of Motion to Dismiss by Defendant Wyndham Hotels & Resorts LLC* filed by Wyndham Hotel Group LLC, Wyndham Hotel Management Incorporated, Wyndham Hotels and Resorts LLC, Wyndham Worldwide Corporation. (Rosenbaum, David) (Entered: 10/23/2012) |
| 10/23/2012 | 64 | REPLY to Response to Motion re 33 MOTION to Dismiss Case *Reply in Support of Motion to Dismiss by Defendants Wyndham Worldwide Corp., Wyndham Hotel Group, LLC, & Wyndham Hotel Management, Inc.* filed by Wyndham Hotel Group LLC, Wyndham Hotel Management Incorporated, Wyndham Hotels and Resorts LLC, Wyndham Worldwide Corporation. (Rosenbaum, David) (Entered: 10/23/2012) |
| 10/24/2012 | 65 | NOTICE re Service of Plaintiff's Responses and Objections to Defendants' Second Set of Requests for Production by Federal Trade Commission . (Schifferle, Lisa) (Entered: 10/24/2012) |
| 10/31/2012 | 66 | NOTICE re Service of Plaintiff's First Set of Requests for Production of Documents by Federal Trade Commission . (Cohen, Kristin) (Entered: 10/31/2012) |
| 11/02/2012 | 67 | NOTICE by Federal Trade Commission *of Third Party Discovery*. (McCarron, Katherine) (Entered: 11/02/2012) |
| 11/27/2012 | 68 | NOTICE re of Supplemental Authority by Federal Trade Commission . (Attachments: # 1 Attachment A)(Zimmerman, Jonathan) (Entered: 11/27/2012) |
| 11/28/2012 | 69 | NOTICE re Defendants' Response to Plaintiff's Notice of Supplemental Authority by Wyndham Hotel Group LLC, Wyndham Hotel Management Incorporated, Wyndham Hotels and Resorts LLC, Wyndham Worldwide Corporation re 68 Notice (Other) . (Rosenbaum, David) (Entered: 11/28/2012) |
| 01/02/2013 | 70 | NOTICE re Service of Third Party Discovery Requests by Federal Trade Commission . (Schifferle, Lisa) (Entered: 01/02/2013) |
| 01/10/2013 | 71 | NOTICE re of Service by Federal Trade Commission *of Third Party Discovery*. (McCarron, Katherine) (Entered: 01/10/2013) |
| 01/15/2013 | 72 | NOTICE re Service of Third Party Discovery by Federal Trade Commission . (Schifferle, Lisa) (Entered: 01/15/2013) |

JA271

| | | |
|---|---|---|
| 01/29/2013 | 73 | NOTICE re Service of Third Party Discovery by Wyndham Hotel Group LLC, Wyndham Hotel Management Incorporated, Wyndham Hotels and Resorts LLC, Wyndham Worldwide Corporation . (Allen, K) (Entered: 01/29/2013) |
| 02/22/2013 | 74 | NOTICE re Service of Third Party Discovery by Federal Trade Commission . (McCarron, Katherine) (Entered: 02/22/2013) |
| 02/27/2013 | 75 | NOTICE re Supplemental Authority by Wyndham Hotel Group LLC, Wyndham Hotel Management Incorporated, Wyndham Hotels and Resorts LLC, Wyndham Worldwide Corporation re 32 MOTION to Dismiss Case , 33 MOTION to Dismiss Case . (Attachments: # 1 Exhibit Cybersecurity Executive Order, # 2 Exhibit Presidential Policy Directive)(Assaf, Eugene) (Entered: 02/27/2013) |
| 03/18/2013 | 76 | NOTICE re Notice of Service of Plaintiff's Responses and Objections to Defendants' Third Set of Requests for Production and Admissions by Federal Trade Commission . (Cohen, Kristin) (Entered: 03/18/2013) |
| 03/25/2013 | 77 | ORDER granting 23 Motion to Change Venue. The Clerk of the Court is instructed to transfer this case to the District Court for the District of New Jersey. The following motions are denied without prejudice to refiling in the transferee court: Motion to Dismiss Case by Wyndham Hotels and Resorts LLC (Doc. 32 ); Motion toDismiss Case by Wyndham Hotel Group LLC, Wyndham Hotel Management Incorporated,and Wyndham Worldwide Corporation (Doc. 33 ); Motion for Leave to File Brief AmicusCuriae of the International Franchise Association (Doc. 49 ); Motion for Leave to File BriefAmici Curiae by Chamber of Commerce of the United States (Doc. 57 ). Signed by Senior Judge Paul G Rosenblatt on 3/25/13. (LAD) (Entered: 03/25/2013) |
| 03/26/2013 | 78 | Certified Copy of Transfer Order and docket received, Case transferred in from District of Arizona; Case Number 2:12-cv-01365. Original file certified copy of transfer order and docket sheet received. (Entered: 03/26/2013) |
| 03/26/2013 | | Judge Esther Salas and Magistrate Judge Steven C. Mannion added. (jr) (Entered: 03/27/2013) |
| 03/27/2013 | 79 | NOTICE of Appearance by KEVIN HYLAND MORIARTY on behalf of FEDERAL TRADE COMMISSION (MORIARTY, KEVIN) (Entered: 03/27/2013) |
| 03/27/2013 | 80 | NOTICE by FEDERAL TRADE COMMISSION *of Designation Pursuant to L.Civ.R. 101.1(f)* (MORIARTY, KEVIN) (Entered: 03/27/2013) |
| 03/27/2013 | 81 | NOTICE of Appearance by LISA NAOMI WEINTRAUB SCHIFFERLE on behalf of FEDERAL TRADE COMMISSION (SCHIFFERLE, LISA) (Entered: 03/27/2013) |
| 03/28/2013 | 82 | NOTICE of Appearance by KRISTIN KRAUSE COHEN on behalf of FEDERAL TRADE COMMISSION (COHEN, KRISTIN) (Entered: 03/28/2013) |
| 03/28/2013 | 83 | NOTICE of Appearance by JOHN ANDREW KREBS on behalf of FEDERAL TRADE COMMISSION (KREBS, JOHN) (Entered: 03/28/2013) |
| 04/15/2013 | 84 | NOTICE of Appearance by JENNIFER A. HRADIL on behalf of WYNDHAM HOTEL GROUP LLC, WYNDHAM HOTELS AND RESORTS, LLC, |

JA272

| | | WYNDHAM WORLDWIDE CORPORATION, Wyndham Hotel Management Incorporated (HRADIL, JENNIFER) (Entered: 04/15/2013) |
|---|---|---|
| 04/15/2013 | 85 | NOTICE of Appearance by JUSTIN TAYLOR QUINN on behalf of WYNDHAM HOTEL GROUP LLC, WYNDHAM HOTELS AND RESORTS, LLC, WYNDHAM WORLDWIDE CORPORATION, Wyndham Hotel Management Incorporated (QUINN, JUSTIN) (Entered: 04/15/2013) |
| 04/18/2013 | 86 | Letter from Jennifer A. Hradil, Esq. to the Honorable Esther Salas, U.S.D.J. (Attachments: # 1 Text of Proposed Order)(HRADIL, JENNIFER) (Entered: 04/18/2013) |
| 04/24/2013 | 87 | Consent ORDER setting Briefing Schedule for Defts' Motions to Dismiss, etc. Signed by Judge Esther Salas on 4/22/13. (jd, ) (Entered: 04/24/2013) |
| 04/24/2013 | 88 | NOTICE of Appearance by JONATHAN ELI ZIMMERMAN on behalf of FEDERAL TRADE COMMISSION (ZIMMERMAN, JONATHAN) (Entered: 04/24/2013) |
| 04/25/2013 | 89 | NOTICE of Appearance by KATHERINE ELIZABETH MCCARRON on behalf of FEDERAL TRADE COMMISSION (MCCARRON, KATHERINE) (Entered: 04/25/2013) |
| 04/26/2013 | 90 | NOTICE of Appearance by ANDREA VANINA ARIAS on behalf of FEDERAL TRADE COMMISSION (ARIAS, ANDREA) (Entered: 04/26/2013) |
| 04/26/2013 | 91 | MOTION to Dismiss by WYNDHAM HOTELS AND RESORTS, LLC. (Attachments: # 1 Brief, # 2 Declaration of Jennifer A. Hradil, Esq., # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Text of Proposed Order, # 7 Certificate of Service)(HRADIL, JENNIFER) (Entered: 04/26/2013) |
| 04/26/2013 | 92 | MOTION to Dismiss by WYNDHAM HOTEL GROUP LLC, WYNDHAM WORLDWIDE CORPORATION, Wyndham Hotel Management Incorporated. (Attachments: # 1 Brief, # 2 Text of Proposed Order, # 3 Certificate of Service) (HRADIL, JENNIFER) (Entered: 04/26/2013) |
| 04/26/2013 | 93 | MOTION to Stay *Discovery* by WYNDHAM HOTEL GROUP LLC, WYNDHAM HOTELS AND RESORTS, LLC, WYNDHAM WORLDWIDE CORPORATION, Wyndham Hotel Management Incorporated. (Attachments: # 1 Brief, # 2 Text of Proposed Order, # 3 Certificate of Service)(HRADIL, JENNIFER) (Entered: 04/26/2013) |
| 04/29/2013 | | Set Deadlines as to 93 MOTION to Stay *Discovery*. Motion set for 5/20/2013 before Judge Esther Salas. The motion will be decided on the papers. No appearances required unless notified by the court. (jd, ) (Entered: 04/29/2013) |
| 04/29/2013 | | Set Deadlines as to 92 MOTION to Dismiss , 91 MOTION to Dismiss . Motion set for 6/17/2013 before Judge Esther Salas. The motion will be decided on the papers. No appearances required unless notified by the court. (jd, ) (Entered: 04/29/2013) |
| 05/03/2013 | 94 | MOTION for Leave to File *Brief Amici Curiae* by TechFreedom, International Center for Law & Economics, Paul H. Rubin, Todd J. Zywicki, Justin (Gus) Hurwitz. (Attachments: # 1 Brief in Support of Motion for Leave to File Brief Amici Curiae, # 2 Declaration of Stephen M. Orlofsky, Esquire, # 3 Exhibit A to |

JA273

| | | Orlofsky Declaration, # 4 Exhibit B to Orlofksy Declaration, # 5 Certificate of Service, # 6 Text of Proposed Order)(ORLOFSKY, STEPHEN) (Entered: 05/03/2013) |
|---|---|---|
| 05/03/2013 | 95 | MOTION for Leave to File *Brief Amici Curiae in Support of Defendants* by Chamber of Commerce of the United States. (Attachments: # 1 Memorandum in Support of Motion for Leave to File Brief Amici Curiae, # 2 Proposed Brief Amici Curiae, # 3 Proposed Order)(MAROTTA, SEAN) (Entered: 05/03/2013) |
| 05/03/2013 | | Set Deadlines as to 94 MOTION for Leave to File *Brief Amici Curiae*. Motion set for 6/17/2013 before Judge Esther Salas. The motion will be decided on the papers. No appearances required unless notified by the court. (jd, ) (Entered: 05/03/2013) |
| 05/03/2013 | | Set Deadlines as to 95 MOTION for Leave to File *Brief Amici Curiae in Support of Defendants*. Motion set for 6/3/2013 before Judge Esther Salas. The motion will be decided on the papers. No appearances required unless notified by the court. (jd, ) (Entered: 05/03/2013) |
| 05/03/2013 | 96 | MOTION for Leave to File *(Notice of Motion)* by International Franchise Association. (Attachments: # 1 (Motion for Leave to File Brief Amicus Curiae of the International Franchise Association in Support of Defendant Wyndham Hotels & Resorts' Motion to Dismiss), # 2 Brief (Brief Amicus Curiae of the International Franchise Association in Support of the Defendant Wyndham Hotels & Resorts' Motion to Dismiss), # 3 Text of Proposed Order [Proposed] Order, # 4 Certificate of Service)(WEINER, RACHEL) (Entered: 05/03/2013) |
| 05/03/2013 | | Set Deadlines as to 96 MOTION for Leave to File *(Notice of Motion)*. Motion set for 6/3/2013 before Judge Esther Salas. The motion will be decided on the papers. No appearances required unless notified by the court. (jd, ) (Entered: 05/03/2013) |
| 05/03/2013 | 97 | MOTION for Leave to Appear Pro Hac Vice by International Franchise Association. (Attachments: # 1 (Application for Admission Pro Hac Vice), # 2 (Certification of Rachel L. Weiner in Support of Application for Admission Pro Hac Vice of Jonathan G. Cedarbaum), # 3 (Certification of Jonathan G. Cedarbaum in Support of Application for Admission Pro Hac Vice), # 4 (Certificate of Good Standing: District of Colombia Court of Appeals), # 5 ([Proposed] Order Granting Application for Admission Pro Hac Vice of Jonathan G. Cedarbaum), # 6 (Certificate of Service))(WEINER, RACHEL) (Entered: 05/03/2013) |
| 05/03/2013 | 98 | MOTION for Leave to Appear Pro Hac Vice by International Franchise Association. (Attachments: # 1 (Application for Admission Pro Hac Vice), # 2 (Certification of Rachel L. Weiner in Support of Application for Admission Pro Hac Vice of Heather M. Zachary), # 3 (Certification of Heather M. Zachary in Support of Application for Admission Pro Hac Vice), # 4 (Certificate of Good Standing: District of Colombia Court of Appeals), # 5 ([Proposed] Order Granting Application for Admission Pro Hac Vice of Heather M. Zachary), # 6 (Certificate of Service))(WEINER, RACHEL) (Entered: 05/03/2013) |
| 05/03/2013 | 99 | MOTION for Leave to Appear Pro Hac Vice by International Franchise Association. (Attachments: # 1 (Application for Admission Pro Hac Vice), # 2 (Certification of Rachel L. Weiner in Support of Application for Admission Pro |

| | | Hac Vice of Daniel Aguilar), # 3 (Certification of Daniel Aguilar in Support of Application for Admission Pro Hac Vice, # 4 (Certificate of Good Standing: District of Colombia Court of Appeals), # 5 ([Proposed] Order Granting Application for Admission Pro Hac Vice of Daniel Aguilar), # 6 (Certificate of Service))(WEINER, RACHEL) (Entered: 05/03/2013) |
|------------|------|---|
| 05/06/2013 | | Set Deadlines as to 97 MOTION for Leave to Appear Pro Hac Vice , 99 MOTION for Leave to Appear Pro Hac Vice , 98 MOTION for Leave to Appear Pro Hac Vice . Motion set for 6/3/2013 before Judge Esther Salas. The motion will be decided on the papers. No appearances required unless notified by the court. (jd, ) (Entered: 05/06/2013) |
| 05/06/2013 | 100 | NOTICE by MASTERCARD INTERNATIONAL INCORPORATED re 93 MOTION to Stay *Discovery /Non-Party MasterCard International Incorporated's Notice of Joinder in Defendants' Motion to Stay Discovery Pending Resolution of Defendants' Motions to Dismiss* (Attachments: # 1 Brief, # 2 Certificate of Service)(VEIT, JACQUELINE) (Entered: 05/06/2013) |
| 05/06/2013 | 101 | RESPONSE in Opposition filed by FEDERAL TRADE COMMISSION re 93 MOTION to Stay *Discovery* (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order, # 3 Certificate of Service)(ZIMMERMAN, JONATHAN) (Entered: 05/06/2013) |
| 05/10/2013 | 102 | Letter from Kristin Krause Cohen to the Honorable Esther Salas, U.S.D.J.. (Attachments: # 1 Text of Proposed Order)(COHEN, KRISTIN) (Entered: 05/10/2013) |
| 05/10/2013 | 103 | Letter from Jennifer A. Hradil, Esq. enclosing pro hac vice application for Eugene F. Assaf, P.C., Esq. and K. Winn Allen, Esq. (Attachments: # 1 Declaration of Jennifer A. Hradil, Esq., # 2 Declaration of Eugene F. Assaf, P.C., Esq., # 3 Declaration of K. Winn Allen, Esq., # 4 Text of Proposed Order)(HRADIL, JENNIFER) (Entered: 05/10/2013) |
| 05/13/2013 | 104 | MEMORANDUM in Support filed by MASTERCARD INTERNATIONAL INCORPORATED re 93 MOTION to Stay *Discovery* (VEIT, JACQUELINE) (Entered: 05/13/2013) |
| 05/13/2013 | 105 | REPLY BRIEF to Opposition to Motion filed by WYNDHAM HOTEL GROUP LLC, WYNDHAM HOTELS AND RESORTS, LLC, WYNDHAM WORLDWIDE CORPORATION, Wyndham Hotel Management Incorporated re 93 MOTION to Stay *Discovery* (Attachments: # 1 Declaration of Jennifer A. Hradil, Esq., # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Certificate of Service)(HRADIL, JENNIFER) (Entered: 05/13/2013) |
| 05/14/2013 | 106 | ORDER granting pro hac vice admission as to Eugene F. Assaf and K. Winn Allen. Signed by Magistrate Judge Steven C. Mannion on 5/14/13. (jd, ) (Entered: 05/14/2013) |
| 05/15/2013 | 107 | CONSENT ORDER modifying briefing schedule for defts' Motions to Dismiss. Signed by Judge Esther Salas on 5/14/13. (sr, ) (Entered: 05/15/2013) |
| 05/15/2013 | | ReSet Deadlines as to 92 MOTION to Dismiss , 91 MOTION to Dismiss . Motion |

|  |  |  |
|---|---|---|
|  |  | set for 6/17/2013 before Judge Esther Salas. The motion will be decided on the papers. No appearances required unless notified by the court. (sr, ) (Entered: 05/15/2013) |
| 05/15/2013 | 108 | Notice of Request by Pro Hac Vice Eugene F. Assaf, P.C., Esq. to receive Notices of Electronic Filings. ( Pro Hac Vice fee $ 150 receipt number 0312-5012459.) (HRADIL, JENNIFER) (Entered: 05/15/2013) |
| 05/15/2013 | 109 | Notice of Request by Pro Hac Vice K. Winn Allen, Esq. to receive Notices of Electronic Filings. ( Pro Hac Vice fee $ 150 receipt number 0312-5012475.) (HRADIL, JENNIFER) (Entered: 05/15/2013) |
| 05/20/2013 | 110 | RESPONSE in Opposition filed by FEDERAL TRADE COMMISSION re 91 MOTION to Dismiss (Attachments: # 1 Certificate of Service)(MCCARRON, KATHERINE) (Entered: 05/20/2013) |
| 05/20/2013 | 111 | RESPONSE in Opposition filed by FEDERAL TRADE COMMISSION re 92 MOTION to Dismiss (Attachments: # 1 Certificate of Service)(MCCARRON, KATHERINE) (Entered: 05/20/2013) |
| 05/23/2013 | 112 | Letter from Jennifer A. Hradil, Esq. enclosing pro hac vice application for Douglas H. Meal, Esq. (Attachments: # 1 Declaration of Jennifer A. Hradil, Esq., # 2 Declaration of Douglas H. Meal, Esq., # 3 Text of Proposed Order)(HRADIL, JENNIFER) (Entered: 05/23/2013) |
| 05/28/2013 | 113 | MOTION for Leave to File *Amici Curiae Brief in Support of Plaintiff's Opposition to Defendants' Motions to Dismiss* by PUBLIC CITIZEN, INC., Chris Jay Hoofnagle. (Attachments: # 1 Brief in Support of Motion for Leave to File Amici Curiae Brief, # 2 Brief in Support of Plaintiff FTC's Opposition to Defendants' Motions to Dismiss, # 3 Text of Proposed Order, # 4 Certificate of Service) (PATTERSON, JEHAN) (Entered: 05/28/2013) |
| 05/28/2013 |  | Set Deadlines as to 113 MOTION for Leave to File *Amici Curiae Brief in Support of Plaintiff's Opposition to Defendants' Motions to Dismiss*. Motion set for 6/17/2013 before Judge Esther Salas. The motion will be decided on the papers. No appearances required unless notified by the court. (jd, ) (Entered: 05/28/2013) |
| 05/30/2013 | 114 | ORDER granting pro hac vice admission as to Douglas H. Meal. Signed by Magistrate Judge Steven C. Mannion on 5/30/13. (jd, ) (Entered: 05/30/2013) |
| 06/10/2013 | 115 | REPLY BRIEF to Opposition to Motion filed by WYNDHAM HOTELS AND RESORTS, LLC re 91 MOTION to Dismiss (Attachments: # 1 Certificate of Service)(HRADIL, JENNIFER) (Entered: 06/10/2013) |
| 06/10/2013 | 116 | REPLY BRIEF to Opposition to Motion filed by WYNDHAM HOTEL GROUP LLC, WYNDHAM WORLDWIDE CORPORATION, Wyndham Hotel Management Incorporated re 92 MOTION to Dismiss (Attachments: # 1 Certificate of Service)(HRADIL, JENNIFER) (Entered: 06/10/2013) |
| 06/12/2013 | 117 | Letter from Jennifer A. Hradil, Esq. to the Honorable Esther Salas, U.S.D.J. (HRADIL, JENNIFER) (Entered: 06/12/2013) |
| 06/13/2013 | 118 | Notice of Request by Pro Hac Vice Douglas H. Meal, Esq. to receive Notices of Electronic Filings. ( Pro Hac Vice fee $ 150 receipt number 0312-5063854.) (HRADIL, JENNIFER) (Entered: 06/13/2013) |

JA276

| 07/17/2013 | 119 | ORDER granting 96 Motion for Leave to File Brief Amicus Curiae; the Court accepts the proposed amicus brief as formal submission. Signed by Judge Esther Salas on 7/16/13. (jd, ) (Entered: 07/17/2013) |
| 07/17/2013 | 120 | ORDER granting 95 Motion for Leave to File Brief Amici Curiae; the Court hereby accepts the proposed amici curiae brief as amici's formal submission. Signed by Judge Esther Salas on 7/17/13. (jd, ) (Entered: 07/17/2013) |
| 07/17/2013 | 121 | ORDER granting 94 Motion for Leave to File Brief Amici Curiae; the Court hereby accepts the proposed amici curiae brief as amici's formal brief. Signed by Judge Esther Salas on 7/16/13. (jd, ) (Entered: 07/17/2013) |
| 07/17/2013 | 122 | ORDER granting 113 Motion for Leave to File Amici Curiae Brief; the Court hereby accepts the proposed amici curiae brief as amici's formal submission. Signed by Judge Esther Salas on 7/16/13. (jd, ) (Entered: 07/17/2013) |
| 07/30/2013 | 123 | CERTIFICATION in Support filed by International Franchise Association re 97 MOTION for Leave to Appear Pro Hac Vice *(Supplemental Certification of Jonathan G. Cedarbaum in Support of Application for Admission Pro Hac Vice)* (Attachments: # 1 Exhibit : Cover Letter, # 2 Text of Proposed Order)(WEINER, RACHEL) (Entered: 07/30/2013) |
| 07/30/2013 | 124 | CERTIFICATION in Support filed by International Franchise Association re 98 MOTION for Leave to Appear Pro Hac Vice *(Supplemental Certification of Heather M. Zachary in Support of Application for Admission Pro Hac Vice)* (Attachments: # 1 Exhibit : Cover Letter, # 2 Text of Proposed Order)(WEINER, RACHEL) (Entered: 07/30/2013) |
| 07/30/2013 | 125 | CERTIFICATION in Support filed by International Franchise Association re 99 MOTION for Leave to Appear Pro Hac Vice *(Supplemental Certification of Daniel Aguilar in Support of Application for Admission Pro Hac Vice)* (Attachments: # 1 Exhibit : Cover Letter, # 2 Text of Proposed Order)(WEINER, RACHEL) (Entered: 07/30/2013) |
| 08/06/2013 | 126 | ORDER granting 99 Motion for Leave to Appear Pro Hac Vice as to Daniel Aguilar. Signed by Magistrate Judge Steven C. Mannion on 8/6/13. (jd, ) (Entered: 08/06/2013) |
| 08/06/2013 | 127 | ORDER granting 97 Motion for Leave to Appear Pro Hac Vice as to Jonathan G. Cedarbaum. Signed by Magistrate Judge Steven C. Mannion on 8/6/13. (jd, ) (Entered: 08/06/2013) |
| 08/06/2013 | 128 | ORDER granting 98 Motion for Leave to Appear Pro Hac Vice as to Heather M. Zachary. Signed by Magistrate Judge Steven C. Mannion on 8/6/13. (jd, ) (Entered: 08/06/2013) |
| 08/07/2013 | | Pro Hac Vice fee as to Daniel Aguilar, Jonathan G. Cedarbaum and Heather M. Zachary: $ 450.00, receipt number NEW017713 (jd, ) (Entered: 08/07/2013) |
| 09/13/2013 | | Case Reassigned to Magistrate Judge Joseph A. Dickson. Magistrate Judge Steven C. Mannion no longer assigned to the case. (msd) (Entered: 09/13/2013) |
| 09/23/2013 | | Set Hearings: Please be advised that Oral Argument for the pending motions to dismiss has been scheduled for 11/7/2013 at 10:00 AM in Newark - Courtroom 5A before Judge Esther Salas. Please mark your calendars accordingly. (ps, ) |

JA277

| | | |
|---|---|---|
| 09/26/2013 | 129 | Letter from Federal Trade Commission. (COHEN, KRISTIN) (Entered: 09/26/2013) |
| 09/30/2013 | 130 | Letter from Jennifer A. Hradil, Esq. to the Hon. Joseph A. Dickson, U.S.M.J. re 129 Letter. (HRADIL, JENNIFER) (Entered: 09/30/2013) |
| 10/08/2013 | 131 | ORDER STAYING CASE. Plaintiff's counsel shall advise the Court, in writing, when they are able to continue litigating this matter. Signed by Magistrate Judge Joseph A. Dickson on 10/7/13. (jd, ) (Entered: 10/08/2013) |
| 10/17/2013 | 132 | Letter from Plaintiff re 131 Order Staying Case. (ZIMMERMAN, JONATHAN) (Entered: 10/17/2013) |
| 10/18/2013 | | Set Hearings: Please be advised that a Telephone Conference has been scheduled for 10/21/2013 at 4:00 PM before Judge Esther Salas. Plaintiff's counsel shall coordinate the conference call. (ps, ) (Entered: 10/18/2013) |
| 10/21/2013 | 133 | Minute Entry for proceedings held before Judge Esther Salas: Telephone Conference held on 10/21/2013. Oral Argument for pending motions to dismiss is scheduled for 11/7/2013 at 10:00 AM before Judge Esther Salas. (ps, ) (Entered: 10/22/2013) |
| 11/07/2013 | 134 | Minute Entry for proceedings held before Judge Esther Salas: Motion Hearing held on 11/7/2013. 91 MOTION to Dismiss filed by WYNDHAM HOTELS AND RESORTS, LLC, 92 MOTION to Dismiss filed by Wyndham Hotel Management Incorporated, WYNDHAM HOTEL GROUP LLC, WYNDHAM WORLDWIDE CORPORATION. Decision Reserved on Motions to Dismiss. 93 MOTION to Stay *Discovery* filed by Wyndham Hotel Management Incorporated, WYNDHAM HOTEL GROUP LLC, WYNDHAM HOTELS AND RESORTS, LLC, WYNDHAM WORLDWIDE CORPORATION. Ordered Motion to Stay Discovery denied. (Court Reporter Lynne Johnson.) (ps, ) (Entered: 11/08/2013) |
| 11/08/2013 | 135 | TEXT ORDER: The parties are advised that an Initial Conference is set for 1/7/2014 02:30 PM in Newark - Courtroom 2D before Magistrate Judge Joseph A. Dickson.SO ORDERED by Magistrate Judge Joseph A. Dickson on 11/8/13. (nm, ) (Entered: 11/08/2013) |
| 11/12/2013 | 136 | ORDER denying 93 Motion to Stay Discovery. Signed by Judge Esther Salas on 11/12/13. (jd, ) (Entered: 11/12/2013) |
| 11/12/2013 | 137 | JUDGE ESTHER SALAS'S GENERAL PRETRIAL AND TRIAL PROCEDURES. (ps, ) (Entered: 11/12/2013) |
| 11/19/2013 | 138 | MOTION for Leave to Appear Amicus Curiae by CHARLES LEE THOMASON. (Attachments: # 1 Text of Proposed Order, # 2 Brief, # 3 Declaration, # 4 Exhibit Exhibit 1 to Declaration, # 5 Exhibit Exhibit 2 to Declaration)(THOMASON, CHARLES) (Entered: 11/19/2013) |
| 11/20/2013 | | Set Deadlines as to 138 MOTION for Leave to Appear Amicus Curiae . Motion set for 12/16/2013 before Judge Esther Salas. The motion will be decided on the papers. No appearances required unless notified by the court. (jd, ) (Entered: 11/20/2013) |

| 12/02/2013 | 139 | Transcript of Proceedings held on NOVEMBER 7, 2013, before Judge ESTHER SALAS,. Court Reporter/Transcriber Lynne Johnson (chjlaw@aol.com/609-896-1836).MOTIONS TO DISMISS. **NOTICE REGARDING REDACTION OF TRANSCRIPTS:** The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript. Redaction Request due 12/23/2013. Redacted Transcript Deadline set for 1/2/2014. Release of Transcript Restriction set for 3/3/2014.(Main Document 139 replaced on 12/5/2013) (ek). (Entered: 12/02/2013) |
|---|---|---|
| 12/02/2013 | 140 | RESPONSE in Opposition filed by FEDERAL TRADE COMMISSION re 138 MOTION for Leave to Appear Amicus Curiae (Attachments: # 1 Certificate of Service, # 2 Text of Proposed Order)(ARIAS, ANDREA) (Entered: 12/02/2013) |
| 12/03/2013 | 141 | REPLY BRIEF to Opposition to Motion filed by CHARLES LEE THOMASON re 138 MOTION for Leave to Appear Amicus Curiae (THOMASON, CHARLES) (Entered: 12/04/2013) |
| 12/13/2013 | 142 | Letter from Jennifer A. Hradil, Esq. enclosing supplemental authority. (Attachments: # 1 Exhibit Number 1)(HRADIL, JENNIFER) (Entered: 12/13/2013) |
| 12/18/2013 | 143 | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J. (Attachments: # 1 Joint Discovery Plan, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3)(HRADIL, JENNIFER) (Entered: 12/18/2013) |
| 12/19/2013 | 144 | Letter from Katherine E. McCarron, Esq. regarding Supplemental Authority re 142 Letter. (MCCARRON, KATHERINE) (Entered: 12/19/2013) |
| 12/20/2013 | | Set Hearings: Telephone Conference scheduled for 12/23/2013 at 2:00 PM before Judge Esther Salas. Plaintiff's counsel shall coordinate the conference call. (ps, ) (Entered: 12/20/2013) |
| 12/23/2013 | 145 | Letter from Jennifer A. Hradil, Esq. enclosing pro hac vice application of David T. Cohen, Esq. (Attachments: # 1 Declaration of David T. Cohen, Esq., # 2 Declaration of Jennifer A. Hradil, Esq., # 3 Text of Proposed Order)(HRADIL, JENNIFER) (Entered: 12/23/2013) |
| 12/23/2013 | | Minute Entry for proceedings held before Judge Esther Salas: Telephone Conference held on 12/23/2013. (ps, ) (Entered: 12/27/2013) |
| 12/27/2013 | 146 | ORDER that the parties shall submit a supplemental, joint letter-brief to the Court of no more than 10 pages (5 pages each) by January 21, 2014, as discussed during the December 23, 2013 conference; that, for administrative purposes, the two motions, (D.E. Nos. 91 & 92), will be held in abeyance pending the Court's review of the parties' supplemental letter-brief. Signed by Judge Esther Salas on 12/27/13. (jd, ) (Entered: 12/27/2013) |
| 01/02/2014 | 147 | Consent ORDER granting pro hac vice admission as to David T. Cohen. Signed by Magistrate Judge Joseph A. Dickson on 1/2/14. (jd, ) (Entered: 01/02/2014) |
| 01/07/2014 | | Minute Entry for proceedings held before Magistrate Judge Joseph A. Dickson: Initial Pretrial Conference held on 1/7/2014. (nm, ) (Entered: 01/07/2014) |
| 01/07/2014 | 148 | Pretrial SCHEDULING ORDER: Settlement Conference set for 4/28/2014 10:30 AM before Magistrate Judge Joseph A. Dickson. Fact Discovery due by |

| | | |
|---|---|---|
| | | 9/8/2014.. Signed by Magistrate Judge Joseph A. Dickson on 1/7/14. (jd, ) (Entered: 01/08/2014) |
| 01/08/2014 | 149 | Notice of Request by Pro Hac Vice David T. Cohen, Esq. to receive Notices of Electronic Filings. ( Pro Hac Vice fee $ 150 receipt number 0312-5441556.) (HRADIL, JENNIFER) (Entered: 01/08/2014) |
| 01/16/2014 | 150 | Letter from Jennifer A. Hradil, Esq. to the Honorable Esther Salas, U.S.D.J. (HRADIL, JENNIFER) (Entered: 01/16/2014) |
| 01/17/2014 | 151 | Letter from Katherine E. McCarron, Esq., enclosing Supplemental Authority. (Attachments: # 1 Exhibit)(MCCARRON, KATHERINE) (Entered: 01/17/2014) |
| 01/21/2014 | 152 | Letter from Jennifer A. Hradil, Esq. to the Honorable Esther Salas, U.S.D.J. re 146 Order,. (Attachments: # 1 Brief Joint Letter Brief containing supplemental authority)(HRADIL, JENNIFER) (Entered: 01/21/2014) |
| 01/22/2014 | 153 | Letter from Jennifer A. Hradil, Esq. to the Honorable Esther Salas, U.S.D.J. requesting leave to file a five-page letter brief.. (HRADIL, JENNIFER) (Entered: 01/22/2014) |
| 01/23/2014 | 154 | ORDER that the Court accepts Plaintiff's recent submission of supplemental authority, (D.E. No. 151); that Defendants' request for leave to submit a five-page letter brief by January 29, 2014, (D.E. No. 153), is GRANTED, etc. Signed by Judge Esther Salas on 1/23/14. (jd, ) (Entered: 01/23/2014) |
| 01/27/2014 | 155 | Letter from Jennifer A. Hradil, Esq. to the Honorable Esther Salas, U.S.D.J. enclosing courtesy copies of supplemental authority re 152 Letter. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(HRADIL, JENNIFER) (Entered: 01/27/2014) |
| 01/29/2014 | 156 | Letter from Jennifer A. Hradil, Esq. to the Honorable Esther Salas, U.S.D.J. responding to the FTC's notice of supplemental authority. re 151 Letter, 152 Letter. (Attachments: # 1 Exhibit A to J. Hradil Letter, # 2 Exhibit B to J. Hradil Letter, # 3 Exhibit C to J. Hradil Letter, # 4 Exhibit D to J. Hradil Letter) (HRADIL, JENNIFER) (Entered: 01/29/2014) |
| 02/04/2014 | 157 | NOTICE of Change of Address by JENNIFER A. HRADIL (HRADIL, JENNIFER) (Entered: 02/04/2014) |
| 02/06/2014 | 158 | Letter from Jennifer A. Hradil, Esq. to the Honorable Esther Salas, U.S.D.J. enclosing supplemental authorities. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (HRADIL, JENNIFER) (Entered: 02/06/2014) |
| 02/07/2014 | 159 | Letter from Kevin H. Moriarty. (Attachments: # 1 Text of Proposed Order) (MORIARTY, KEVIN) (Entered: 02/07/2014) |
| 02/07/2014 | 160 | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J. re 159 Letter. (HRADIL, JENNIFER) (Entered: 02/07/2014) |
| 02/10/2014 | 161 | NOTICE of Appearance by ALLISON MICHELLE LEFRAK on behalf of FEDERAL TRADE COMMISSION (LEFRAK, ALLISON) (Entered: 02/10/2014) |
| 02/10/2014 | 162 | TEXT ORDER - On or before 2/14/14, Plaintiff shall electronically file a single |

| | | |
|---|---|---|
| | | letter, of no more than 7 pages, setting forth any and all current discovery disputes that the parties were unable to resolve through the meet and confer process. Defendants may file a response, of no more than 7 pages, on or before 2/21/14. No further briefing shall be submitted without leave of Court. An in-person status conference is scheduled for 3/21/14 at 2:00 p.m. in Newark, Courtroom 2D before Magistrate Judge Dickson. SO ORDERED by Joseph A. Dickson, U.S.M.J. (ps, ) (Entered: 02/10/2014) |
| 02/10/2014 | 163 | AMENDED TEXT ORDER: The Text Order dated 2/10/14 is hereby amended to read as follows: On or before 2/14/14, Plaintiff and Defendants may each electronically file a single letter, of no more than 7 pages, setting forth their respective positions on any all current discovery disputes that the parties were unable to resolve through the meet and confer process. Plaintiff and Defendants may each file a response to the other's submission, of no more than 7 pages, on or before 2/21/14. No further briefing shall be submitted without leave of Court. An in-person status conference is scheduled for 3/21/14 at 2:00 p.m. in Newark, Courtroom 2D before Magistrate Judge Dickson. SO ORDERED by Magistrate Judge Joseph A. Dickson on 2/10/14. (nm, ) (Entered: 02/11/2014) |
| 02/12/2014 | 164 | NOTICE of Appearance by JAMES ALAN TRILLING on behalf of FEDERAL TRADE COMMISSION (TRILLING, JAMES) (Entered: 02/12/2014) |
| 02/14/2014 | 165 | MOTION to Seal by FEDERAL TRADE COMMISSION. (Attachments: # 1 Brief in support of Motion to Seal, # 2 Declaration in support of Motion to Seal, # 3 Exhibit Redacted Letter re Discovery Disputes, # 4 Exhibit Declaration in Support of Letter re Discovery Disputes, # 5 Exhibit A, # 6 Exhibit B, # 7 Exhibit C, # 8 Exhibit D, # 9 Exhibit E, # 10 Exhibit F (confidential materials), # 11 Exhibit G, # 12 Exhibit H, # 13 Exhibit I (confidential materials), # 14 Exhibit J (confidential materials), # 15 Exhibit K (confidential materials), # 16 Exhibit L (confidential materials), # 17 Text of Proposed Order)(MORIARTY, KEVIN) (Entered: 02/14/2014) |
| 02/14/2014 | 166 | Letter from Federal Trade Commission re Discovery Disputes. (Attachments: # 1 Declaration in support of Letter re Discovery Issues, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F (confidential materials), # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I (confidential materials), # 11 Exhibit J (confidential materials), # 12 Exhibit K (confidential materials), # 13 Exhibit L (confidential materials))(MORIARTY, KEVIN) (Entered: 02/14/2014) |
| 02/14/2014 | 167 | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J. regarding discovery disputes re 163 Order,,,. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F) (HRADIL, JENNIFER) (Entered: 02/14/2014) |
| 02/16/2014 | | Set Deadlines as to 165 MOTION to Seal . Motion set for 3/17/2014 before Judge Esther Salas. The motion will be decided on the papers. No appearances required unless notified by the court. (jd, ) (Entered: 02/16/2014) |
| 02/21/2014 | 168 | Letter from Kevin H. Moriarty re 159 Letter. (MORIARTY, KEVIN) (Entered: 02/21/2014) |
| 02/21/2014 | 169 | MOTION to Seal by FEDERAL TRADE COMMISSION. (Attachments: # 1 Brief, # 2 Declaration of Kevin H. Moriarty, # 3 Exhibit Letter (redacted), # 4 |

JA281

| | | |
|---|---|---|
| | | Exhibit Declaration of Jonathan E. Zimmerman, # [5] Exhibit A (confidential materials), # [6] Exhibit B (confidential materials), # [7] Exhibit C, # [8] Exhibit D, # [9] Exhibit E, # [10] Exhibit F, # [11] Exhibit G, # [12] Exhibit H (confidential materials), # [13] Text of Proposed Order)(MORIARTY, KEVIN) (Entered: 02/21/2014) |
| 02/21/2014 | [170] | Letter from Jonathan E. Zimmerman re [167] Letter,. (Attachments: # [1] Declaration of Jonathan E. Zimmerman, # [2] Exhibit A (confidential materials), # [3] Exhibit B (confidential materials), # [4] Exhibit C, # [5] Exhibit D, # [6] Exhibit E, # [7] Exhibit F, # [8] Exhibit G, # [9] Exhibit H (confidential materials))(ZIMMERMAN, JONATHAN) (Entered: 02/21/2014) |
| 02/21/2014 | [171] | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J. re [166] Letter,. (Attachments: # [1] Declaration Jennifer A. Hradil, Esq., # [2] Exhibit A, # [3] Exhibit B, # [4] Exhibit C, # [5] Exhibit D, # [6] Exhibit E, # [7] Exhibit F)(HRADIL, JENNIFER) (Entered: 02/21/2014) |
| 02/23/2014 | | Set Deadlines as to [169] MOTION to Seal . Motion set for 3/17/2014 before Judge Esther Salas. The motion will be decided on the papers. No appearances required unless notified by the court. (jd, ) (Entered: 02/23/2014) |
| 02/24/2014 | [172] | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J. (HRADIL, JENNIFER) (Entered: 02/24/2014) |
| 02/25/2014 | 173 | TEXT ORDER: Per the request of the parties, the in person settlement conference scheduled for 4/28/14 has been adjourned to 5/6/14 at 11:00 a.m. SO ORDERED by Magistrate Judge Joseph A. Dickson on 2/25/14. (nm, ) (Entered: 02/25/2014) |
| 02/28/2014 | [174] | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J. (Attachments: # [1] Declaration of Lynn A. Feldman, # [2] Exhibit A (Proposed Form of Stipulated Discovery Confidentiality Order))(HRADIL, JENNIFER) (Entered: 02/28/2014) |
| 02/28/2014 | [175] | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J. re [165] MOTION to Seal . (Attachments: # [1] Declaration of Jennifer A. Hradil, Esq., # [2] Proposed Findings of Fact and Conclusions of Law)(HRADIL, JENNIFER) (Entered: 02/28/2014) |
| 03/03/2014 | [176] | Stipulated Discovery Confidentiality Order. Signed by Magistrate Judge Joseph A. Dickson on 3/3/14. (jd, ) (Entered: 03/03/2014) |
| 03/07/2014 | [177] | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J. re [169] MOTION to Seal . (Attachments: # [1] Declaration of Jennifer A. Hradil, Esq., # [2] Proposed Findings of Fact and Conclusions of Law)(HRADIL, JENNIFER) (Entered: 03/07/2014) |
| 03/21/2014 | | Minute Entry for proceedings held before Magistrate Judge Joseph A. Dickson: Status Conference held on 3/21/2014. (CD #ECR.) (nm, ) (Entered: 03/24/2014) |
| 03/26/2014 | [178] | Transcript of Proceedings held on March 21, 2014, before Judge JOSEPH A. DICKSON. Court Reporter/Transcriber KLJ Transcription Service/ Terry L. DeMarco (201-703-1670).STATUS CONFERENCE. **NOTICE REGARDING REDACTION OF TRANSCRIPTS:** The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript. Redaction Request due 4/16/2014. Redacted Transcript Deadline set for 4/28/2014. Release of Transcript Restriction set for 6/24/2014. (ek) (Main |

| | | |
|---|---|---|
| | | Document 178 replaced on 4/2/2014 (ek). (Entered: 03/26/2014) |
| 03/28/2014 | 179 | ORDER granting 165 Motion to Seal. Signed by Magistrate Judge Joseph A. Dickson on 3/27/14. (jd, ) (Entered: 03/28/2014) |
| 04/04/2014 | 180 | NOTICE by FEDERAL TRADE COMMISSION *of Ex Parte and In Camera Filing* (ZIMMERMAN, JONATHAN) (Entered: 04/04/2014) |
| 04/07/2014 | 181 | OPINION. Signed by Judge Esther Salas on 4/7/14. (jd, ) (Entered: 04/07/2014) |
| 04/07/2014 | 182 | ORDER that the motion to dismiss by Defendant Wyndham Hotels & Resorts LLC, (D.E. No. 91), is DENIED. Signed by Judge Esther Salas on 4/7/14. (jd, ) (Entered: 04/07/2014) |
| 04/08/2014 | 183 | Letter from Kristin Cohen, Esq.. (Attachments: # 1 Text of Proposed Order, # 2 Text of Proposed Order)(LEFRAK, ALLISON) (Entered: 04/08/2014) |
| 04/09/2014 | 184 | ORDER Regarding Discovery Issues. Signed by Magistrate Judge Joseph A. Dickson on 4/9/14. (jd, ) (Entered: 04/09/2014) |
| 04/11/2014 | 185 | ORDER granting 169 Motion to Seal. Signed by Magistrate Judge Joseph A. Dickson on 4/11/14. (jd, ) (Entered: 04/14/2014) |
| 04/16/2014 | 186 | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(HRADIL, JENNIFER) (Entered: 04/16/2014) |
| 04/16/2014 | 187 | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J. (Attachments: # 1 Text of Proposed Order)(HRADIL, JENNIFER) (Entered: 04/16/2014) |
| 04/17/2014 | 188 | MOTION Certify Order Denying Motion to Dismiss For Interlocutory Appeal re 181 Opinion, 182 Order by WYNDHAM HOTELS AND RESORTS, LLC. (Attachments: # 1 Brief in Support of Wyndham Hotels and Resorts LLC's Motion to Certify Order Denying Motion to Dismiss For Interlocutory Appeal, # 2 Text of Proposed Order, # 3 Certificate of Service)(HRADIL, JENNIFER) (Entered: 04/17/2014) |
| 04/17/2014 | 189 | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J. requesting leave to file a motion for partial summary judgment. (HRADIL, JENNIFER) (Entered: 04/17/2014) |
| 04/20/2014 | | Set Deadlines as to 188 MOTION Certify Order Denying Motion to Dismiss For Interlocutory Appeal re 181 Opinion, 182 Order . Motion set for 5/19/2014 before Judge Esther Salas. The motion will be decided on the papers. No appearances required unless notified by the court. (jd, ) (Entered: 04/20/2014) |
| 04/21/2014 | | Set Hearings: Please be advised that a Telephone Conference has been scheduled for 4/23/2014 at 2:00 PM before Judge Esther Salas. Defense counsel shall coordinate the conference call. (ps, ) (Entered: 04/21/2014) |
| 04/21/2014 | 190 | MOTION for Leave to Appear Amicus Curiae *and filed brief supporting motion Dkt. #188* by CHARLES LEE THOMASON. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Proposed Amicus Brief Supporting a Section 1292(b) certification, # 3 Exhibit Exhibit to Brief - Legislative History of Section 1292(b)) (THOMASON, CHARLES) (Entered: 04/21/2014) |

| 04/21/2014 | | Set Deadlines as to [190](#) MOTION for Leave to Appear Amicus Curiae *and filed brief supporting motion Dkt. #188.* Motion set for 5/19/2014 before Judge Esther Salas. The motion will be decided on the papers. No appearances required unless notified by the court. (jd, ) (Entered: 04/21/2014) |
|---|---|---|
| 04/22/2014 | [191](#) | ORDER that Wyndham Hotels and Resorts, LLC's time to file a responsive pleading is hereby extended until 14 days after the Court rules upon Wyndham Worldwide Corporation, Wyndham Hotel Group, LLC, and Wyndham Hotel Management, Inc.'s motion to dismiss. Signed by Magistrate Judge Joseph A. Dickson on 4/21/14. (jd, ) (Entered: 04/22/2014) |
| 04/23/2014 | [193](#) | Minute Entry for proceedings held before Judge Esther Salas: Telephone Conference held on 4/23/2014. (ps, ) (Entered: 04/25/2014) |
| 04/24/2014 | [192](#) | MOTION for Leave to File *Brief Amici Curiae in Support of Defendants* by Chamber of Commerce of the United States. (Attachments: # [1](#) Memorandum in Support of Motion for Leave to File Brief Amici Curiae, # [2](#) Proposed Brief Amici Curiae, # [3](#) Proposed Order)(MAROTTA, SEAN) (Entered: 04/24/2014) |
| 04/25/2014 | | Set Deadlines as to [192](#) MOTION for Leave to File *Brief Amici Curiae in Support of Defendants.* Motion set for 5/19/2014 before Judge Esther Salas. The motion will be decided on the papers. No appearances required unless notified by the court. (jd, ) (Entered: 04/25/2014) |
| 04/28/2014 | [194](#) | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J. re [189](#) Letter. (HRADIL, JENNIFER) (Entered: 04/28/2014) |
| 04/30/2014 | 195 | TEXT ORDER: The Court has scheduled an in-person settlement conference for 5/6/2014 at 11 am in Courtroom 2D- Newark. All parties with full settlement authority are required to attend the conference. Confidential position papers no longer than 5 pages may be faxed by 5/5/2014 to 973-645-4549. SO ORDERED by Magistrate Judge Joseph A. Dickson on 4/30/14. (nm, ) (Entered: 04/30/2014) |
| 05/05/2014 | [196](#) | BRIEF in Opposition filed by FEDERAL TRADE COMMISSION re [188](#) MOTION Certify Order Denying Motion to Dismiss For Interlocutory Appeal re [181](#) Opinion, [182](#) Order (TRILLING, JAMES) (Entered: 05/05/2014) |
| 05/06/2014 | | Minute Entry for proceedings held before Magistrate Judge Joseph A. Dickson: Settlement Conference held on 5/6/2014. (nm, ) (Entered: 05/06/2014) |
| 05/12/2014 | [197](#) | REPLY BRIEF to Opposition to Motion filed by WYNDHAM HOTELS AND RESORTS, LLC re [188](#) MOTION Certify Order Denying Motion to Dismiss For Interlocutory Appeal re [181](#) Opinion, [182](#) Order (Attachments: # [1](#) Declaration of Jennifer A. Hradil, Esq., # [2](#) Exhibit A, # [3](#) Exhibit B, # [4](#) Certificate of Service) (HRADIL, JENNIFER) (Entered: 05/12/2014) |
| 05/13/2014 | 198 | TEXT ORDER: The parties are advised that an in person settlement conference is scheduled for 6/25/14 at 2:30 p.m. SO ORDERED by Magistrate Judge Joseph A. Dickson on 5/13/14. (nm, ) (Entered: 05/13/2014) |
| 05/23/2014 | [199](#) | ORDER regarding Discovery Issues. Signed by Magistrate Judge Joseph A. Dickson on 5/23/14. (jd, ) (Entered: 05/23/2014) |
| 06/12/2014 | [200](#) | NOTICE by FEDERAL TRADE COMMISSION *of Withdrawal of Attorney* |

JA284

(ZIMMERMAN, JONATHAN) (Entered: 06/12/2014)

| 06/23/2014 | 201 | OPINION. Signed by Judge Esther Salas on 6/23/14. (jd, ) (Entered: 06/23/2014) |
|---|---|---|
| 06/23/2014 | 202 | ORDER that the motion to dismiss by Defendants Wyndham Worldwide Corporation, Wyndham Hotel Group, LLC, and Wyndham Hotel Management, Inc., (D.E. No. 92), is DENIED. Signed by Judge Esther Salas on 6/23/14. (jd, ) (Entered: 06/23/2014) |
| 06/23/2014 | 203 | MEMORANDUM OPINION and ORDER that Defendant Wyndham Hotels and Resorts, LLC's motion, (D.E. No. 188), for an order certifying this Court's April 7, 2014 Order, (D.E. No. 182), for interlocutory review is hereby GRANTED, etc.; that Defendant Wyndham Hotels and Resorts, LLC shall file a Petition for Permission to Appeal with the United States Court of Appeals for the Third Circuit in accordance with Federal Rule of Appellate Procedure 5(a)(2); that the motions requesting leave for certain individuals or entities to file brief amici curiae in support of Defendant Wyndham Hotels and Resorts, LLCs motion for an order certifying this Court's April 7, 2014 Order, (D.E. Nos. 190 & 192), are DENIED. Signed by Judge Esther Salas on 6/23/14. (jd, ) (Entered: 06/23/2014) |
| 06/26/2014 | | Minute Entry for proceedings held before Magistrate Judge Joseph A. Dickson: Settlement Conference held on 6/25/2014. (nm, ) (Entered: 06/26/2014) |
| 06/27/2014 | 204 | Letter from Jennifer A. Hradil to the Honorable Joseph A. Dickson, U.S.M.J. enclosing application seeking the pro hac vice admission of Jason M. Wilcox, Esq.. (Attachments: # 1 Declaration of Jennifer A. Hradil in support of Application for Pro Hac Vice Admission, # 2 Declaration of Jason M. Wilcox, Esq. in support of Application for Pro Hac Vice Admission, # 3 Text of Proposed Order)(HRADIL, JENNIFER) (Entered: 06/27/2014) |
| 06/30/2014 | 205 | ORDER that Charles L. Thomason's Motion for Leave to Appear as Amicus Curiae, (D.E. No. 138), is DENIED. Signed by Judge Esther Salas on 6/30/14. (jd, ) (Entered: 06/30/2014) |
| 07/02/2014 | 206 | Consent ORDER granting Pro Hac Vice admission as to Jason M. Wilcox. Signed by Magistrate Judge Joseph A. Dickson on 7/2/14. (jd, ) (Entered: 07/02/2014) |
| 07/02/2014 | 207 | Notice of Request by Pro Hac Vice Jason M. Wilcox to receive Notices of Electronic Filings. (HRADIL, JENNIFER) (Entered: 07/02/2014) |
| 07/03/2014 | | CLERK'S QUALITY CONTROL MESSAGE - Please be advised that the Request for Electronic Notification of Pro Hac Vice Counsel submitted by J. Hradil on 7/2/14 cannot be processed until pro hac counsel's application fee has been paid. Please review the Electronic Notification for Pro Hac Vice instructions on our website. Counsel is advised to resubmit the Request for Electronic Notification of Pro Hac Vice Counsel once payment has been recorded. This message is for informational purposes only. (jd, ) (Entered: 07/03/2014) |
| 07/03/2014 | 208 | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J. requesting additional time for Defendants to file answer. (Attachments: # 1 Text of Proposed Order)(HRADIL, JENNIFER) (Entered: 07/03/2014) |
| 07/03/2014 | 209 | Notice of Request by Pro Hac Vice Jason M. Wilcox to receive Notices of Electronic Filings. ( Pro Hac Vice fee $ 150 receipt number 0312-5790076.) |

| | | (HRADIL, JENNIFER) (Entered: 07/03/2014) |
|---|---|---|
| 07/06/2014 | | Pro Hac Vice counsel, Jason M. Wilcox, has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (jd, ) (Entered: 07/06/2014) |
| 07/07/2014 | 210 | ORDER that Wyndham's time to file a responsive pleading is hereby extended for aperiod of 10 days, through and including July 17, 2014. Signed by Magistrate Judge Joseph A. Dickson on 7/7/14. (jd, ) (Entered: 07/07/2014) |
| 07/07/2014 | | Answer Due Deadline Update - The document 210 Order submitted by WYNDHAM WORLDWIDE CORPORATION, WYNDHAM HOTELS AND RESORTS, LLC, WYNDHAM HOTEL GROUP LLC, Wyndham Hotel Management Incorporated has been GRANTED. The answer due date has been set for 7/17/14. (jd, ) (Entered: 07/07/2014) |
| 07/14/2014 | 211 | Letter from Kevin H. Moriarty re 148 Scheduling Order. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Text of Proposed Order)(MORIARTY, KEVIN) (Entered: 07/14/2014) |
| 07/17/2014 | 212 | *Defendants'* ANSWER to Amended Complaint by WYNDHAM HOTEL GROUP LLC, WYNDHAM HOTELS AND RESORTS, LLC, WYNDHAM WORLDWIDE CORPORATION, Wyndham Hotel Management Incorporated. (HRADIL, JENNIFER) (Entered: 07/17/2014) |
| 07/18/2014 | 213 | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J. re 211 Letter. (Attachments: # 1 Exhibit A)(HRADIL, JENNIFER) (Entered: 07/18/2014) |
| 07/23/2014 | 214 | Letter from Thomas Burger to Judge Dickson. (jd, ) (Entered: 07/23/2014) |
| 07/23/2014 | 215 | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J. re 214 Letter. (HRADIL, JENNIFER) (Entered: 07/23/2014) |
| 07/24/2014 | 216 | Letter ORDER instructing the Parties and Mr. Burger to go forward with the deposition as scheduled. Additionally however, the Parties are instructed to discuss with Mr. Burger, an appropriate form of relief in connection with his time off from work and other expenses. If this issue is not resolved to everyone's satisfaction, Mr. Burger shall be permitted to file a formal application, proceeding prose, to this Court. Signed by Magistrate Judge Joseph A. Dickson on 7/23/14. (jd, ) (Entered: 07/24/2014) |
| 07/29/2014 | 217 | ORDER of USCA granting Petition for Leave of Appeal (ca3cjg) (Entered: 07/29/2014) |
| 07/29/2014 | 218 | NOTICE OF INTERLOCUTORY APPEAL by WYNDHAM HOTELS AND RESORTS, LLC. (Pursuant to 28 USC Section 1292(b)) Filing fee $ 505, receipt number NEW20831. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (db, ) Modified on 8/6/2014 (db). (Entered: 08/05/2014) |
| 08/05/2014 | 219 | Letter from Thomas Burger to Magistrate Judge Dickson. (sr, ) (Entered: |

CM/ECF LIVE - U.S. District Court for the District of New Jersey

| 08/07/2014 | 220 | USCA Case Number 14-3514 for 218 Notice of Appeal (USCA), filed by WYNDHAM HOTELS AND RESORTS, LLC. USCA Case Manager Caitlyn (CJG) (Document Restricted - Court Only) (ca3cjh) (Entered: 08/07/2014) |
| --- | --- | --- |
| 08/07/2014 | 221 | Letter from Kevin H. Moriarty re 211 Letter. (MORIARTY, KEVIN) (Entered: 08/07/2014) |
| 08/07/2014 | 222 | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J. re 219 Letter. (HRADIL, JENNIFER) (Entered: 08/07/2014) |
| 08/11/2014 | 223 | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J. re 221 Letter. (HRADIL, JENNIFER) (Entered: 08/11/2014) |
| 08/13/2014 | 224 | AMENDED SCHEDULING ORDER re: extensions of the discovery deadlines. Fact Discovery shall remain open through 12/3/2014; etc. Signed by Magistrate Judge Joseph A. Dickson on 8/13/14. (sr, ) (Entered: 08/13/2014) |
| 08/13/2014 | 227 | LETTER ORDER regarding Mr. Burger's deposition. Signed by Magistrate Judge Joseph A. Dickson on 8/8/2014. (nr, ) (Entered: 08/14/2014) |
| 08/13/2014 | 228 | LETTER ORDER: In person Status Conference set for 10/9/2014 10:30 AM before Magistrate Judge Joseph A. Dickson. Fact Discovery due by 12/3/2014. etc.. Signed by Magistrate Judge Joseph A. Dickson on 8/12/2014. (nr, ) (Entered: 08/14/2014) |
| 08/14/2014 | 225 | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J. seeking to compel discovery. (Attachments: # 1 Declaration of Jennifer A. Hradil, Esq., # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E)(HRADIL, JENNIFER) (Entered: 08/14/2014) |
| 08/14/2014 | 226 | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J. seeking a protective order. (Attachments: # 1 Declaration of Jennifer A. Hradil, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(HRADIL, JENNIFER) (Entered: 08/14/2014) |
| 08/15/2014 | 229 | Letter from Jennifer A. Hradil, Esq. to The Honorable Joseph A. Dickson, U.S.M.J. seeking admission pro hac vice of Kate E. Wooler.. (Attachments: # 1 Declaration of Jennifer A. Hradil, Esq., # 2 Declaration of Kate E. Wooler, Esq., # 3 Text of Proposed Order)(HRADIL, JENNIFER) (Entered: 08/15/2014) |
| 08/15/2014 | 230 | Letter from James A. Trilling to the Honorable Joseph A. Dickson re 225 Letter,. (Attachments: # 1 Declaration of James A. Trilling, # 2 Exhibit)(TRILLING, JAMES) (Entered: 08/15/2014) |
| 08/18/2014 | 231 | Letter from Jennifer A. Hradil, Esq. to The Honorable Joseph A. Dickson, U.S.M.J. requesting leave to file reply. re 230 Letter. (Attachments: # 1 Exhibit A - Proposed Reply)(HRADIL, JENNIFER) (Entered: 08/18/2014) |
| 08/25/2014 | 232 | CONSENT ORDER Granting Pro Hac Vice Admission as to KATE E. WOOLER, ESQ.. Signed by Magistrate Judge Joseph A. Dickson on 8/25/2014. (ld, ) (Entered: 08/25/2014) |
| 08/26/2014 | 233 | Letter from Kevin H. Moriarty re 226 Letter. (Attachments: # 1 Declaration, # 2 |

| | | Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E) (MORIARTY, KEVIN) (Entered: 08/26/2014) |
|---|---|---|
| 08/26/2014 | 234 | MOTION to Seal by FEDERAL TRADE COMMISSION. (Attachments: # 1 Brief, # 2 Declaration, # 3 Exhibit Redacted Letter, # 4 Exhibit A, # 5 Exhibit B, # 6 Exhibit C, # 7 Exhibit D, # 8 Exhibit E, # 9 Text of Proposed Order) (MORIARTY, KEVIN) (Entered: 08/26/2014) |
| 08/27/2014 | | Set Deadlines as to 234 MOTION to Seal . Motion set for 10/6/2014 before Judge Esther Salas. The motion will be decided on the papers. No appearances required unless notified by the court. (jd, ) (Entered: 08/27/2014) |
| 08/28/2014 | 235 | Notice of Request by Pro Hac Vice Kate E. Wooler, Esq. to receive Notices of Electronic Filings. ( Pro Hac Vice fee $ 150 receipt number 0312-5898012.) (HRADIL, JENNIFER) (Entered: 08/28/2014) |
| 08/29/2014 | | Pro Hac Vice counsel, KATE E. WOOLER, has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (jd, ) (Entered: 08/29/2014) |
| 09/05/2014 | 236 | Letter dated 8/18/14 from Thomas Burger to Judge Dickson w/copy of letter from Judge Dickson attached. (jd, ) (Entered: 09/05/2014) |
| 09/16/2014 | 237 | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J. re 233 Letter. (Attachments: # 1 Exhibit A)(HRADIL, JENNIFER) (Entered: 09/16/2014) |
| 09/26/2014 | 238 | MOTION to Seal by FEDERAL TRADE COMMISSION. (Attachments: # 1 Brief, # 2 Declaration, # 3 Exhibit Redacted Letter from Kevin Moriarty, # 4 Exhibit Exhibits 1-8, # 5 Text of Proposed Order)(MCCARRON, KATHERINE) (Entered: 09/26/2014) |
| 09/26/2014 | 239 | Letter from Kevin H. Moriarty. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8) (MCCARRON, KATHERINE) (Entered: 09/26/2014) |
| 09/28/2014 | | Set Deadlines as to 238 MOTION to Seal . Motion set for 10/20/2014 before Judge Esther Salas. The motion will be decided on the papers. No appearances required unless notified by the court. (jd, ) (Entered: 09/28/2014) |
| 09/30/2014 | 240 | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J. re 236 Letter. (HRADIL, JENNIFER) (Entered: 09/30/2014) |
| 10/01/2014 | 241 | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J. (HRADIL, JENNIFER) (Entered: 10/01/2014) |
| 10/02/2014 | 242 | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J.. (Attachments: # 1 Exhibit A)(HRADIL, JENNIFER) (Entered: 10/02/2014) |
| 10/02/2014 | 243 | Letter from Jennifer A. Hradil, Esq. to the Honorable Joseph A. Dickson, U.S.M.J. (Attachments: # 1 Proposed Agenda)(HRADIL, JENNIFER) (Entered: 10/02/2014) |

# CERTIFICATE OF SERVICE

I, Eugene F. Assaf, P.C., hereby certify that on October 6, 2014, I caused four (4) copies of the Joint Appendix, Volume 2, to be dispatched by Federal Express Overnight delivery to the Clerk of the Court for the United States Court of Appeals for the Third Circuit, and filed an electronic copy of the appendix via CM/ECF.  I also caused a copy of the appendix to be served electronically on the following counsel for Appellee:

Joel R. Marcus-Kurn, Esq. (*jmarcuskurn@ftc.gov*)
David C. Shonka, Esq. (*dshonka@ftc.gov*)
David L. Sieradzki, Esq. (*dsieradzki@ftc.gov*)
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Mail Stop H-584
Washington, DC   20580


October 6, 2014                    /s/ *Eugene F. Assaf*
                                   Eugene F. Assaf, P.C.
                                   *Counsel for Appellant*